**E-FILED**
Friday, 09 September, 2011  10:10:33 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION**

Daniel J. Schlicksup,               )
                                    )
    Plaintiff,              )
                                    )
        v.                  )      No.  09-CV-1208
                                    )
Caterpillar, Inc., et al.,          )
                                    )
    Defendants.             )

## <u>ORDER</u>

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

On May 24, 2011, this Court entered an order deferring a ruling on Defendant Caterpillar, Inc.'s motions to quash the subpoenas directed to Howrey, LLP, Ernst and Young, LLP, and PricewaterhouseCoopers, LLP. Caterpillar subsequently filed privilege logs and the documents it seeks to withhold for an *in camera* review.  On July 13, 2011, this Court ruled on Caterpillar's motion to quash the subpoena to Howrey, LLP.   On August 19, 2011, the Court ruled on Caterpillar's motion to quash the subpoena to Ernst and Young, LLP.  Now before the Court is Caterpillar's motion to quash the subpoena to PricewaterhouseCoopers, LLP ("PwC").
For the reasons below, the motion will be granted in part and denied in part.

## Background

As Plaintiff's claims relate to the subpoena to PwC, Plaintiff alleges that he reported what he believed to be a scheme by Caterpillar, Inc., ("Caterpillar") to improperly avoid over $2 billion in U.S. income tax, purportedly accomplished by shifting U.S. profits to offshore shell companies in Switzerland.  (Complaint ¶ 3; d/e 35, Schlicksup Aff. ¶¶ 39-41).  This plan has been referred to as the "Swiss Tax Structure," the "Global Value Enhancement Program" and the "Supply Chain Transactions."  Plaintiff further alleges that the Switzerland profits were returned to the U.S. by way of a "Bermuda Tax Structure," also known as the "Luxembourg Structure" or the "Financing Center Transaction."  Plaintiff alleges that he was retaliated against for essentially blowing the whistle on these transactions.

Caterpillar counters that these projects were legitimate business transactions which were disclosed on its tax returns.  According to Caterpillar, the supply chain project was a "corporate restructuring of Caterpillar's international supply chains . . . in 2000 through 2004" in order to "streamlin[e] the acquisition of parts from our unrelated suppliers and present[] a single face to the dealer customers."   (d/e 69, p. 69; Beran Aff.

¶ 5).  The purpose of the financing center transaction, according to

Caterpillar, was to efficiently finance foreign affiliates and foreign

acquisitions, and to minimize taxes.

Plaintiff's subpoena to PwC seeks:

•Documents used to "market" the Global Value Enhancement program to Caterpillar or to Defendant Beran (Caterpillar's Tax Director and Assistant Treasurer)

•Invoices sent to the Caterpillar Tax Department in Peoria, Illinois for years 1999-2008 relating to the Global Value Enhancement program

• "Any and all memos written to provide supporting opinions for the . . . Global Value Enhancement tax structure and/or the Luxembourg/Bermuda tax structure."

•Documents "related to the audit of the tax provision on the Caterpillar Inc. financial statements for 1999 through 2010."

•Documents "related to the audit of the tax reserves on the Caterpillar Inc. financial statements for 1999 through 2010."

•Documents relating to the classification of PwC's fees charged to Caterpillar, as submitted by Sharad Jain (PwC audit partner) to PwC's national office[1]

• Correspondence with Defendant Beran and/or Burritt (Caterpillar's Chief Financial Officer) from 1999-2010

(d/e 69-1, pp. 5-6).

---

[1]Plaintiff alleged in his OSHA complaint that he informed Defendants Burritt and Beran that PwC's fees were being improperly classified in the proxy statement as "non-audit" fees.  (d/e pp. 12-13).  Plaintiff alleges that material information was omitted in Jain's factual summary to the national office regarding the classification of the fees.

Caterpillar moved to quash the subpoena, but this Court reserved a ruling because the documents had not been submitted for an *in camera* review with a detailed privilege log.  Caterpillar has since complied with that directive and this Court has conducted an *in camera* review of each PwC document.

## Applicable Law

Caterpillar's privilege log asserts primarily the work-product doctrine and at times the "attorney-client communication" and/or the "tax advisor communication" privilege.  As discussed in the Court's prior order, Caterpillar did not assert a "tax advisor" privilege in its motion to quash and has not briefed the issue.  Accordingly, the Court addresses only the attorney-client privilege and work-product doctrine.  The legal standard set forth below was already set forth in the Court's prior order, but its repetition provides helpful context for the analysis here.

The attorney-client privilege protects communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice.  <u>Sandra T.E. v. South Berwyn School Dist. 100</u>, 600 F.3d 612, 618 (7th Cir. 2010).  Statements from the attorney to the client are also protected "'where those

communications rest on confidential information obtained from the client, or

where those communications would reveal the substance of a confidential

communication by the client.'" Miyano Machinery USA, Inc. v. MiyanoHitec

Machinery, Inc., 257 F.R.D. 456, 460 (N.D. Ill. 2008)(quoted cite omitted).

The party asserting the privilege has the burden of demonstrating that it

applies.  Valero Energy Corp. v. U.S., 569 F.3d 626, 630 (7th Cir. 2009).

The attorney-client privilege "is in derogation of the search for the truth and

therefore, must be strictly confined."  In re Grand Jury Proceedings, 220

F.3d 568, 571 (7th Cir. 2000).  The analysis is "highly fact specific,"

requiring a "document-by-document" review and a consideration of the

"'totality of the circumstances.'"  Id. at 571, 572 (quoted cite omitted).

Confidential communications by non-lawyers such as PwC for the

purpose of assisting the lawyers to provide legal advice are also protected

by the attorney-client privilege.  See U.S. v. Kovel, 296 F.2d 918, 922

(2d Cir. 1961)(accountant's assistance was protected by the attorney-client

privilege where it enabled "effective consultation between the client and the

lawyer").  "'[W]hat is vital to the privilege is that the communication be

made *in confidence* for the purpose of obtaining *legal* advice *from the

lawyer*. If what is sought is not legal advice but only accounting service ...

or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.' " In re Grand Jury Proceedings, 220 F.3d at 571, *quoting* U.S. v. Brown, 478 F.2d 1038, 1040 (7th Cir.1973), *quoting* U.S. v. Kovel, 296 F.2d 918, 922 (2d Cir.1961))(emphasis in Kovel).  Thus, the attorney-client privilege applies if a consultant's communications were "'necessary, or at least highly useful, for the effective consultation between the client and the lawyer.'" Heriot v. Byrne, 257 F.R.D. 645, 667 (N.D. Ill. 2009) (referring to accountant's services), *quoting* Kovel, 296 F.2d at 922; *see also* Lawrence E. Jaffe Pension Plan v. Household Intern., Inc., 244 F.R.D. 412,  (N.D. Ill. 2006)("'the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others, [and] the attorney-client privilege must include all persons who act as the attorney's agents.'")(quoted cited omitted).

The work-product doctrine is separate from the attorney-client privilege, protecting "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . ." Fed. R. Civ. P. 26(b)(3)(A).  "The work-product doctrine protects documents prepared by attorneys in anticipation of litigation for the purpose of analyzing and preparing a client's case."

Sandra T.E., 600 F.3d at 618.  "[W]e look to whether in light of the factual

context 'the document can fairly be said to have been prepared or obtained

*because* of the prospect of litigation.'" Logan v. Commercial Union

Insurance Co., 96 F.3d 971, 976-77 (7th Cir. 1996), *quoting* Binks v. Mfg.

Co. v. National Presto Indus., Inc., 709 F.2d 1109, 1119 (7th Cir.

1983)(emphasis in Binks, *quoting* 8 Wright & Miller, Fed. Practice and

Procedure § 2024).  Documents prepared in the ordinary course of

business addressing matters which present a remote prospect of litigation

are not work-product.  In contrast, documents prepared "'*because* of the

prospect of litigation'" or prepared because "'some articulable claim, *likely*

to lead to litigation' . . . ha[s] arisen" are work-product.  Binks, 709 F.2d at

1120 (emphasis in Binks)(internal quoted cites omitted).  Fed. R. Civ. P.

26(b)(3)(A) also extends work-product protection to materials prepared "by

or for another party."  Thus, "[t]he person preparing the materials may be

any representative of the client, regardless of whether the representative is

acting for the lawyer."  Grochocinski v. Mayer Brown Row & Maw LLP, 251

F.R.D. 316, 321 (N.D. Ill. 2008), *citing* Caremark, Inc. v. Affiliated Computer

Services, Inc., 195 F.R.D. 610, 615 (N.D. Ill. 2000)("[W]hether a document

is protected depends on the motivation behind its preparation, rather than on the person who prepares it.").

## Analysis

## I.      Attorney-Client Privilege

Caterpillar contends that PwC's "Opinion Documents and Informational Documents would necessarily reflect legal analysis and opinion of attorneys from within Caterpillar and from McDermott."  (d/e 69, p. 19).  With the exception of a few documents, the Court's review does not support that conclusion.  By and large, these documents impart tax analysis and tax-saving proposals by PwC to Caterpillar, not legal advice from an attorney.  "The attorney-client privilege protects communications made in confidence by a client and a client's employees to an *attorney*, acting as an attorney, for the purpose of obtaining legal advice."  Sandra T.E., 600 F.3d at 618 (emphasis added); In re Grand Jury Proceedings, 220 F.3d at 571 (7th Cir. 2001)("'[W]hat is vital to the privilege is that the communication be made . . . for the purpose of obtaining *legal* advice *from the lawyer*. . . . [I]f the advice sought is the accountant's rather than the lawyer's, no privilege exists.' ")(quoted cites omitted); *see also* United States of America v. Telephone and Data Systems, Inc., 2002 WL 2023767

* 3 (W.D. Wis. 2002)(not reported in F.Supp.2d)(attorney-client privilege did not apply to Arthur Anderson letter, even though letter was similar to law firm's letter which did enjoy attorney-client privilege protection).  The documents may be protected by the tax advisor privilege set forth in 26 U.S.C. § 7525 in civil matters before the IRS or brought by the U.S., but they are not protected by the attorney-client privilege because they are not communications to or from attorneys.

Caterpillar contends that the attorney-client privilege applies, even though the documents were not communications from lawyers, because MWE could not have provided Caterpillar legal advice without PwC's assistance. Lowell Yoder avers that "McDermott retained tax advisors from PwC to assist McDermott (1) in conducting its legal analysis of the federal tax consequences of the proposed corporate restructuring, (2) determining litigation risks, and (3) assisting in the defense.  Because of PwC's large international presence, PwC assisted McDermott, in part, by gathering facts about the existing international operations and providing information related to implementation issues."  (Yoder Aff. ¶ 11, d/e 69-3).

The documents do not support this conclusion either.  Caterpillar does not adequately explain how these documents helped any lawyers

provide legal advice, determine litigation risks or assist in the defense of any litigation, nor is it evident from the face of the documents.  *Cf.* Lawrence E. Jaffe Pension Plan, 244 F.R.D. 412, 420 (N.D. Ill. 2006) (attorney-client privilege applied where E&Y retained to "conduct complex quantitative analysis and extensive information-gathering that was beyond" in-house counsel's resources and necessary to enable in-house counsel to provide legal advice on pending litigation).  These documents are primarily PwC's own tax analysis and tax-saving business ideas created for Caterpillar, not documents to help an attorney impart legal advice.

Additionally, even if these communications were made by a lawyer, many of them would still not be protected by the attorney-client privilege. Proposals on tax-saving strategies and the creation, analysis and implementation of business ideas to bolster the bottom line are not confidential communications of legal advice.  *See* Burden-Meeks v. Welch, 319 F.3d 897, 899 (7th Cir. 2003)(the attorney-client privilege "extends . . . to communications about legal subjects, and it is hard to see why a business evaluation meets that description."); In re Carl Walsh, 623 F.2d 489, 494 (7th Cir. 1980)("Business or other advice is not privileged, and should be distinguished from professional legal services.").  For example,

the outlines, presentations, and implementation of the supply chain

transactions do not contain legal advice, nor does the presentation and

implementation of the "like kind exchange program."

In short, Caterpillar has not sustained its burden of demonstrating

that the attorney-client privilege shields these documents, save for the

documents identified at the end of this order.

## II.  Work-product Doctrine

### A.  Business and Tax Advice

Caterpillar asserts that it approached the law firm McDermott, Will &

Emery ("MWE") to "discuss a proposed significant corporate restructuring

of CAT's international supply chains (the 'Supply Chain Transactions') for

CAT's products throughout the world."  (Beran Aff. ¶ 5).  Defendant Beran

avers that he:

> believed that it was reasonably foreseeable that CAT would
> only obtain the full benefits of its transactions if it was prepared
> to litigate against the IRS.  Thus, my reason for engaging
> McDermott on this project was to assist CAT and its
> subsidiaries in preparing for reasonably foreseeable litigation
> with the IRS arising from the tax issues associated with any
> complex international corporate restructuring.

(Beran Aff. ¶ 7).

Beran avers that he hired MWE to "provide a legal analysis of the federal tax consequences, advise CAT as to the potential litigation risks . . ., and defend the transaction in IRS administrative proceedings and litigation." (Beran Aff. ¶ 8, d/e 69-2).  Beran "was of the view that those transactions . . . would be closely scrutinized by the IRS and be challenged during IRS audits, and result in litigation, albeit litigation to which CAT would ultimately prevail." (Beran Aff. ¶ 9, d/e 69-2).  Beran avers that he expected litigation because the IRS examines all of Caterpillar's returns pursuant to the Coordinated Examination Program, the transactions significantly reduced tax liability and were disclosed on the return, and that related-party transactions had been the subject of considerable litigation between the IRS and other large corporate taxpayers like CAT." (Beran Aff. ¶ 9, d/e 69-2).  Beran maintains that the prospect of litigation existed because "the major disputed issues in recent IRS examinations of CAT's tax returns have been nearly all 'international.'  In fact, the largest dollar issues presently in dispute with the IRS for CAT's 2000-2004 and 2005-2006 examination cycles involve the U.S. tax treatment of the sales activity of CAT's Swiss operations, albeit ones entirely unrelated to the Plaintiff's action." (Beran Aff. ¶ 10, d/e 69-2).

Lowell Yoder, an MWE partner and head of its international tax group, offers similar averments.  Both Yoder and Beran conclude that the documents "(a) would not have been generated but for the litigation with the IRS that was anticipated . . . , or (b) would not have been generated with all of the content they contained and the subjects they addressed but for the anticipated litigation.  These documents were not prepared in the ordinary course of CAT's business."  (Yoder Aff. ¶ 15, d/e 69-3).  PwC's privilege log asserts repeatedly that documents were "prepared by [PwC] at the request of [MWE] incorporat[ing] legal advice . . . and prepared in anticipation of litigation with the IRS."  The IRS has not challenged the transactions at issue here, but that is not dispositive of whether the documents were prepared in anticipation of litigation.

As the Court concluded in its prior order, Caterpillar's expectation that the transactions would be closely scrutinized by the IRS does not demonstrate that a prospect of litigation existed when the documents were created.  The Court adopts the same reasoning as it did in its prior order:

> The audit of Caterpillar's returns is in the ordinary course of business for Caterpillar—all of its returns are audited.  As the Seventh Circuit stated in In re Special September 1978 Grand Jury (II), 640 F.2d 49, 65 (7th Cir. 1980), which involved an IRS subpoena for MWE's work related to a client's tax filings, "[a]lthough litigation could ultimately have ensued in connection

with the . . . tax filings, a remote prospect of future litigation is not sufficient to invoke the work product doctrine."[2]  *See also* United States of America v. Telephone and Data Systems, Inc., 2002 WL 2023767 * 3-4 (W.D. Wis. 2002)(not reported in F.Supp.2d)(documents purportedly prepared in anticipation of audit pursuant to Coordinated Examination Program were not subject to work-product protection because the possibility of litigation was too remote).

(d/e 114, pp. 10-11).

It is also clear that, even if a prospect of litigation existed, most of these documents were not prepared *because of* that prospect.  They impart tax analysis, planning and advice, focusing on strategies to minimize taxes, analyze tax consequences and comply with tax laws.  The documents on their face do not appear to relate to a tangible prospect of litigation with the IRS, other than the same generalized risk that every business faces.  Other documents do not appear to have any connection whatsoever with a prospect of litigation, such as PwC's presentations, documents outlining or recommending tax-saving strategies, an engagement letter with McDermott, Will & Emery for specific business initiatives, discussions of tax and reporting requirements, discussions on how to save money within the company, business projections, meeting minutes and agendas, letters of

_____

[2]The Seventh Circuit also reasoned that, "[a]t most, the materials were prepared with an eye toward a possible administrative proceeding with the IRS," and concluded that was not enough to warrant work-product protection.  640 F.2d at 65.

understanding with the IRS, discussions of IRS cases (which are of public record), and concerns about billing.  For example, one e-mail addresses concerns about the size of PwC's bill, but the privilege log describes the document as an "Email discussing work product re corporate restructuring prepared with D.Ryder McDermott Will & Emery and in anticipation with the IRS."  (PwC-CAT-6360).   If these kinds of documents are work-product, then nearly all the work PwC performs for clients is work-product.

## B.  Tax Accrual Workpapers

In addition to devising and assisting with tax-saving transactions, PwC serves as Caterpillar's independent financial auditor, reviewing tax returns and financial statements prepared by Caterpillar.  According to Defendant Beran:

> CAT prepares financial statements in accordance with United States generally accepted accounting principles ("US GAAP"). As part of this financial reporting, CAT is required to prepare tax accrual work papers that identify, evaluate, and measure the likely success of its "uncertain tax positions."  In reporting on these "uncertain tax positions,"  CAT's counsel makes judgments about the likelihood that the tax positions will be upheld if challenged by the IRS and the amount of tax benefit CAT will realize through a settlement should the IRS challenge one or more of the tax positions.  The product of assessing "uncertain tax positions" is that CAT makes a provision on its financial statements for a tax reserve, which provides a current reflection of an uncertain potential future tax liability.  These tax accrual workpapers contain CAT's in-house legal counsel's

> beliefs, analysis, opinions, and conclusions regarding its "uncertain tax positions."  These materials are created after obtaining the opinion work product of its outside tax advisors that are engaged to provide guidance and assess the anticipated risks associated with litigating "uncertain tax positions."

(Beran Aff. ¶ 23, d/e 69-2).  As Caterpillar's auditor, PwC keeps copies of the Caterpillar's tax accrual workpapers and creates its own workpapers during its independent review.[3]

Caterpillar argues that the work-product doctrine applies to the "Opinion Documents, Tax Accrual Workpapers, or Information Documents" because they would not have been created but for the prospect of litigation with the IRS.  According to CAT, these papers contain the "mental impressions, conclusions, opinions and legal theories" by MWE, PwC and E&Y.  (d/e 69, p. 16).

Much of the information highlighted for redaction are the reserve numbers themselves, or spreadsheets, or terse statements about changes to reserves, not substantive evaluations of the likelihood of succeeding a tangible and anticipated IRS challenge in court.  While numbers may be

---

[3]Tax accrual workpapers created by PwC as part of its independent auditor duties are not protected from an IRS summons.  *See* <u>U.S. v. Arthur Young & Company</u>, 465 U.S. 805 (1984).

privileged in certain circumstances, U.S. v. Frederick, 182 F.3d 496, 501

(7ᵗʰ Cir. 1999), Caterpillar does not explain why these numbers,

spreadsheets and statements are protected work-product.  The Court

realizes that the reserves are reflections of Caterpillar's assessment of the

strength of its uncertain tax positions, but that alone does not demonstrate

that they were prepared in anticipation of litigation.  Businesses must

assess and plan for litigation risks as part of the ordinary course of their

business and as part of complying with accounting requirements.  While

that planning may be literally "because of the prospect of litigation," the

prospect itself is too generalized and uncertain to warrant work product

protection.

    For example, in Binks Mfg. Co. v. National Presto Indus., Inc.,

709 F.2d 1109 (7ᵗʰ Cir. 1983), a company's in-house counsel investigated

problems with purchased equipment and made recommendations on

negotiations with the seller of that equipment, as well as an evaluation of

the allocation of responsibility for the equipment malfunctions.

Negotiations broke down and litigation ensued.  The Seventh Circuit upheld

the district court's ruling compelling production of the documents,

reasoning that "'[t]he mere contingency that litigation may result is not

determinative. . . . The fact that a defendant anticipates the contingency of litigation resulting from an accident or event does not automatically qualify an 'in house' report as work product .... A more or less routine investigation of a possibly resistable claim is not sufficient to immunize an investigative report developed in the ordinary course of business.'" 709 F.2d at 1119, *quoting with approval* Janicker v. George Washington University, 94 F.R.D. 648, 650 (D.D.C.1982).  This reasoning applies here as well.  The documents here are routine and required business assessments of general risks regarding possible tax liabilities.  As the court stated in its prior order, the possibility of litigation over tax positions is too remote, by itself, to amount to a prospect of litigation for work-product purposes.  In re Special September 1978 Grand Jury (II), 640 F.2d 49, 65 (7th Cir. 1980)("[a]lthough litigation could ultimately have ensued in connection with the . . . tax filings, a remote prospect of future litigation is not sufficient to invoke the work product doctrine."); United States of America v. Telephone and Data Systems, Inc., 2002 WL 2023767 * 3-4 (W.D. Wis. 2002)(not reported in F.Supp.2d) (documents purportedly prepared in anticipation of audit pursuant to Coordinated Examination Program were not subject to work-product protection because the possibility of litigation was too remote).

Further, the cases cited by Caterpillar do not hold that the kind of routine papers they are withholding here are protected by the work-product doctrine.  For example, the Sixth Circuit case of U.S. v. Roxworthy, 457 F.3d 590, 594 (6th Cir. 2006) dealt with "memoranda contain[ing] dense legal analysis . . ., including arguments and counter-arguments."  The Second Circuit case of U.S. v. Adlman, 134 F.3d 1194 (2d Cir. 1998) involved a similarly detailed memorandum, and, in any event, only remanded the case for a redetermination using the proper legal standard. *See also* United States v. Deloitte LLP, 610 F.3d 129 (D.C. Cir. 2009) (remanding for *in camera* review of memorandum created during audit). The California district court case of U.S. v. ChevronTexaco Corp., 241 F.Supp.2d 1065 (N.D. Cal. 2002) involved an in-depth analysis of litigation positions, and the Illinois district court case of Lawrence E. Jaffe Pension Plan v. Household International, Inc., 237 F.R.D. 176, 178 (N.D. Ill. 2006), involved "opinion letters summarizing pending and threatened litigation."

Lastly, the D.C. Circuit case of U.S. v. Deloitte LLP, 610 F.3d 129 (D.C. Cir. 2009), cited by Caterpillar, dealt with a memo summarizing a meeting regarding likely litigation over a corporate transaction.  The Deloitte Court remanded the case, reasoning that the document *might*

contain work-product material even though it was prepared during an independent audit.  This Court agrees with <u>Deloitte</u> that there is no blanket rule denying work-product protection to all documents created or produced during an independent audit.  There are no blanket rules, only general principles; the decision must be made on a document-by-document basis. <u>Deloitte</u> does not support Caterpillar's conclusion that all of its tax accrual workpapers are protected by the work-product doctrine.[4]

The Court found only a few documents in its review that were prepared because of the prospect of litigation.  These few documents appear to have been created in response to a tangible and imminent prospect of litigation in a foreign country.  Plaintiff makes an undeveloped argument that any protection is waived because the documents were disclosed to an independent auditor, citing a California district case, <u>Medinol v. Boston Scientific Corp.</u>, 214 F.R.D. 113 (S.D.N.Y. 2002). (d/e 80, ¶ 15).  However, Plaintiff does not address the D.C. Circuit's conclusion otherwise in <u>U.S. v. Deloitte, LLP</u>, 610 F.3d 129, 136 (D.C. Cir.

---

[4]The cases of  <u>U.S. v. Textron, Inc.</u>, 577 F.3d 21 (1st Cir. 2009) and <u>U.S. v. El Paso</u>, 682 F.2d 530 (5th Cir. 1982)(applying different standard from 7th Circuit), also mentioned by Caterpillar, did deal with tax accrual work papers, but both cases held that the papers did *not* constitute work-product material.  While these cases provide helpful reasoning, in the end it comes down to the content of each document and the factual context in which each document was created.  The application of other cases to this fact-specific inquiry therefore has its limits.

2010), cited by Caterpillar, or Caterpillar's other arguments on this issue.

*See also* Lawrence E. Jaffe Pension Plan, 237 F.R.D. at 183 (disclosure to

independent auditor was not a waiver); Westernbank Puerto Rico v.

Kachkar, 2009 WL 530131 *7-8 (D.Puerto Rico 2009)(unpublished)(stating

that Medinol has been "roundly criticized" and that majority of courts have

found no waiver).  Accordingly the Court finds the argument waived.  In re

Extradition of Jarosz, — F.Supp.2d —, 2011 WL 3205367 *12 (N.D. Ill.

2001)("And, of course, skeletal and perfunctory arguments are waived.").

**IT IS THEREFORE ORDERED THAT:**

1)      Caterpillar's motion to quash the subpoena to

PricewaterhouseCoopers, LLP, is granted in part and denied in part

(d/e 68).  The Court finds that the following documents are protected by the

attorney-client privilege:

> PwC-CAT-1566-1575
> PwC-CAT-1984-1994
> PwC-CAT-2375-2430
> PwC-CAT-3077-3081
> PwC-CAT-3156-3159
> PwC-CAT-4093-4132
> PwC-CAT-4166-4177
> PwC-CAT-4245-4262
> PwC-CAT-4298-4301

The Court further finds that the following documents are protected by the work-product doctrine:

PwC-CAT-5064-5069

2) Except for the documents identified in paragraph (1) above, the motion to quash is denied as to the PwC documents.  By September 23, 2011, Caterpillar is directed to produce to Plaintiff the PwC documents submitted for an *in camera* review, except for those identified in paragraph (1) above.

ENTER:    September 9, 2011

_____*s/ Byron G. Cudmore*_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE