UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| DANIEL J. SCHLICKSUP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 09-1208 |
| v. | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| CATERPILLAR, INC., DAVID B. BURRITT, ALICE | ) | |
| BARBOUR, ROBIN D. BERAN, JAMES B. BUDA, | ) | |
| DOUGLAS R. OBERHELMAN, and EDWARD J. | ) | |
| RAPP, | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED RESPONSE OPPOSING**

**CATERPILLAR'S/RAPP'S MOTION FOR SUMMARY JUDGMENT**

For his memorandum opposing defendant Caterpillar Inc.'s and Ed Rapp's motion for

summary judgment, including the Argument that begins on page 58, *infra*, plaintiff Daniel J.

Schlicksup states:

**INTRODUCTION**

**A.  A simple view of the evidence**

There was a meeting in 2008 that was held in the ballroom on the top level of the Civic

Center on Jefferson Street in Peoria. Attendees were many of the highest-paid people at

Caterpillar. In attendance were managers of the Global Finance division, which was headed by

its Vice President, defendant David Burritt.  The Global Finance division had about 200

employees having Salary Grade (SG) levels of 27 or above, thus necessitating holding a meeting

in such a large ballroom. Of those 200+ managers, 76 were Salary Grade 29 or higher. The Tax

Department was part of the Global Finance division.  In the Tax Department alone, which was

headed by defendant Robin Beran, who was a Salary Grade 34, there were 9 employees who were Salary Grade 29 or higher, including Plaintiff. By way of an apples-to-apples comparison of divisions headed by vice presidents who reported to a Group President, in 2008, the IT Department (headed by its Vice President, John Heller) only had about 6 employees with SG levels of 29 or above, (including Plaintiff after he was transferred), compared to 76 such employees in the Global Finance division.

At the 2008 meeting of finance managers, Gene Fife spoke to the attendees, including Plaintiff. At the time Mr. Fife was the Chair of the Audit Committee of the Board of Directors. Mr. Fife spoke to the group about the importance of integrity and the importance of the Board being able to trust what Board members are told. Group President Ed Rapp also spoke at the meeting about the importance of integrity. Then-CEO Jim Owens closed the three-day meeting, by stating to the gathering of managers that he doesn't understand why other companies have integrity lapses which should have been detected sooner. Mr. Owens said that he couldn't imagine this happening at Caterpillar and that he sleeps well. Mr. Owens said employees should have the highest integrity, always. Significantly, CEO Owens also stated that questions about integrity should be put on the table right away and employees should not be afraid to do that. May 1, 2008, was the date of CEO Owens's closing remarks for the three-day World-Wide Finance Manager Meeting.

After CEO Owens closed the meeting, on May 1, 2008, Plaintiff left the Civic Center and walked a few blocks back to his office in the building housing Caterpillar's World Headquarters. Back at his office, Plaintiff composed and sent an email and an attached Interoffice

Memorandum to then-Group President Doug Oberhelman and to Group President Ed Rapp. The email was computer-time-stamped as being sent at "07:35:59 PM" on May 1, 2008.

In the one-page email dated May 1, 2008, Plaintiff referenced CEO Owens's comments as he closed the 2008 World-Wide Global Finance Managers Meeting. Thereafter, in the first sentence on the first page of the attached Interoffice Memorandum (all referenced hereafter as the "May 1 Memo"), Plaintiff referenced Mr. Oberhelman's remarks, concerning ethics, at previous world-wide finance meetings. The second sentence of the May 1 Memo referenced Messrs. Rapp's and Fife's remarks about ethics during the three-day meeting which had concluded only hours earlier. The third, fourth, fifth, and sixth sentences on the first page of the May 1 Memo repeated CEO Owens's remarks which had been uttered at the end of the meeting that very day.  The second paragraph of the May 1 Memo asserted that there were facts that were important to the addressees, Rapp and Oberhelman, along with the Board and Caterpillar shareholders. The second paragraph also asserted that the memo spoke directly to what they and Mr. Fife and Mr. Owens had said at the world-wide finance manager meetings.

This case may be as simple as taking defendant Rapp at his own word, that he made the decision to transfer Plaintiff out of the Tax Department and the Finance Division on May 1, 2008, once he read the May 1 Memo which Plaintiff sent to him.  The memo on which Rapp based his decision was itself protected activity under the Sarbanes-Oxley Act.  Rapp testified that, before he read the memo, he had no intention to move Plaintiff.  Rapp testified that, had he not read the memo, he doesn't know if he would have moved Plaintiff.  Thus, the issue of causation can be stated as simply as whether Plaintiff's May 1 memo, which itself was protected activity, was a contributing factor in Rapp's decision to move Plaintiff.  The answer to

3

this appears to be easy: without the memo, there would not have been a transfer of Plaintiff out of the Tax Department.  The answer is "yes"; the memo was a contributing factor.

But defendants have asserted some defenses to this simple way of looking at the facts. Defendant Rapp has attempted to mount a defense by assigning adjectives to the May 1 memo, such as his postulation that the memo was "legalistic."  Well, of course it was legalistic; the memo was a legal disclosure protected by a federal law.  That is not a justification for taking action against a whistleblower.

Another purported defense is Rapp's contention that the memo showed that Plaintiff's relationship with his superiors was "dysfunctional," even thought all of what Rapp calls "dysfunctionality" was related to Plaintiff's protected activities and none of it stemmed from matters unrelated thereto.  The simple fact is that some tension can be expected when a whistleblower differs from his superiors on matters concerning disclosures and conduct.  The fact that such tension exists provides no justification to move the whistleblower because then the protected activity amounts to a "contributing factor" for the move, rather than serving as a defense.

Another purported defense is that defendant Rapp says he did not like the "tone" of the memo because it had footnotes and attachments.  However, there is nothing in the Sarbanes-Oxley Act to remove a disclosure from the protection of the Act simply because the recipient does not like the fact that the disclosure is so detailed.  Indeed, after Rapp, Board Member Fife, and CEO Owens, had just hours earlier requested that employees make disclosures, there was nothing wrong with the memo's tone.

Another supposed defense is that Rapp did not read the entire memo, in that he only read the first four pages. Rapp claims he did not read the attachments or details which followed the Executive Summary. However, Rapp understood the attachments were "legalistic". Thus, he knew that claims of illegality were being made. Moreover, even in the first four pages, there was plenty to indicate that the memo was protected activity under the Act. Rapp testified he noticed the footnotes in the May 1 memo. Within the first footnote of the May 1 memo, it said that the correspondence concerned itself with "general accounting practices, tax accounting practices, PwC [PriceWaterhouseCoopers] independence issues, earnings issues, Board reporting issues, structured finance, etc." Forewarned about what the ensuing pages and attachments concerned themselves with, as we shall explain more fully below, Rapp became an ostrich by intentionally not reading the remainder of the memo and thereby closing his eyes to these detailed facts. However, the most telling fact was that Rapp sent the May 1 memo to the Office of Business Practices, which was to review claims of unethical or illegal business practices. Thus, he knew those practices were what the memo discussed, as shown by the evidence in so many ways.

Under the applicable law, as we shall show, it is not possible to divorce the tone, or the footnotes or the attachments or the alleged dysfunctionality of Plaintiff's situation, from the protected nature of the memo itself. Under a "contributing factor" test of causation, the Court should deny summary judgment on the issue of causation.

Any such conclusion would be bolstered by the evidence which includes a "mosaic" of facts in support of each and every element of a cause of action, as explained later in our Argument in each instance.

**B.**     **The "Mosaic" of Facts**

Daniel Schlicksup is currently employed at Caterpillar as a manager in Caterpillar's

Global Information Services ("IT") Division.  In October 1992, Caterpillar hired Schlicksup as a

tax attorney.  At the end of 2004, Caterpillar's then Chief Financial Officer and Vice President of

the Global Finance & Strategic Services Division ("GF&SSD"), Dave Burritt ("Burritt") contacted

Schlicksup and told him that he wanted Schlicksup to take a position in the tax department in

order to strengthen some of the Tax Department's process-related deficiencies and also to

evaluate existing tax structures .

On or around March 1, 2005, Schlicksup transferred to a tax manager position in the

finance division, reporting directly to Burritt regarding certain issues, and also to Robin Beran

("Beran"), Caterpillar's Director of Global Tax and Trade within the GF&SSD.  Beran reported

directly to Burritt.

Schlicksup received a performance review in early March 2006 for the period of March

1, 2005 to February 28, 2006 signed by Beran, Burritt, and Oberhelman.  Schlicksup received a

"2-Notable Performance" rating for this time period.  Schlicksup received a performance review

on February 28, 2007 for the period of March 1, 2006 to February 28, 2007.  Schlicksup received

a "2-Notable Performance" rating for this time period.

During 2006, Schlicksup raised concerns to Burritt regarding how approximately $2M in

fees paid to PricewaterhouseCoopers ("PWC") were characterized on Caterpillar's proxy

statement as "audit related" fees as opposed to "audit" fees.

In December 2006, Schlicksup was asked to participate in a coalition of companies

regarding the codification of the Judicial Doctrine of Economic Substance.  Due to his

participation in this coalition, Schlicksup informed himself on the Doctrine of Economic Substance by reading applicable Seventh Circuit caselaw. Schlicksup informed Caterpillar's Internal Tax Counsel, John Caviness, of the caselaw that he had found. Caviness requested that Schlicksup email him with the cases. Accordingly, Schlicksup emailed Caviness and Beran the cases and indicated that the caselaw raised questions as to the legitimacy of Caterpillar's Swiss Tax Structure.

Beran responded to Schlicksup's email stating that it was not a concern because legal entities would be respected by the Internal Revenue Service unless they are artificial. Thereafter, Schlicksup sent an email to both Beran and Caviness again raising the issue of economic substance as it related to the Swiss Tax Structure. Schlicksup did not receive any substantive responses as related to his concerns.

Thereafter, Schlicksup raised his concerns to Burritt, at which time he referenced Sarbanes-Oxley. On June 22, 2007, Caterpillar internal documents indicate that an entry was made on behalf of Beran requesting that Schlicksup be transferred from the Tax Division.

In August 2007, Schlicksup had a meeting with Caterpillar Securities Counsel, Ms. Kuper, and its General Counsel, James Buda, so as to discuss the shifting of profits to Switzerland in order to avoid United States income tax. At this meeting, Schlicksup was informed that nothing further would be done to address the issues that he was raising. In early September 2007, Schlicksup was in discussions regarding the Swiss Tax Structure with Ms. Snowden, the Director of the Office of Business Practices. He prepared a complaint for her regarding all of the issues related to the Swiss Tax Structure that he had previously raised in his prior discussions with Beran, Caviness, Burritt, Kuper, and Buda.

Also, in or about August 2007, Schlicksup's Global Tax Strategy Manager position and other director and manager positions in the tax department were reviewed by Caterpillar's compensation and benefits department to determine appropriate salary grades for those positions.  Schlicksup's Global Tax Strategy Manager position was then down-graded to be an SG 29, making Schlicksup the only employee in the Tax Department to receive a salary downgrade.  A special agreement was approved by Defendants Beran, Burritt and Oberhelman to continue to administer Schlicksup's pay and benefit eligibility at the SG 30 level for a period of two years.

On September 7, 2007, Beran informed Schlicksup that he had been downgraded from a salary grade 30 to a salary grade 29.  Schlicksup is the only employee in the tax department to ever receive a salary downgrade.  All other senior managers in the Tax Department received promotions conterminously.

On or about September 11, 2007, Schlicksup sent an email to Buda, Kuper, and Snowden relating his concerns about Caterpillar's tax avoidance of over $1,000,000,000 and related financial statement fraud.  Schlicksup further noted in the September 11, 2007 email that he had previously raised this concern to both Beran and "Corporate accounting" in January 2007.

On October 12, 2007, Schlicksup had a meeting with Beran wherein Schlicksup was told that his downgrade would mean less equity compensation, less short-term bonus percentage, less in future raises.  Furthermore, Schlicksup was informed that his job may be terminated in the future.

In October 2007, Schlicksup discussed the merits of his complaint with Snowden, as well as whether there is any appeal process for an employee who feels that the issues raised were

not handled properly.  Schlicksup was informed that there was no appeal process.  However, a lack of an appeals process is contrary to both company practice and the intent of Sarbanes Oxley.

On or about February 15, 2008, Schlicksup prepared a draft performance review for himself for the period of March 1, 2007 through February 29, 2008.  It is accepted practice for direct reports to have discussions with their supervisors regarding the contents of a performance review.  As such, between February 15, 2008 and April 17, 2008, Beran and Schlicksup exchanged approximately five (5) drafts of the performance review, as well as numerous hand-marked versions of those drafts and email communications related thereto. On April 18, 2008, Alice Barbour and Robin Beran presented Schlicksup with a final performance review signed by Beran.  Schlicksup was assigned an overall performance rating of "2-Notable Performance".

When Barbour and Beran presented Schlicksup with his finished performance review, she explained to Schlicksup that "he did not need to have to sign the document, that the employee signature was acknowledgment that the review had been given and that he had the option to provide comments".  Company policy permits employees to elect not to sign a performance review due to disagreement over the contents of the performance review. Schlicksup elected not to sign the review, instead opting to submit employee comments separately.

During this time, Beran and Schlicksup had a discussion regarding the performance review, wherein Schlicksup asked Beran for supporting facts to justify comments made in the review.  In response to Schlicksup's request, Beran made some amendments to statements that

9

he had previously placed in the review.  Beran admitted to Schlicksup that at least some of the

comments in Schlicksup's 2007 performance review were not Beran's comments.  Beran further

explained to Schlicksup that the comments were from both the Legal Department and

Corporate Human Resources.

On February 25, 2008, Schlicksup had a meeting with Beran wherein Beran explained to

Schlicksup that Schlicksup's reporting activities were causing difficulty for his superiors.

Schlicksup challenged Beran to explain how the Swiss Tax Structure met the Judicial Doctrine of

Economic Substance.  Beran did not meet Schlicksup's request.

Defendant Rapp is a Caterpillar Group President and has responsibility for multiple

Caterpillar internal divisions, including, at all relevant times to this litigation, Caterpillar's

"Financial Products, Building Construction Products, Legal Services, Global Finance & Strategic

Services, and Global Information Services".  On or about May 1, 2008, Rapp received from,

Schlicksup, an email containing a subject line that read "Ethics issues important to you, the

Board and Cat Shareholders," and an attached memorandum.  It was proper for Schlicksup to

send Rapp a memorandum detailing potential ethical violations because Rapp was someone

who at the time of Schlicksup's email had the authority to deal with the matters set forth

therein.  The issues outlined in Schlicksup's memorandum were of an "OBP type nature," and

further, the Office of Business Practices ("OBP") was within Rapp's reporting structure at the

time he received Schlicksup's email.

Company policy requires that ethical violations be raised without fear of reprisal.  Not

coincidentally, from April 28, 2008 through May 1, 2008, the three days leading up to the day

on which Schlicksup sent Rapp the email and memorandum, Caterpillar had a three-day Global

10

Senior Finance Managers Conference in Peoria wherein Rapp, Fife, and Owens spoke to all of the finance managers, including Schlicksup, regarding how serious they were about reporting ethics violations, or even what appeared to be potential ethics violations because Caterpillar's reputation was of the utmost importance.  Within hours of the conclusion of the conference, Schlicksup sent Rapp and Oberhelman the May 1, 2008 email and memorandum.

After Rapp received the email and read the "Executive Summary" of the memorandum in the attached file, he contacted Nancy Snowden, the head of Caterpillar's Office of Business Practices, and routed the materials attached to the email to her.  The Office of Business Practices ("OBP") reviews complaints of unethical or illegal practices at Caterpillar.  Rapp told Snowden that the materials should be "run through the normal OBP process".  Interestingly, having read Schlicksup's email and Executive Summary, Rapp knew that Schlicksup had previously filed an ethics complaint regarding the issues raised in the memorandum, and further, that Schlicksup had been informed that there was no appeals process for issues that were handled improperly.  Thus, Rapp sent Schlicksup's memorandum to the OBP, the very office that Schlicksup felt had failed to properly handle the situation the first time.

Rapp's alleged determination of the dysfunctionality of the relationship between Schlicksup, and Beran and Burritt is in stark contrast to the facts.  Prior to receiving this email on or about May 1, Rapp had not heard any complaints raised about Schlicksup.  Rapp had reviewed and signed Plaintiff's performance review only a few days earlier, which did not suggest dysfunctionality.  General Counsel Buda said that there had been only some "difficulty" over a performance review but specifically disagreed that there were any problems or dysfunction when he testified, and Beran described Schlicksup's performance review as "in the

11

range," not materially different, and "pretty much the same" rating as his peers.  In response to questioning about Schlicksup's "2-Notable Performance" rating, Beran volunteered that "[t]wo is a good rating.  [Beran's] gotten 2's most of [his] career".  Even after Rapp received Schlicksup's email and memorandum, for several months Schlicksup continued to perform in the same capacity, within the Tax Department, that he had prior to sending Rapp the memorandum.  He managed the same projects, corresponded with his superiors frequently, as he did before Rapp had received the email and memorandum, and Schlicksup was called on to collaborate with Beran on projects.  Beran still had Schlicksup chairing the Tax Council meetings on his behalf, as well as helping prepare reports for the Board of Directors.

Later, Beran kept in contact with Schlicksup even after his transfer to IT.  Beran emailed Schlicksup through April, 2009.  In a September 12, 2008 email to Schlicksup, Beran thanked Schlicksup for the work he had done, and asked Schlicksup if he could buy him lunch sometime.

As late as January 2008, there were no indications of any dysfunction in Schlicksup's role in the tax department, and there were no indications that Schlicksup was going to be leaving the tax department.  As of April 22, 2008, Rapp had no intentions of moving Schlicksup.  From May 1, 2008, until August 2008, nobody had ever contacted Heller, the Vice President of Global Information Systems (IT), about providing Schlicksup a position within his organization.

Schlicksup's profile indicated that he could be in the tax department for another ten years.  Schlicksup was thought to be "the second highest tax individual at Caterpillar".  Barbour could not recall ever hearing anybody at Caterpillar saying anything about transferring Schlicksup prior to the time at which he sent Oberhelman and Rapp the May 1, 2008 email and memorandum.  Barbour was involved in the annual process of assigning Schlicksup a succession

planning rating while he was in the tax department.  This process included Barbour, Dave Burritt, the vice president of the finance division, Burritt's direct reports, and Pat Murphy. Barbour never heard anybody say that Schlicksup should be transferred out of the department at any meetings during which the succession planning process was being conducted.

Moreover, Beran could not recall Al Hagen, the Domestic Tax Manager and one of Schlicksup's colleagues in the Tax Department, ever making negative comments about Schlicksup.  Snowden always observed Schlicksup acting with integrity and professionally insofar as it related to his allegations of wrongdoing at Caterpillar.  Giles Parsons, another one of Schlicksup's colleagues in the Tax Department, never had any complaints about Schlicksup while working with him in the tax department, and he was surprised when Schlicksup was transferred to the IT department because he was not aware of any pending transfer, and he had never observed Schlicksup act unreasonably.

Parsons never heard Beran talk negatively about Schlicksup.  Pierpont had no problems with Schlicksup as it pertained to their professional relationship in the tax department.  Perkins has no idea why Schlicksup was transferred to IT.  Copeland didn't think Schlicksup was difficult to get along with.  Copeland did not think Schlicksup had any shortcomings, nor did Pierpont indicate to Copeland any perceived shortcomings, on the part of Schlicksup.  During the time that Barbour worked with Beran on Schlicksup's performance review, her supervisor was Barb Hodel.  Hodel never gave Barbour negative feedback about Schlicksup, and further, Barbour could not recall Hodel ever saying that Schlicksup was difficult to work with.

Further indicating a lack of dysfunction, several members of the Tax Department emailed Schlicksup with statements of support as they learned he had been transferred to the

IT division.  The following is a sampling of some, but far from all, of the comments:  "Dear Dan.

You will be one of my best recollection(s) during my long career with this company.  YES, my

best recollection," "WOW!!  Comes as a bit of a shock.  Thanks for all you did while in tax," "I

am sorry you are leaving tax-you will be missed," "You have always been honest and reliable

and that is refreshing," and "WHY???".

Rapp says that he believed that the tone of the May 1, 2008 memorandum was

"legalistic" and that Plaintiff was "building a file".  One such reference that Rapp is referring to

is footnote one of the Executive Summary, wherein Schlicksup lists some of the ethics issues

raised later in the memorandum: to wit, "general accounting practices, tax accounting

practices, PwC independence issues, earnings issues, Board reporting issues, structured finance,

etc".  Second, Rapp believed that the comments indicating that Schlicksup would be "toast" if

he were to report ethical violations evidenced support for the belief that dysfunction existed.

Rapp claims to have determined that the relationship between Schlicksup, and Beran

and Burritt was dysfunctional based solely on his reading of the May 1 email and the first three

(3) pages of the attachment to the email (the "Executive Summary" prepared by Schlicksup).  As

a result, Rapp did not consider transferring Burritt or Beran—only Schlicksup.

Schlicksup's position in the tax department in May 2008, was within Rapp's reporting

structure.  After a meeting with Caterpillar's General Counsel, James Buda, and Caterpillar's

Human Services (HR) Division Vice President, Sid Banwart, Rapp testified that he made the

decision to seek an alternative position for Schlicksup outside of the tax department.

Rapp claims to have made the decision to seek an alternative position for Schlicksup on

his own.  However, such a decision is in contrast to company "practice" requiring the whole

Executive Office to sign off on transfers of people at SG 30 and above.  Accordingly, Rapp

presented the proposed transfer of Schlicksup at a "roundtable" meeting.  Everyone present at

that meeting approved Schlicksup's transfer to the IT department.  Roundtable meetings

include the Group Presidents and the CEO.  Furthermore, Caterpillar's former CEO, Jim Owens,

was at the meeting.  Moreover, the OSHA investigator, Ms. Howe, was told that Buda was

responsible for Schlicksup's transfer.  Burritt testified that he believed Doug Oberhelman, Ed

Rapp, <u>and</u> Jim Buda made the decision to transfer Schlicksup.

Rapp first directed Banwart to determine what other job opportunities existed for

Schlicksup outside the tax department.  After Banwart reported that he had not identified any

positions, Rapp began to search for opportunities for Schlicksup within his (Rapp's) "span of

control". However, the IT department is the only division that Buda knows to have been

considered as a possible destination for Schlicksup, even though "[t]he finance department is a

huge department[, and] [t]here are infinite number of things [Schlicksup] can do in the finance

department.   In August 2008, Rapp spoke to John Heller, Caterpillar's Vice President over the

information systems (or IT) area, about opportunities within Heller's organization.

Heller found such a position, and Schlicksup moved to the position offered to him by

Heller in the IT area in October 2008.  This new position was severely lacking in career

opportunities for Schlicksup.  As Rod Perkins, Schlicksup's colleague in the Tax Department

explained, he would never have asked to be placed in the IT Department because "[i]t was not

an area that could take advantage of the skills [he] could offer".  When Schlicksup was offered

the position in Heller's department, Schlicksup asked what would happen if he refused to take

the job.  Before Heller could respond, Barbour informed Schlicksup that he had no other

15

options and that the company had the right to terminate him.  Typically, representatives from Human Resources, like Barbour, are only present when there is a negative personnel action or discipline.  Furthermore, Schlicksup was requested to sign a "Confidential Release and Settlement Agreement" as part of his transfer to the IT Department.

Schlicksup was transferred to his current position in IT (or "GIS") effective October 1, 2008.  If Schlicksup had not complained to Rapp in the form of the email, Rapp does not know if he would have taken any action to transfer Schlicksup.  Further, if it were not for Schlicksup's May 1, 2008 email to Rapp, Rapp would never have asked whether Schlicksup's job was necessary.

There were other candidates for the IT position offered to Schlicksup within the IT Division, and further, those candidates had deeper technological expertise than Schlicksup. Furthermore, several people with deeper IT expertise, had previously been given essentially the same IT position as Schlicksup.  None of them had been able to accomplish the job tasks to any reasonable degree of success because there was a problem of consensus amongst different groups within the IT department, wherein different groups reported to different people with differing opinions as to how to accomplish Schlicksup's job tasks.

Heller told the OSHA investigator that Wes Blumenshine had told him that it was important to find Schlicksup a job where he had no "baggage".  Heller further explained that he is frequently asked to take "troubled" employees and help them change their "paths".  In his deposition, Heller testified that he is asked "because of [his] management and leadership style, to help place individuals that [Caterpillar management] believe still have significant

16

contributions to make to the enterprise, and to get them into a role and create an environment for them to be successful.

Michael Samp, a former IT Department manager, only knew of one person, Pete Riley, from the IT department that did not have an IT background.  However, Pete Riley "never actually moved to IT".  Riley was in corporate accounting and finance but assigned to the IT organization--he had no IT responsibilities, only accounting tasks.  Perkins had never seen a person at Schlicksup's Salary Grade transfer to IT before.  Parsons does not recall anyone, other than Schlicksup, ever moving from the Tax department to the IT department.  Parsons does not believe that, aside from one person, there is anyone in the tax department at the level of Salary Grade 29 or above who has come to the department from any other area of the company.  Similarly, Stiles knows of nobody who has ever come in to the Tax department from the IT department at a Salary Grade 29 or above.

As we shall show, Plaintiff can present a prima facie case, based on all of the facts, including Rapp's admitted reactions to the first four pages of the May 1 memo, as those pages and Rapp's reactions thereto prove all of the elements of a claim under the Sarbanes-Oxley Act (SOX), codified in pertinent part at 18 U.S.C. §1514A.  A claim can be shown against Defendant Caterpillar as well, for the reasons applicable to Rapp and to all the other defendants too.  The arguments made in Plaintiff's responses to motions filed by Defendants other than Caterpillar and Rapp are adopted by this reference.

## UNDISPUTED MATERIAL FACTS

The following facts are conceded to be undisputed and material:  ¶¶1-2; ¶¶4-9; ¶11; ¶13; ¶21; ¶27; ¶¶28-30; ¶¶32-33; ¶¶36-37; ¶39; ¶¶41-42; ¶¶44-45; ¶47; and ¶51.

## DISPUTED MATERIAL FACTS

¶3.      Between 2004 and June 2010, Burritt served as Caterpillar's Chief Financial Officer and Vice President of the Global Finance and Strategic Services Division ("GF&SSD") (Burritt Dep. 207; Barbour Dec. ¶ 3). **Plaintiff argues that Burritt started in his position in 2004, not 2005 as Defendants stated.**

¶12.      Caterpillar employs a Performance Management Process ("PMP") to assign a performance rating to each employee on a scale of 1 to 5, with 1 being the highest (Barbour Dec., ¶ 12). **Plaintiff disputes that it is a five point scale, and instead states that it is a 7 point scale with a "3A," "3B," and "3C" (Schlicksup Dec., 12, ¶40).**

¶18.      In the December 13 e-mail to Burritt, Schlicksup further stated "I would see the duration of this job being around two years." (Schlicksup Dep. I, 236; Ex. 23). Schlicksup further noted his concerns that his supervisor in the new position, Defendant Beran, would not appreciate his role and be a barrier. Specifically, Schlicksup wrote:

> "Robin does not value organization, processes, communication, etc. the way that you and I do. He also does not value these skills or maybe even people with these skills. **Robin has said to many people many times that he would rather be doing tax deals than administrating**. He values people who want to do technical tax work in the manner that he does. This is a potential barrier to your vision, and since I will report to Robin, this dynamic creates an inherent bias on Robin's part against my skills, competancies [sic] and abilities that are the very reason you have asked me to take this role. **I believe that this can only work with your ongoing influence and if we have regular direct communication. Also, we talked about this position threatening many others in tax**."

18

(Schlicksup Dep. I 238; Ex. 23, p. 2).  **Schlicksup was given the position in the Tax Department, and reported to Beran, despite the comments stated *supra*.  This was not considered dysfunctional.**

¶19.	On or around March 1, 2005, Schlicksup transferred to a tax manager position in the finance division, reporting directly to Beran, who reported directly to Burritt (Barbour Dec., ¶ 8).  **Plaintiff disputes that while this was the general reporting structure for Schlicksup, it is also true that Burritt wanted Schlicksup to work directly with Burritt on some issues; indeed, Schlicksup would sometimes bypass Beran altogether at the request of Burritt**.  (Beran Dep., 125).  **Owens questioned the legitimacy of Beran's tax structures; thus, Burritt assigned Schlicksup to the Tax Department in order to evaluate the risk associated with Beran's tax structures (Schlicksup Dec., 4, ¶7).**  During 2005, Schlicksup raised concerns to Burritt and the Office of Business Practices related to the manner in which the financial performance of Caterpillar's external logistics business was being reported within Caterpillar and to investors (Schlicksup Dep. III, 99-101; Ex. 27).

¶20.	Schlicksup received a performance review in early March 2006 for the period of March 1, 2005 to February 28, 2006 signed by Beran, Burritt, and Oberhelman (Schlicksup Dep. I, 166-67; Ex. 18).  Schlicksup received a "2-Notable Performance" rating for this time period (Schlicksup Dep. II, 166; Ex. 18).  Schlicksup received this review after having raised the issues regarding the logistics business's financial reporting to Burritt (Schlicksup Dep. I, 167).  Schlicksup signed the performance review and **believes that while some comments demonstrated a**

**displeasure with reporting potential ethical violations**, the review fairly assessed

his performance in his Global Tax Strategy Manager position for the time period at

issue (Schlicksup Dep. I, 167-68; Ex. 18). **Schlicksup only disputed this fact as to**

**completeness.**

¶22.    Schlicksup received a performance review on February 28, 2007 for the

period of March 1, 2006 to February 28, 2007.  The review was **signed by Beran.**

**However, while policy and past performance dictated that Burritt and Oberhelman**

**were likely supposed to sign the review, they did not.  Plaintiff explained that this**

**is entirely possible because policies are not always followed at Caterpillar**

(Schlicksup Dep. I, 168; Ex. 19).  Schlicksup received a "2-Notable Performance"

rating for this time period (Schlicksup Dep. I, 169; Ex. 19).  Schlicksup signed the

performance review and believes that the review fairly assessed his performance in

his Global Tax Strategy Manager position for the time period at issue (Schlicksup

Dep. I, 169).  Schlicksup only disputes the completeness of this fact.

¶30    Between February 15, 2008 and April 17, 2008, Beran and Schlicksup

exchanged approximately five (5) drafts of a performance review for Schlicksup for

the March 2007 through February 2008 timeframe, as well as numerous hand-

marked versions of those drafts and email communications related to Schlicksup's

objections to Beran's proposed changes to Schlicksup's drafts (Schlicksup Dep. III, 9-

10; Schlicksup Dep. Exs. 29-42).  On April 18, 2008, Schlicksup was presented with a

final performance review signed by Beran (Schlicksup Dep. II, 81-82; Schlicksup Dep.

Ex. 28).  Schlicksup was assigned an overall performance rating of "2-Notable

Performance" (Schlicksup Dep. II, 96; Ex. 28).  Schlicksup refused to sign the review (Schlicksup Dep. II, 81; Ex. 28).  **However, Schlicksup disputes the connotation created from any statement that he refused to sign the review.  At the time Schlicksup was presented with the performance review, Alice Barbour "explained to Mr. Schlicksup that he did not need to have to sign the document, that the employee signature was acknowledgement that the review had been given and that he had the option to provide comments."  (Barbour Dep., 97).  Schlicksup elected not to sign the review, instead opting to submit employee comments separately (Schlicksup Dep. II, 81; Ex. 28).**

¶31.     As Group President, Defendant Rapp has responsibility for multiple Caterpillar internal divisions, including **Caterpillar's Financial Products, Construction Products, Legal Services, Global Finance & Strategic Services, and Global Information Services**  (Rapp Dep., 19).  **Schlicksup only disputed this paragraph as to completeness.**

¶34.     Rapp determined that the relationship between Schlicksup and Beran and Burritt was "dysfunctional" based on his reading of the May 1, 2008 e-mail from Schlicksup and the three (3) page "Executive Summary" of the attached memorandum created by Schlicksup (Rapp Dep., 44-45; Exs. 4, 7)  Rapp determined that the relationship was dysfunctional based on the tone of Schlicksup's e-mail and the Executive Summary and based on the legalistic structure of the document (with multiple references to attachments) (Rapp Dep. 44, 62, 91, 95).  From the Executive Summary, Rapp also concluded that Schlicksup had refused to sign his performance

evaluation, even though Schlicksup had received a favorable "2" rating (Rapp Dep., 97-100).  Plaintiff disputes that any dysfunction existed, and argues that his relationship was functioning properly.  **Beran described Schlicksup's performance review as "in the range," not materially different, and "pretty much the same" rating as his peers (Beran Dep., 193, 198).  In response to questioning about Schlicksup's "2-Notable Performance" rating, Beran volunteered that "[t]wo is a good rating.  [Beran's] gotten 2's most of [his] career" (Beran Dep., 194).  Even after Rapp received Schlicksup's email and memorandum, Schlicksup continued to perform in the same capacity, within the Tax Department, that he had prior to sending Rapp the memorandum (Schlicksup Dec., 97-99, ¶¶244-245).  He managed the same projects, corresponded with his superiors as frequently as he ever did before, and was called on to collaborate with Beran on projects (Schlicksup Dec., 97-99, ¶¶244-245).  Beran still had Schlicksup chairing the Tax Council meetings on his behalf, as well as helping prepare reports to the Executive Office's weekly roundtable meeting and for the Board of Directors (Schlicksup Dec., 98-99, ¶245).  Beran kept in contact with Schlicksup even after his transfer (Schlicksup Dec., 99, ¶246).  Beran emailed Schlicksup through April, 2009 (Schlicksup Dec., 99, ¶246).  In a September 12, 2008 email to Schlicksup, Beran thanked Schlicksup for the work he had done, and asked Schlicksup if he could buy him lunch sometime (Schlicksup Dec., 100, ¶247).  Rapp, in fact, believed that the tone of the May 1, 2008 memorandum was "legalistic" and that Plaintiff was "building a file" (Rapp Dep., 92).  One such reference that Rapp is referring to is footnote one of the**

**Executive Summary, wherein Schlicksup lists some of the ethics issues raised later in the memorandum: to wit, "general accounting practices, tax accounting practices, PwC independence issues, earnings issues, Board reporting issues, structured finance, etc" (Schlicksup Dec., Ex. M001, p. 4).  Second, Rapp believed that the comments indicating that Schlicksup would be "toast" if he were to report ethical violations evidenced support for the belief that dysfunction existed (Rapp Dep., 44-45).  Additionally, Rapp inexplicably inferred that Schlicksup did not sign his performance evaluation even though that was not conveyed in what Schlicksup wrote, and Rapp had not noticed that when he had previously signed Schlicksup's performance review (Rapp Dep., 98, 191-92).**

¶35.      Rapp determined that the relationship between Schlicksup and Beran and Burritt was dysfunctional based solely on his reading of the May 1 e-mail and the first three (3) pages of the attachment to the e-mail (the "Executive Summary" prepared by Schlicksup) (Rapp Dep., 91-92).  Rapp made no determination whether Schlicksup or Beran or Burritt was responsible for the dysfunction (Rapp Dep., 95).  Rather, Rapp simply determined that he had a dysfunctional situation which he needed to resolve (Rapp Dep., 95).  Schlicksup adopts the arguments raised in Disputed Paragraph 34, *supra*.

¶38.      Rapp did not discuss the contents of the May 1, 2008 e-mail or attached memorandum with Douglas Oberhelman, who was also indicated as an addressee on the cover email (Rapp Dep., 42-43; Ex. 4).  Rapp merely referenced that he had received the email and sent it to the Office of Business Practices (Rapp Dep., 43).

Oberhelman had no supervisory authority over Schlicksup during this time period
(Rapp Dep., 69). **Schlicksup adopts the reasoning in Disputed Material Fact 40,
*infra*.**

¶40.      Rapp made the decision to seek an alternative position for Schlicksup on
his own (Rapp Dep. 48).  Rapp considered the dysfunctional situation involving
Schlicksup to be his issue to manage and to resolve (Rapp Dep. 69-70).  However,
Schlicksup disputes Rapp's claim.  Such a decision **is in contrast to company
"practice" requiring the whole Executive Office to sign off on transfers of people at
SG 30 and above (Rapp Dep., 66).  Rapp presented the proposed transfer of
Schlicksup to the Executive Office at a "roundtable" meeting (Rapp Dep., 66, 147-
48).  Everyone present at that meeting approved Schlicksup's transfer to the IT
department (Rapp Dep., 68).  Roundtable meetings include the Group Presidents
and the CEO (Rapp Dep., 67).  Furthermore, Caterpillar's former CEO, Jim Owens,
was at the meeting (Rapp Dep., 147-48).  Moreover, the OSHA investigator, Ms.
Howe, was told that Buda was responsible for Schlicksup's transfer. (Schlicksup
Dec., Ex. AAW).  This dovetails nicely with Burritt's testimony that he believed
Doug Oberhelman, Ed Rapp, <u>and</u> Jim Buda made the decision to transfer Schlicksup
(Burritt Dep., 118) (Emphasis added).**

¶43.      Schlicksup moved to the position offered to him by Heller in the IT area in
October**,** 2008 (Needham Dec., ¶ 12), not September, 2008 as Defendants suggest.
Rapp understood the position to be comparable in salary grade and pay to
Schlicksup's position in the tax department (Rapp Dep., 133).  From Rapp's

perspective, he did not view any difference between the two positions from an opportunity perspective (Rapp Dep., 57).  **However, this was not a sentiment shared by all, especially Schlicksup.  Perkins, like Schlicksup, understood the limited opportunities in the IT Department and never expressed a desire to go to the IT department because "[i]t was not an area that could take advantage of the skills [he] could offer" (Perkins Dep., 138).**

¶46.	Schlicksup disputes that he does not know who made the decision to transfer him.  Schlicksup **testified that Heller informed him that the legal office told Barbour to offer Schlicksup the position in IT** (Schlicksup Dep. I, 89-90, 113).  **Rapp presented the proposed transfer of Schlicksup at an Executive Office "roundtable" meeting (Rapp Dep., 66, 147-48).  Everyone present at that meeting approved Schlicksup's transfer to the IT department (Rapp Dep., 68).  Roundtable meetings include the Group Presidents and the CEO (Rapp Dep., 67).  Furthermore, Caterpillar's former CEO, Jim Owens, was at the meeting (Rapp Dep., 147-48).  Moreover, the OSHA investigator, Ms. Howe, was told that Buda was responsible for Schlicksup's transfer. (Schlicksup Dec., Ex. AAW).  This dovetails nicely with Burritt's testimony that he believed Doug Oberhelman, Ed Rapp, _and_ Jim Buda made the decision to transfer Schlicksup (Burritt Dep., 118) (Emphasis added).**

¶48.	Due to economic conditions, effective January 1, 2009 (just three months after Schlicksup's 6.5% pay increase), Caterpillar discontinued annual merit increases and lateral move increases until further notice (Needham Dec., ¶ 15; Schlicksup Dep. III, 196).  Schlicksup, therefore, did not receive a merit increase in 2009 or 2010

(Schlicksup Dep. III, 196).  Likewise, Schlicksup is at the top of the pay scale for his

salary grade and, therefore, he has less opportunity for merit increases (Schlicksup

Dep. III, 179).  **Despite all of this, however, Schlicksup testified that:**

> **"there were stock option grants and those stock option grants are influenced heavily by the vice president.  In [his] experience in the past positions [he had] been in, [he] know[s] that those stock option grants were heavily influenced heavily by the VP's and their direct reports, sometimes higher than that.  [He is] confident [he] was not the recipient of that type of thing in '09, '10, or '11"**

**(Schlicksup Dep. III, 196).**

¶49.     Schlicksup has indicated to Caterpillar that he is not willing to relocate for

a job opportunity (Schlicksup Dep. III, 187-88).  **In his deposition testimony,**

**Schlicksup further explained his position and disputes any presumption gleaned**

**from Defendants' statement.  Schlicksup is "trained as a tax professional."**

**(Schlicksup Dep., 188).  There were positions as product managers that Rich Lavin**

**had discussed with Schlicksup; however, they did not suit Schlicksup's strengths or**

**training (*Id*.).  Thus, he declined such offers because they did not represent strong**

**opportunity (*Id*.).**

¶50.     From 2007 through 2010, there was only one promotion in the tax

department (Thompson Rep., 7).  **Plaintiff disputes this.  Thompson did not**

**consider reclassifications promotions during his study, and all Senior Tax Managers**

**have received promotions in the form of salary upgrades since Schlicksup received**

**his salary downgrade (Thompson Dep., 25; Schlicksup Dec., 60-61, ¶161).**

¶52.     Promotional opportunities are limited by an employee's unwillingness to

relocate and by an increased length of time in the same salary grade (Thompson Rep., 9).  **However, Schlicksup disputes this fact because his peers in the Tax Department, namely Hagen, Crook, Vest, Stiles, Perkins, and Parsons, never had to relocate outside of their home countries in order to receive promotions (Schlicksup Dec., 155-156, ¶366).**

### Undisputed Immaterial Facts

Local Rule 7.1(D)(1)(b) states as a rule of caution that "[m]aterial facts are only those facts which bear directly on the legal issue raised by the motion."  The following facts are immaterial because they do not bear directly on the legal issue of causation raised in the motion currently before the court.

¶15.    Effective November 1, 2003, Schlicksup transferred from the corporate human resources division to Caterpillar Logistics Services Inc., a Caterpillar subsidiary (Needham Dec. ¶ 9).  Schlicksup's compensation and benefits continued to be administered at the SG 30 level (*Id*.).

¶17.    At the end of 2004, Burritt contacted Schlicksup and told him that he wanted Schlicksup to take a position in the tax department (Schlicksup Dep. I, 50).  On December 14, 2004, Schlicksup sent an e-mail to Burritt providing an outline of a job and summary job description for a position within the tax department for Schlicksup which they had discussed (Schlicksup Dep. I, 233-34; Ex. 23).  In the e-mail, Schlicksup stated that the "<u>primary</u> objective" of the position is to "research

and benchmark other international companies that have tax functions which are regarded by industry as the best in the business with the objective to develop a strategy for transforming the global tax function consistent with your vision for CSD [Corporate Services Division]" (Schlicksup Dep. I, 234; Ex. 23).  In the e-mail, Schlicksup stated that the "secondary objective" of the position is to "perform business manager functions such as budgeting, reporting and risk assessment." (Schlicksup Dep. I, 235; Ex. 23).  Schlicksup further stated "[t]he purpose of the job is strategic and transformational.  It is not to perform technical tax work or work on tax projects."  (Schlicksup Dep. I, 235-36; Ex. 23).

¶23.	In May of 2007, Schlicksup sought legal advice from Caterpillar related to his sale of Caterpillar stock (Schlicksup Dep. II, 108; Ex. 26).  Specifically, Schlicksup alleges that he sold shares of Caterpillar stock on a Friday and later realized that the number of shares he sold would leave him approximately 3400 shares short of the stock ownership requirements for Schlicksup to receive stock options (Schlicksup Dep. II, 108, 112; Ex. 26, p. 8).  According to Schlicksup, he was advised by Smith Barney (the broker designated by Caterpillar) that he could rescind the sale of 3400 shares of stock through use of an error account (Schlicksup Dep. II, 108-109).  In response to his request for legal advice, Caterpillar attorney Babatunde O. Awodiran sent an e-mail to Schlicksup on May 7, 2007 stating:

> "I believe it's ok to rescind the sale of the 3400 shares, as long as it is done today—the end of the trade window and no gain or profit is recorded in your favor.  Also, you must not have learned of any material non-public information about Caterpillar between last Friday and today.  I will discourage you from buying because the stock price has gone down about 45 cents as we speak and it would appear as if you are trading on inside

information and you could be held liable for short swing profit from sale and purchase within six months, because of the short time span."

(Schlicksup Dep. III, 110; Ex. 44).

¶24.    The consequence of Schlicksup failing to rescind the sale of 3400 shares, or, in the alternative, buy back an additional 3400 shares, would be Schlicksup's ineligibility to receive additional stock options.  (Schlicksup Dep. III, 112-13). Schlicksup's refusal to rescind the sale would result in no negative consequences to Caterpillar (Schlicksup Dep. III, 113).

¶25.    In approximately July 2007, Schlicksup reported to Caterpillar's Office of Business Practices the unlawful tape recording of meetings of the Tax Council at Caterpillar by a third party (Schlicksup Dep. II, Ex. 26, p. 10).

¶26.    Schlicksup did not believe the tape recording of these meetings was a violation of SOX (Schlicksup Dep. III, 118).  Schlicksup does not believe that he was asked to participate in any illegal activity in relation to the tape recording incident (Schlicksup Dep. III, 118-19).

**DIPSUTED IMMATERIAL FACTS**

Local Rule 7.1(D)(1)(b) states as a rule of caution that "[m]aterial facts are only those facts which bear directly on the legal issue raised by the motion."  The following facts are immaterial because they do not bear directly on the legal issue of causation raised in the motion currently before the court.

¶10.        Effective February 1, 1996, Schlicksup transferred from the corporate tax department to a tax manager position in Caterpillar Overseas, S.A., where he first worked in Gosselies, Belgium and later in Geneva, Switzerland (Schlicksup Dep. I, 246; Needham Dec., ¶ 5).  **Plaintiff disputes the effective transfer date identified in Defendants' motion, and believes that in August 2000, he transferred from his overseas assignment back to Peoria as a manager in Caterpillar's corporate human resources division (Schlicksup Dep. I, 259; Needham Dec., ¶ 6).**

¶14.        **In the Fall of 2003, Schlicksup was sent home for a week with pay by his manager, Rich Lavin.  The reason Lavin gave for Schlicksup being sent home was that Schlicksup embarrassed a co-worker in a disagreement.  However, Schlicksup disputes this reasoning as he explained that his colleagues were surprised that he was sent home, that he did not feel that he had done anything to embarrass his co-worker, and further, he explained his belief that Lavin's actions stemmed from a potential budget issue.  After this incident,** Schlicksup was rated "3A" by Lavin on his performance review for the time period January 1, 2003 through October 31, 2003 (Schlicksup Dep. I, 119; Ex. 10).  **As Defendant's assert in their Motion for Summary Judgment**, Schlicksup viewed some of the comments from the performance review under his "Job-Related Characteristics" ratings as "inappropriate" or "unfair."  **However, it is disputed whether "unfair" was a term Schlicksup first chose to use or whether his word selection was the result of suggestion from defense counsel.  Additionally, Schlicksup agreed with defense counsel's term "unsubstantiated" to describe his performance review because**

**Lavin's comments indicated that Schlicksup was "working effectively in the work group," that he was "maintain[ing] proper working relationships with others," that he was "cooperative, tactful, respectful, and respect[ed] the needs and feelings of others," and that he "…listen[ed] effectively."  (Schlicksup Dep. I, 120-125; Ex. 10). However, the numerical ratings Lavin gave did not coincide with his comments regarding Schlicksup—as Schlicksup agreed, the numerical ratings were unsubstantiated**.  For example, Schlicksup viewed the comment that "[i]t is important for Dan to remain open to feedback, particularly from his peers" as inappropriate and unfair (Schlicksup Dep. I 120-125; Ex. 10, p. 3 under "Communications").

¶16.	Schlicksup's performance evaluations for the time period of November 1, 2003 through February 28, 2005, during which he worked in Caterpillar Logistics, reflect a performance rating of "3A" (Schlicksup Dep. II 45-47; Exs. 24 and 25). Schlicksup disputes any negative connotation derived from a performance rating of "3A" insofar as **the commentary next to the "3A" rating states "[e]mployee not only meets all the requirements of the job but also demonstrates a definite upward trend toward even more significant contributions."  (Schlicksup Dep. II 45-47; Exs. 24 and 25).**


## Additional Material Facts

(begins with ¶53)

31

53. Prior to raising tax, financial and other fraud, Schlicksup's performance ratings were outstanding for 17 years, placing him at the top of the company (Schlicksup Dec., p.11-14, ¶¶39-46).  Comments in his performance reviews were even more outstanding using words like outstanding, excellent, exceeded, beyond all expectations, etc. (Schlicksup Dec., p.14-32, ¶¶47-62).

54. After raising tax, financial and other fraud Schlicksup's performance ratings dropped significantly placing him at the bottom of the company (Schlicksup's Dec., p.33-35, ¶¶63-73).  Comments in his performance reviews changed significantly using phrases like needs-to-be-more- collaborative, focus-on-solutions-instead-of-raising-issues, promised- yet-failed, less-than-effective, condescending and/or argumentative, etc. (Schlicksup Dec., p.35-41,  ¶¶74-85).

55. In December 2006, Schlicksup was asked to participate in a coalition of companies regarding the codification of the Judicial Doctrine of Economic Substance. (Schlicksup Dec., p.49, ¶122)  Due to his participation in this coalition, Schlicksup informed himself on the Doctrine of Economic Substance by reading applicable Seventh Circuit caselaw. (Schlicksup Dec., p.49-50, ¶125)

56. Schlicksup then informed Caterpillar's Internal Tax Counsel, John Caviness, of the caselaw that he had found.  (Schlicksup Dec., p.50, ¶127)  Caviness requested that Schlicksup email him with the cases.  (Schlicksup Dec., p.50, ¶128)  Accordingly, Schlicksup emailed Caviness and Beran the cases and indicated that the caselaw raised questions as to the legitimacy of Caterpillar's Swiss Tax Structure. (Schlicksup Dec., p.50, ¶129)

57. Beran responded to Schlicksup's email stating that it was not a concern because legal entities would be respected by the Internal Revenue Service unless they are artificial. (Schlicksup Dec., p.51, ¶130)

58. Thereafter, Schlicksup sent an email to both Beran and Caviness again raising the issue of economic substance as it related to the Swiss Tax Structure.  (Schlicksup Dec., p.51, ¶131)  Schlicksup did not receive any substantive responses as related to his concerns. (Schlicksup Dec., p.51, ¶132-134)

59. Thereafter, Schlicksup raised his concerns to Burritt, at which time he referenced Sarbanes-Oxley. (Schlicksup Dec., p.51, ¶134)

60. On June 22, 2007, Caterpillar internal documents indicate that an entry was made on behalf of Beran requesting that Schlicksup be transferred from the Tax Division. (Schlicksup Dec., p.52, ¶135)

61. In July 2007, Schlicksup was corresponding with Caterpillar Securities Counsel, Ms. Kuper, regarding the issues previously raised with Burritt, Beran, and Caviness. (Schlicksup Dec., p.52, ¶136-137)  Schlicksup was told to discuss his issues with investigators from the Howrey law firm.  During his interview with Howrey officials, they did not have time to discuss the Swiss Tax Structure. Schlicksup later found out from Kuper that Howrey was not interested in discussing the Swiss Tax Structure. (Schlicksup Dec., p.52-53, ¶138-140)

62. Thereafter, Schlicksup requested that Kuper forward a file onto Howrey so that they could review the issues that he had raised as pertaining to the Swiss Tax Structure.

While she said that she forwarded it to Howrey as requested, Schlicksup received no response. (Schlicksup Dec., p.53-54, ¶141-144)

63. In August 2007, Schlicksup had a meeting with Kuper and Buda so as to discuss the issues raised regarding the Swiss Tax Structure and other issues.  (Schlicksup Dec., p.54-56, ¶146-147)  At this meeting, Schlicksup was informed that nothing further would be done to address the issues that he was raising. (Schlicksup Dec., p.54-56, ¶147-150)

64. In early September 2007, Schlicksup was in discussions regarding the Swiss Tax Structure with Snowden, the Director of the Office of Business Practices.  He prepared a complaint for her regarding all of the issues regarding the Swiss Tax Structure that he had previously raised in his prior discussions with Beran, Caviness, Burritt, Kuper, and Buda.  A copy of the complaint was sent to Kuper and Buda. (Schlicksup Dec., p.56-57, ¶151-155)

65. Within three weeks of Schlicksup's email, the investigation into Schlicksup's complaint had been conducted and closed. (Schlicksup Dec., p.58-59, ¶157-160)

66. On September 7, 2007, Beran informed Schlicksup that he had been downgraded from a salary grade 30 to a salary grade 29.  Beran reasoned that he had to downgrade Schlicksup to comply with company policy; however, Beran had previously deviated from company policy to create a job for a tax employee at a salary grade 25 when the position was rated at a salary grade 24. (Schlicksup Dec., p.60-61, ¶161)

67. Schlicksup is the only employee in the tax department to ever receive a salary

    downgrade. (Schlicksup Dec., p.60-61, ¶161)

68. Since Schlicksup's downgrade, all other senior managers in the Tax Department have

    received promotions. (Schlicksup Dec., p.60-61, ¶161)

69. On October 12, 2007, Schlicksup had a meeting with Beran wherein Schlicksup was

    told that his downgrade would mean less equity compensation, less short-term

    bonus percentage, less in future raises.  Furthermore, Schlicksup was informed that

    his job may be terminated in the future. (Schlicksup Dec., p.61-63, ¶162)

70. On October 2007, Schlicksup discussed the merits of his complaint with Snowden, as

    well as whether there is any appeal process for an employee who feels that the

    issues raised were not handled properly.  Schlicksup was informed that there was no

    appeal process (Schlicksup Dec., p.63, ¶163).  Rapp affirmed, in his deposition

    testimony, that he is not aware of any appeals process (Rapp Dep., 61).  However, a

    lack of an appeals process is contrary to both company practice and the intent of

    Sarbanes Oxley (Schlicksup Dec., p.65-66, ¶165).  Rapp then testified, later in his

    deposition, that if an employee is unhappy with the way in which the OBP handled a

    matter, that employee may raise it with a supervisor and if necessary, to upper

    management (Rapp Dep., 152-53).  Rapp said that nothing was improper with the

    way in which Schlicksup sent him the May 1, 2007 email and memorandum (Rapp

    Dep., 153).

71. Rapp believes that the OBP would interview an employee regarding the facts and circumstances surrounding any complaint filed (Rapp Dep., 181).  Schlicksup was never interviewed by the OBP.

72. Rapp was aware of the Swiss Tax Structure based upon presentations Beran had made to him (Rapp Dep., 71-74).  Equipped with this knowledge, Rapp understood that the Swiss Tax Structure lowered Caterpillar's effective tax rate (Rapp Dep., 76).

73. Rapp became a Vice President, while working in Geneva, when the Swiss Tax Structure was implemented, and he testified that he had no change in responsibilities as a result of the tax structure (Rapp Dep., 77).

74. Rapp testified that he has an understanding of purchased-finished replacement parts, and that there is no parts facility in Switzerland (Rapp Dep., 81-82, 119-20).

75. Rapp has a "high level" understanding of how the Swiss Tax Structure operates (Rapp Dep., 124-25).

76. On February 25, 2008, Schlicksup had a meeting with Beran wherein Beran explained to Schlicksup that Schlicksup's reporting activities were causing difficulty for his superiors.  Schlicksup asked Beran to explain how the Swiss Tax Structure met the Judicial Doctrine of Economic Substance.  Beran did not meet Schlicksup's request, but asked for Schlicksup's help to resolve this issue. (Schlicksup Dec., p.67-69, ¶170)

77. It is accepted practice for direct reports to have discussions with their supervisors regarding the contents of a performance review (Barbour Dep., 77).

78. In describing Schlicksup's performance review, Beran testified that it was "in the range," not materially different, and "pretty much the same" rating as his peers (Beran Dep., 193, 198).  In response to questioning about Schlicksup's "2-Notable Performance" rating, Beran volunteered that "[t]wo is a good rating.  [He's] gotten 2's most of [his] career" (Beran Dep., 194).

79. During Beran and Schlicksup's discussion regarding the performance review, Schlicksup asked Beran for supporting facts to justify comments made in the review (Barbour Dep., 122-23).  In response to Schlicksup's request, Beran made some amendments to statements that he had previously placed in the review (Barbour Dep., 123).  Beran admitted to Schlicksup that the comments in Schlicksup's 2007 performance review were not Beran's comments.  Beran further explained to Schlicksup that the comments were from both the Legal Department and Corporate Human Resources. (Schlicksup Dec., p.37, ¶77)

80. When Barbour and Beran presented Schlicksup with his finished performance review, she explained to Schlicksup that "he did not need to have to sign the document, that the employee signature was acknowledgment that the review had been given and that he had the option to provide comments" (Barbour Dep., 97).

81. Company policy permits employees to elect not to sign a performance review due to disagreement over the contents of the performance review (Barbour Dep., 122).

82. Schlicksup elected not to sign the review, instead opting to submit employee comments separately (Schlicksup Dep. II, 81; Ex. 28).

83. Schlicksup's email to Rapp and Oberhelman had a subject line that said "Ethics issues important to you, the Board and Cat Shareholders". (Schlicksup Dec., p.84, ¶210)

84. Rapp and Oberhelman received and opened Schlicksup's email. (Schlicksup Dec., p.83-86, ¶204-216)

85. Rapp thought that Schlicksup was "building a file" of the issues he was raising within Caterpillar (Rapp Dep., 92).

86. Having read Schlicksup's email and Executive Summary, Rapp knew that Schlicksup had previously filed an ethics complaint regarding the issues raised in the memorandum, and further, that Schlicksup had been informed that there was no appeals process for issues that were handled improperly. Thus, Rapp sent Schlicksup's memorandum to the very office that Schlicksup felt had failed to properly handle the situation the first time. (Schlicksup Dec., p.82, ¶202)

87. It was acceptable for Schlicksup to send Rapp a memorandum detailing potential ethical violations because Rapp was someone who at the time of Schlicksup's email had the authority to deal with the matters set forth therein (Rapp Dep., 62-63). Rapp was aware that the issues outlined in Schlicksup's memorandum were of an "OBP type nature," and further, the OBP was within Rapp's reporting structure at the time he received Schlicksup's email (Rapp Dep., 62-63). Interestingly enough, Schlicksup's complaints had already been processed by the OBP, and Schlicksup had been informed that there was no appeals process for complaints handled improperly by the OBP. (Schlicksup Dec., p.80, ¶196c)

88. Caterpillar will not take any action against an employee as a result of raising an ethical issue in good faith (Rapp Dep., 165).

89. Stiles testified that Schlicksup subjectively believes that there are ethical violations occurring at Caterpillar (Stiles Dep., 191).

90. Rapp determined from reading the email and the three-page "Executive Summary" to the attached memorandum that there was a "dysfunctional" situation in the tax department (Rapp Dep., 43-44).  When questioned about what specifically demonstrated that there was a dysfunctional situation, he could only fully articulate two reasons.  First, the references to attachments made the document appear "legalistic" (Rapp Dep., 44-45).  One such reference that Rapp is referring to is footnote one of the Executive Summary, wherein Schlicksup lists some of the ethics issues raised later in the memorandum: to wit, "general accounting practices, tax accounting practices, PwC independence issues, earnings issues, Board reporting issues, structured finance, etc" (Schlicksup Dec., Ex. M001, p. 2).  Second, Rapp believed that the comments indicating that Schlicksup would be "toast" if he were to report ethical violations evidenced support for the belief that dysfunction existed (Rapp Dep., 44-45).

91. Rapp's assessment of dysfunctionality was based solely on the content of the email and "Executive Summary" received from Schlicksup (Rapp Dep., 92).

92. If Schlicksup had not complained to Rapp in the form of the email, Rapp does not know if he would have taken any action to transfer Schlicksup (Rapp Dep., 96).

93. Further, if it were not for Schlicksup's May 1, 2008 email to Rapp, Rapp would never have asked whether Schlicksup's job was necessary (Rapp Dep., 97).

94. Rapp inexplicably inferred from what he read of Schlicksup's email and "Executive Summary" that Schlicksup did not sign his performance evaluation—Schlicksup never informed Rapp that he did not sign the performance evaluation (attached hereto as Rapp Dep., Ex. 21) (Rapp Dep., 98). Moreover, Rapp had signed the performance evaluation in question (Rapp Dep., 191-92). At the time Rapp signed the evaluation, on April 22, 2008, he did not perceive that there existed a dysfunctional relationship (Rapp Dep., 191-92). He further explained that he would have signed the document after identifying that Schlicksup had received a "2-Notable Performance" because that was an indicator of a "good performance review" (Rapp Dep., 192).

95. Rapp had not noticed, when he signed the performance review, that Dan had not signed it (Rapp Dep., 192).

96. From Rapp's perspective, it was best to transfer Schlicksup even though Rapp never considered transferring Burritt or Beran, only Schlicksup (Rapp Dep., 96).

97. In January 2008, there were no indications of any dysfunction in Schlicksup's role in the tax department and there were no indications that Schlicksup was going to be leaving the tax department (Rapp Dep., 84).

98. As of April 22, 2008, Rapp had no intentions of moving Schlicksup (Rapp Dep., 196-97).

99. Even after Rapp received Schlicksup's email and memorandum, Schlicksup continued to perform in the same capacity, within the Tax Department, that he had prior to sending Rapp the memorandum.  He managed the same projects, corresponded with his superiors as frequently as he ever did before, and was called on to collaborate with Beran on projects.  Beran still had Schlicksup chairing the Tax Council meetings on his behalf, as well as helping prepare reports to the Executive Office's weekly roundtable meetings and for the Board of Directors. (Schlicksup Dec., p.97-100, ¶244-246)

100. Burritt believed that even after Schlicksup was transferred out of the tax department, there was still a need for a process-oriented person in the tax department because Beran was incapable of doing that himself (Burritt Dep., 243-44).  Moreover, the Tax Department had been having trouble filling positions (Burritt Dep., 244).

101. Beran kept in contact with Schlicksup even after his transfer.  Beran emailed Schlicksup through April, 2009.  In a September 12, 2008 email to Schlicksup, Beran thanked Schlicksup for the work he had done, and asked Schlicksup if he could buy him lunch sometime. (Schlicksup Dec., p.99-100, ¶246-247)

102. From May 1, 2008, until August 2008, nobody had ever contacted Heller, the Vice President of Global Information Systems (IT), about providing Schlicksup a position within his organization (Heller Dep., 49).

103. Schlicksup's profile indicated that he could be in the tax department for another ten years (Rapp Dep., 84).

104. Schlicksup was thought to be "the second highest tax individual at Caterpillar" (Pierpont Dep., 163).

105. Barbour could not recall ever hearing anybody at Caterpillar saying anything about transferring Schlicksup prior to the time at which he sent Oberhelman and Rapp the May 1, 2008 email and memorandum (Barbour Dep., 219).

106. Barbour was involved in the annual process of assigning Schlicksup a succession planning rating while he was in the tax department (Barbour Dep., 221). This process included Barbour, Dave Burritt, the vice president of the tax department, Burritt's direct reports, and Pat Murphy (Barbour Dep., 221-22). Barbour never heard anybody say that Schlicksup should be transferred out of the department at any meetings during which the succession planning process was being conducted (Barbour Dep., 222).

107. Raising an ethical issue does not demonstrate that an employee is dysfunctional (Rapp Dep., 161). Barbour never observed, nor did she hear of Schlicksup ever doing anything that she felt was in violation of Company Policy (Barbour Dep., 130). Buda did not recall thinking Schlicksup was out of line in light of Caterpillar's Code of Conduct (Buda Dep., 140).

108. "Al Hagen talked badly about everyone" (Parsons Dep., 164). Beran could not recall Al Hagen ever making negative comments about Schlicksup (Beran Dep., 194).

109. Snowden always observed Schlicksup acting with integrity and professionally insofar as it related to his allegations of wrongdoing at Caterpillar (Snowden Dep., 30).

110. Parsons never had any complaints about Schlicksup when Parsons worked with him in the tax department (Parsons Dep., 152).

111. Parsons was surprised when Schlicksup was transferred to the IT department because he was not aware of any pending transfer (Parsons Dep., 157).

112. Parsons never observed Schlicksup act unreasonably (Parsons Dep., 163).

113. Parsons never heard Beran talk negatively about Schlicksup (Parsons Dep., 164). Pierpont had no problems with Schlicksup as it pertained to their professional relationship in the tax department (Pierpont Dep., 161). Perkins has no idea why Schlicksup was transferred to IT (Perkins Dep., 125). Copeland didn't think Schlicksup was difficult to get along with (Copeland Dep., 102-103). Copeland did not think Schlicksup had any shortcomings, nor did Pierpont indicate to Copeland any perceived shortcomings, on the part of Schlicksup (Copeland Dep., 103).

114. During the time that Barbour worked with Beran on Schlicksup's performance review, her supervisor was Barb Hodel (Barbour Dep., 102-103). Hodel never gave Barbour negative feedback about Schlicksup, and further, Barbour could not recall Hodel ever saying that Schlicksup was difficult to work with (Barbour Dep., 103).

115. Further indicating a lack of dysfunction, several members of the Tax Department emailed Schlicksup following his move. The following is a sampling of some, but far from all, of the comments: "Dear Dan. You will be one of my best recollection(s) during my long career with this company. YES, my best recollection," "WOW!! Comes as a bit of a shock. Thanks for all you did while in tax," "I am sorry you are

leaving tax-you will be missed," "You have always been honest and reliable and that is refreshing," and "WHY???".  (Schlicksup Dec., p.101-103, ¶248)

116. Upon being asked whether anyone at Caterpillar had made a determination as to whether Schlicksup had become difficult to manage within the tax department, Buda testified that as of May 1, 2008, he understood that Schlicksup and Beran were having some "difficulty" coming to agreement over Schlicksup's performance review (Buda Dep., 18-19).  Thereafter the following dialogue between Plaintiff's counsel and Buda occurred which expresses the extent of the perceived "difficulty" between Schlicksup and Beran:

Q.  Is that the total recollection you have concerning what the problem had been identified as before May 1, 2008?

A.  Again you're using the term problem.  I'm simply indicating to you that at or about May 1, 2008, it was my understanding that [Schlicksup] was having difficulty with his supervisor.

Q.  Concerning an evaluation or more than that?

A.  Concerning his evaluation.

(Buda Dep., 18-19).

117. As Defendant's acknowledge in paragraphs 36 and 37, *supra*, the statements on which they focus provide only a select sampling of sentences contained therein, and they do not focus on the issues contained in the email sent to Rapp on May 1, 2008.  However, the email quite clearly speaks for itself, and even the statements

highlighted by Defendants, *supra*, indicate that Schlicksup is being retaliated against for stating what he knows to be ethics violations.

118. Company policy requires that these issues be raised without fear of reprisal. (Schlicksup Dec., p.76, ¶190c)  Not coincidentally, from April 28, 2008 through May 1, 2008, the three days leading up to the day on which Schlicksup sent Rapp the email and memorandum, Caterpillar had a three-day Global Senior Finance Managers Conference in Peoria wherein Rapp, Fife, and Owens spoke to all of the finance managers, including Schlicksup, regarding how serious they were about reporting ethics violations, or even what appeared to be potential ethics violations because Caterpillar's reputation was of the utmost importance.  (Schlicksup Dec., p.75-76, ¶185-192)  Within hours of the conclusion of the conference, Schlicksup sent Rapp and Oberhelman the May 1, 2008 email and memorandum. (Schlicksup Dec., p.80, ¶196c)

119. The Caterpillar Code of Conduct imposes a right and responsibility upon employees to report unethical behavior. (Schlicksup Dec., p.93, ¶234)

120. Schlicksup is a tax manager, and as such a "trusted advisor."  Trusted advisors are business managers that officers and leaders of Caterpillar can trust on matters related to the financial side of the business (Rapp Dep., 27).

121. There were several options considered in determining where to place Schlicksup, to wit:  keeping Schlicksup in his current position and changing his job function, giving Schlicksup a different job within the tax department, transferring Schlicksup to another division, entering Schlicksup into the PCPP (a job pool where he would be

terminated if he could not find another job within six months), and termination (Buda Dep., 39-40, 160-61; Rapp Dep., 45).

122. The IT department is the only division that Buda knows to have been considered as a possible destination for Schlicksup (Buda Dep., 158), even though "[t]he finance department is a huge department.  There are infinite number of things [Schlicksup] can do in the finance department (Stiles Dep., 187-88).

123. Beran asked Burritt to move Schlicksup out of the tax department (Beran Dep., 233-34).  Beran's reason for requesting that Schlicksup be transferred was "primarily, [that he] didn't need the job filled so in terms of spending corporate money, it didn't make sense on a job [he] didn't need filled" (Beran Dep., 234).  Beran's department was at a point where the other managers could handle the increased workload if Schlicksup were transferred (Beran Dep., 234).

124. Wes Blumenshine, from the legal department, had been requested to look into opportunities outside of the tax department, and offer Barbour guidance on where to place Schlicksup (Barbour Dep., 137).

125. Copeland explained that she had spoken with Halverson regarding Schlicksup's transfer (Copeland Dep., 163-64).  The reason she was given for his transfer was that "the job function wasn't needed" or that "the position wasn't needed" (Copeland Dep., 163-64).

126. Rapp would not agree that Schlicksup had "deep expertise" in project management, the job function he was being placed into within the IT department (Rapp Dep., 142).

However, deep expertise in a field is considered when determining salary grades (Rapp Dep., 134).

127. Net present value achieved is a variable that is considered when evaluating an employee's performance (Rapp Dep., 188).

128. Heller was never asked whether Dan would fit into his division (Heller Dep., 61). Rapp told Heller to look for a position within his organization where Schlicksup could be placed (Rapp Dep., 54-56).

129. When Schlicksup was offered the position in Heller's department, Schlicksup asked what would happen if he refused to take the job (Heller Dep., 82-83).  Before Heller could respond, Barbour informed Schlicksup that he had no other options, and that the company had the right to terminate Schlicksup's employment (Heller Dep., 82-83). (Schlicksup Dec., p.117-124, ¶291)

130. Typically, representatives from Human Resources, like Barbour, are only present when there is a negative personnel action or discipline. (Schlicksup Dec., p.116-117, ¶290)

131. There were other candidates for the IT position offered to Schlicksup within the IT Division, and further, those candidates had deeper technological expertise than Schlicksup (Heller Dep., 158-59).

132. As the charts on the pages identified *infra* indicate, the IT department has significantly less employees in salary grades above 28 than does the Finance Department. (Schlicksup Dec., p.167-170, ¶385-391)

133. Several people, with deeper IT expertise, had previously been given essentially the same IT position as Schlicksup (Samp Dep., 24-25).  None of them had been able to accomplish the job tasks to any reasonable degree of success because there was a problem of consensus amongst different groups within the IT department, wherein different groups reported to different people with differing opinions as to how to accomplish Schlicksup's job tasks (Samp Dep., 24-25).

134. Heller did not give Schlicksup the needed support to find success within the IT Department. (Schlicksup Dec., p.162-163, ¶375a-e).

135. "If you increase the number of openings, the likelihood that someone would move into the opening increases" (Thompson Dep., 44).

136. Rapp knew that Hagen's position would be coming available within the Tax Department (Rapp Dep., 85-86).  Caterpillar management is looking externally to fill Hagen's position as the Domestic Tax Manager (Rapp Dep., 169).

137. Thompson, the Defendants' expert on Schlicksup's career prospects, did not consider Schlicksup's particular skills, education, training leadership assessments, or any other personal criteria (other than time in grade) in determining Schlicksup's potential opportunities for career growth (Thompson Dep., 71-72, 94).  Moreover, Thompson failed to specifically consider the difference in career prospects within the Tax Division versus the IT Division as well as the Finance Division versus the IT Division (Thompson Dep., 77).

138. Thompson did agree that a 10 percent chance of promotion is greater than a 5 percent chance of promotion, and a transfer to a Division offering the latter chances

of promotion is adverse (Thompson Dep., 90).  Thompson also agreed that if

Schlicksup were not permitted in certain departments, the number of opportunities

available to him would be limited as well (Thompson Dep., 196).

139. Thompson did not know whether individuals in the Tax Division with SG 31 and

above had remained in the tax department over the course of their careers

(Thompson Dep., 99).

140. Thompson only found one lateral move in the Tax Division (Thompson Dep., 113).

That move was Schlicksup's transfer out of the Tax Division (Thompson Dep., 113).

141. Thompson did not know, and could not have considered the employee turnover that

was contemplated within the Tax Division (Thompson Dep., 170-71).

142. Thompson admitted that Schlicksup's chances of being promoted were better than

the typical individual in SG 30 for 2007 and 2008 (Thompson Dep., 185).  However,

his chances at promotion were worse than the typical individual in SG 30 for 2009

(Thompson Dep., 185).

143. Thompson did not assess whether Schlicksup would have been better positioned for

a promotion within the Tax Division as opposed to the IT Division (Thompson Dep.,

189).

144. Samp only knew of one person, Pete Riley, from the IT department

that did not have an IT background (Samp Dep., 16).  However, Pete Riley "never

actually moved to IT" (Samp Dep., 16).  Riley was in corporate accounting and

finance but assigned to the IT organization--he had no IT responsibilities, only

accounting tasks (Samp Dep., 16).

145. Perkins had never seen a person at Schlicksup's Salary Grade

transfer to IT before (Perkins Dep., 121).

146. Parsons does not recall anyone, other than Schlicksup, ever moving

from the Tax department to the IT department (Parsons Dep., 152-53).

147. Parsons does not believe that, aside from one person, there is

anyone in the tax department at the level of Salary Grade 29 or above who has come

to the department from any other area of the company (Parsons Dep., 155).

Similarly, Stiles knows of nobody who has ever come in to the Tax department from

the IT department at a Salary Grade 29 or above (Stiles Dep., 188).

148. To work in the tax department it is "advisable" to keep current on

one's knowledge of tax law (Stiles Dep., 188-89).  Since being transferred to the IT

department, Schlicksup has not been seen at any continuing tax education events,

even though there are other invitees from outside of the tax department (Stiles

Dep., 189-90).

149. Rapp is unaware of whether the Board of Directors is aware of this lawsuit (Rapp

Dep., 188).

150. Rapp would not consider it normal for a Human Resources Manager, such as

Barbour, to make comments in an employee's evaluation (Rapp Dep., 192).  Barbour

did make comments on Schlicksup's 2007 performance review (Rapp Dep., 192-93;

Ex. 21).

151. Rapp had a discussion with Heller regarding Schlicksup's performance in his new

position within the IT Department, and Heller informed Rapp that it was a

"challenge" (Rapp Dep., 149-50).  In response, Rapp told Heller that he "appreciated

his leadership" (Rapp Dep., 150).  This dovetails nicely with Heller's statements to

the OSHA investigator, wherein he explained that Wes Blumenshine had told him

that it was important to find Schlicksup a job where he had no "baggage" (Schlicksup

Dec., Ex. AAW).  Heller further explained that he is frequently asked to take

"troubled" employees and help them change their "paths" (Schlicksup Dec., Ex.

AAW).  In his deposition, Heller testified that he is asked "because of [his]

management and leadership style, to help place individuals that [Caterpillar

management] believe still have significant contributions to make to the enterprise,

and to get them into a role and create an environment for them to be successful

(Heller Dep., 81).

152. Schlicksup's transfer to the IT Department came with a pay increase only after

extensive negotiations, and such a situation is not common within Caterpillar.

(Schlicksup Dec., p.126-130, ¶298-300)

153. Schlicksup was requested to sign a "Confidential Release and Settlement

Agreement" as part of his transfer to the IT Department. (Schlicksup Dec., p.134-

137, ¶318-320)

154. Rapp was aware of the significance of the incident surrounding the taping of the tax

council because he was told that it had been handled by Jim Owens, and the Audit

Committee Chairman (Rapp Dep., 88).

155. Schlicksup's 2003 performance review, from Lavin contained very positive

comments, some of which are the following:  "[e]xtraordinary sense of

accountability," "[e]xceptional analytical thinker," and "[c]ustomers are pleased with

Dan's passionate focus on execution and delivery". (Schlicksup Dec., p.27-29, ¶59)

156. Owens questioned the legitimacy of Beran's tax structures; thus, Burritt assigned

Schlicksup to the Tax Department in order to evaluate the risk associated with

Beran's tax structures. (Schlicksup Dec., p.7, ¶7)

157. Rapp testified to the effect that he determined that the relationship between

Schlicksup and Beran and Burritt was dysfunctional based solely on his reading of

the May 1 e-mail and the first three (3) pages of the attachment to the e-mail (the

"Executive Summary" prepared by Schlicksup) (Rapp Dep. 91-92).  Rapp made no

determination whether Schlicksup or Beran or Burritt was responsible for the

dysfunction (Rapp Dep., 95).  Rather, Rapp simply determined that he had a

dysfunctional situation which he needed to resolve (Rapp Dep. 95).

158. Buda knew about the ethics issues Schlicksup had raised (Schlicksup Dep. I, 217; Ex.

22).


**Former is verbatim from first filing and consistent with the Court's Order.**
(Only summation of Undisputed Material Facts & and minor formatting changes)


**Following was redrafted consistent with the Court's Order.**


159. At the end of 2004, Caterpillar's then Chief Financial Officer and Vice President of

the Global Finance & Strategic Services Division ("GF&SSD"), Dave Burritt ("Burritt")

contacted Schlicksup and told him that he wanted Schlicksup to take a position in

the tax department in order to strengthen some of the Tax Departments process-related deficiencies and also to evaluate existing tax structures (Schlicksup Dep. I, 50; Schlicksup Dec., p.4, ¶7).

160. On or around March 1, 2005, Schlicksup transferred to a tax manager position in the finance division, reporting directly to Burritt regarding certain issues, and also to Robin Beran ("Beran"), Caterpillar's Director of Global Tax and Trade within the GF&SSD.  Beran reported directly to Burritt (Barbour Dec., ¶ 8; Beran Dep., 125).

161. Schlicksup received a performance review in early March 2006 for the period of March 1, 2005 to February 28, 2006 signed by Beran, Burritt, and Oberhelman (Schlicksup Dep. I, 166-67; Ex. 18).  Schlicksup received a "2-Notable Performance" rating for this time period (Schlicksup Dep. II, 166; Ex. 18).  Schlicksup received a performance review on February 28, 2007 for the period of March 1, 2006 to February 28, 2007.  (Schlicksup Dep. I, 168; Ex. 19).  Schlicksup received a "2-Notable Performance" rating for this time period (Schlicksup Dep. I, 169; Ex. 19).

162. Schlicksup's Global Tax Strategy Manager position was graded at SG 29, making Schlicksup the only employee in the Tax Department to receive a salary downgrade (Schlicksup Dep. I, 59; Barbour Dec., ¶ 10; Schlicksup Dec., p.60-61 ¶161).

163. On or about September 11, 2007, Schlicksup sent an email to Buda, Kuper, and Snowden relating his concerns about Caterpillar's tax avoidance of over $1,000,000,000 and related financial statement fraud. (Schlicksup Dec., p.57, ¶154) Schlicksup further noted in the September 11, 2007 email that he had previously

raised this concern to both Beran and "Corporate accounting" in January 2007. (Schlicksup Dep. I, 217; Ex. 22).

164. Defendant Rapp is a Caterpillar Group President and has responsibility for multiple Caterpillar internal divisions, including, at all relevant times to this litigation, Caterpillar's "Financial Products, Building Construction Products, Legal Services, Global Finance & Strategic Services, and Global Information Services"  (Rapp Dep., 19).

165. On or about May 1, 2008, Rapp received from, Schlicksup, an email containing a subject line that read "Ethics issues important to you, the Board and Cat Shareholders," and an attached memorandum (Rapp Dep., 35-36; Ex. 4, 7; Schlicksup Dec., p.84 ¶210).

166. It was proper for Schlicksup to send Rapp a memorandum detailing potential ethical violations because Rapp was someone who at the time of Schlicksup's email had the authority to deal with the matters set forth therein (Rapp Dep., 62-63).

167. The issues outlined in Schlicksup's memorandum were of an "OBP type nature," and further, the Office of Business Practices ("OBP") was within Rapp's reporting structure at the time he received Schlicksup's email (Rapp Dep., 62-63).

168. Rapp claims to have determined that the relationship between Schlicksup, and Beran and Burritt was "dysfunctional" based on his reading of the May 1, 2008 email from Schlicksup and the three (3) page "Executive Summary" of the attached memorandum created by Schlicksup (Rapp Dep., 91-92).  Rapp claims to have determined that the relationship was dysfunctional based on the tone of

Schlicksup's email and the Executive Summary, and based on the legalistic structure

of the document (with multiple references to attachments) (Rapp Dep. 44, 62, 91,

95).  From the Executive Summary, Rapp also purportedly inferred that Schlicksup

had refused to sign his performance evaluation, even though Schlicksup had

received a favorable "2" rating (Rapp Dep., 97-100, 191-92).

169. Rapp's determination of the dysfunctionality of the relationship between Schlicksup,

and Beran and Burritt is contested.  Prior to receiving this email on or about May 1,

Rapp had not heard any complaints raised about Schlicksup (Rapp Dep., 46).  Buda

said that there had been only some "difficulty" over a performance review but

specifically disagreed that there were any problems or dysfunction when he

testified, and Beran described Schlicksup's performance review as "in the range,"

not materially different, and "pretty much the same" rating as his peers (Buda Dep.,

18-19; Beran Dep., 193, 198).

170. In response to questioning about Schlicksup's "2-Notable Performance" rating,

Beran volunteered that "[t]wo is a good rating.  [Beran's] gotten 2's most of [his]

career" (Beran Dep., 194).

171. Rapp did not consider transferring Burritt or Beran—only Schlicksup (Rapp Dep., 95-

96).

172. Schlicksup's position in the tax department in May 2008, was within Rapp's

reporting structure (Rapp Dep., 65).  After a meeting with Caterpillar's General

Counsel, James Buda, and Caterpillar's Human Services (HR) Division Vice President,

Sid Banwart, Rapp testified that he made the decision to seek an alternative position for Schlicksup outside of the tax department (Rapp Dep., 43-45, 49-51).

173. Rapp claims to have made the decision to seek an alternative position for Schlicksup on his own (Rapp Dep. 48).  However, such a decision is in contrast to company "practice" requiring the whole Executive Office to sign off on transfers of people at SG 30 and above (Rapp Dep., 66).  Accordingly, Rapp presented the proposed transfer of Schlicksup at a "roundtable" meeting (Rapp Dep., 66, 147-48).  Everyone present at that meeting approved Schlicksup's transfer to the IT department (Rapp Dep., 68).  Roundtable meetings include the Group Presidents and the CEO (Rapp Dep., 67).  Furthermore, Caterpillar's former CEO, Jim Owens, was at the meeting (Rapp Dep., 147-48).  Moreover, the OSHA investigator, Ms. Howe, was told that Buda was responsible for Schlicksup's transfer. (Schlicksup Dec., Ex. AAW)  Burritt testified that he believed Doug Oberhelman, Ed Rapp, _and_ Jim Buda made the decision to transfer Schlicksup (Burritt Dep., 118) (Emphasis added).

174. The IT department is the only division that Buda knows to have been considered as a possible destination for Schlicksup, even though "[t]he finance department is a huge department[, and] [t]here are infinite number of things [Schlicksup] can do in the finance department (Buda Dep., 158; Stiles Dep., 187-88).

175. Schlicksup moved to the position offered to him by Heller in the IT area in October 2008 (Needham Dec., ¶ 12).

176. The new position in IT was severely lacking in career opportunities for Schlicksup.  As Rod Perkins, Schlicksup's colleague in the Tax Department explained, he would

never have asked to be placed in the IT Department because "[i]t was not an area that could take advantage of the skills [he] could offer" (Perkins Dep., 138).

177. When Schlicksup was offered the position in Heller's department, Schlicksup asked what would happen if he refused to take the job (Heller Dep., 82-83).  Before Heller could respond, Barbour informed Schlicksup that he had no other options and that the company had the right to terminate him. (Heller Dep., 82-83; Schlicksup Dec., 118).

178. Typically, representatives from Human Resources, like Barbour, are only present when there is a negative personnel action or discipline.  (Schlicksup Dec., p.116-117, ¶290)

179. Furthermore, Schlicksup was requested to sign a "Confidential Release and Settlement Agreement" as part of his transfer to the IT Department.  (Schlicksup Dec., p.134-137, ¶318-320)

180. Schlicksup was transferred to his current position in IT (or "GIS") effective October 1, 2008 (Needham Dec., ¶ 12).

181. If Schlicksup had not complained to Rapp in the form of the email, Rapp does not know if he would have taken any action to transfer Schlicksup (Rapp Dep., 96).

182. If it were not for Schlicksup's May 1, 2008 email to Rapp, Rapp would never have asked whether Schlicksup's job was necessary (Rapp Dep., 97).

183. There were other candidates for the IT position offered to Schlicksup within the IT Division, and further, those candidates had deeper technological expertise than Schlicksup (Heller Dep., 158-59).

184. Furthermore, several people with deeper IT expertise, had previously been given essentially the same IT position as Schlicksup (Samp Dep., 24-25).

185. None of the predecessors in the position had been able to accomplish the job tasks to any reasonable degree of success because there was a problem of consensus amongst different groups within the IT department, wherein different groups reported to different people with differing opinions as to how to accomplish the job's tasks (Samp Dep., 24-25).

186. Heller explained to the OSHA investigator that he is frequently asked to take "troubled" employees and help them change their "paths" (Schlicksup Dec., Ex. AAW) (*Id*.).

187. In his deposition, Heller testified that he is asked "because of [his] management and leadership style, to help place individuals that [Caterpillar management] believe still have significant contributions to make to the enterprise, and to get them into a role and create an environment for them to be successful (Heller Dep., 81).

188. Michael Samp, a former IT Department manager, only knew of one person, Pete Riley, from the IT department who did not have an IT background (Samp Dep., 16). However, Pete Riley "never actually moved to IT" (Samp Dep., 16).  Riley was in corporate accounting and finance but assigned to the IT organization--he had no IT responsibilities, only accounting tasks (Samp Dep., 16).

189. Perkins had never seen a person at Schlicksup's Salary Grade transfer to IT before (Perkins Dep., 121).

190. Parsons does not recall anyone, other than Schlicksup, ever moving from the Tax department to the IT department (Parsons Dep., 152-53).  Parsons does not believe that, aside from one person, there is anyone in the tax department at the level of Salary Grade 29 or above who has come to the department from any other area of the company (Parsons Dep., 155).

191. Similarly, Stiles knows of nobody who has ever come in to the Tax department from the IT department at a Salary Grade 29 or above (Stiles Dep., 188).

192. The current Director of Global Tax at Caterpillar is Mr. Beran, who is Schlicksup's supervisor in the Tax Department until August 26, 2008.  His position within Caterpillar, prior to being moved to the Information Technology (IT) Department, was a high-level position with significant responsibility for risk management in the Tax Department.  This position was created by Defendant Burritt, then Chief Financial Officer, and approved by Defendant Oberhelman.  Mr. Burritt advised Schlicksup that Mr. Owens, then CEO, had questions with regard to Mr. Beran's tax structures.  Mr. Burritt wanted to have someone help him understand the risk of these tax structures.  In this position, Schlicksup reported to Defendant Beran, and to Mr. Burritt.  Occasionally, he would communicate with Mr. Oberhelman and Mr. Rapp both orally and in writing.  Schlicksup also routinely prepared written communications to the Board of Directors and presented to the Audit Committee Chairman, Gene Fife.  His salary grade at the time placed his in the top 400 people in a company of over 100,000 people.  Schlicksup's position had a significant impact on corporate earnings and regulatory compliance. (Schlicksup Dec., p.4, ¶7)

193. Schlicksup did not send a memo to the Caterpillar Executive Office on May 1, 2008, to complain about a "2 Performance Rating".  The subject line of my May 1, 2008 memo to Mr. Oberhelman and Mr. Rapp was, "*Ethics issues important to you, the Board and Cat Shareholders*". (Schlicksup Dec., p.4-5, ¶10)

**Schlicksup had Personal Relationships with Oberhelman and Rapp**

194. Schlicksup worked directly for Mr. Burritt and/or Mr. Beran for 13 of the 18 years "BEFORE" the threat-to-move-or-be-fired and the move-to-IT.  (Schlicksup Dec., p.5, ¶13)

195.  Mr. Oberhelman knew Schlicksup and had knowledge of his performance and reputation as a highly regarded professional.  (Schlicksup Dec., p.5-6, ¶14a-f)

   a.   During 1992, 1993, 1994, and 1995 Schlicksup worked directly for Mr. Beran.

   b.   In 1994 and 1995, Mr. Beran's direct supervisor was Mr. Oberhelman.

   c.   Mr. Oberhelman signed Schlicksup's 1994 performance review on February 27, 1995.

   d.   Mr. Oberhelman approved Schlicksup's promotion from a salary grade 26 to 27 on November 21, 1995.  This was significant promotion because in 1995 a salary grade 26 was not entitled to stock options.  Only salary grades 27 and above received stock options.  Promoting employees for the first time into a salary grade that would entitle them to receive stock options was considered a significant event and reviewed carefully.

e. Mr. Oberhelman knew of Schlicksup's foreign assignment to Belgium.  At that time, foreign assignments were very expensive for the company and were generally reserved for high potential employees.

f. In or about January 1996, Schlicksup met with Mr. Oberhelman personally in Oberhelman's office before leaving for his Belgium assignment.

196. Mr. Rapp knew Schlicksup and had knowledge of his performance and reputation as a highly regarded professional.  (Schlicksup Dec., p.6-7, ¶15a-g)

    a.   During 1996 and 1997 Schlicksup worked directly for Mr. Burritt in Belgium.

    b.   During 1998, 1999, and 2000 Schlicksup worked directly for Mr. Burritt in Switzerland where he was a Department Head.

    c.   During 1998, 1999, and 2000 Mr. Rapp was also a Department Head in Switzerland whom Schlicksup knew and who was familiar with his performance and reputation as an excellent professional.

    d.   Mr. Burritt wrote in Schlicksup's 1999 performance review the following comments.

        i.   "*Dan is extremely effective in dealing with others and is highly respected by U.S. and European personnel.*" (Mr. Burritt)

        ii.   "*ETS (European Tax Services managed by Dan) is considered an elite group in Geneva (Switzerland).*" (Mr. Burritt)

        iii.   This was also known at the time by the Executive Office in Peoria Illinois.  Mr. Burritt also wrote, "*Jim Owens (then Group President and now retired CEO) commented that he has received very*

61

> *positive feedback about (Dan's Team's) ability to work*
>
> *cooperatively with other in the company.*" (Mr. Burritt)

e. In addition, Mr. Rapp and Schlicksup attended social functions while in Switzerland where they talked and socialized.  This occurred at office holiday functions, at lunch in the office, and at parties at other expatriate employees' homes.

f. Mr. Rapp and Schlicksup also had numerous conversations about tax issues related to his areas of responsibilities while in Switzerland in which Schlicksup would advise him on the best course of action from a tax perspective.  Mr. Rapp followed Schlicksup's advice and recommendations.

g. Schlicksup's relationship with Mr. Rapp was such that in 2001 Schlicksup asked for Mr. Rapp's assistance to speak-up and help Schlicksup make an important point in an upcoming presentation Schlicksup was preparing for to be made to the Administrative Council (i.e. all officers of the company).

   iv. Schlicksup asked Mr. Rapp for his help because he and Schlicksup were well acquainted.

   v. Schlicksup believed that Mr. Rapp would help his because they knew each other and Schlicksup believed Rapp trusted him.

   vi. Schlicksup explained to Rapp what he needed Rapp to say during the Administrative Council meeting.  Rapp agreed and did exactly as Schlicksup asked.

vii.    Schlicksup believed Mr. Rapp offered to and actually did help him, in front of all Schlicksup's peers and superiors, because they were well acquainted and Rapp was very familiar with Schlicksup's knowledge, experience and reputation.

**Schlicksup had Significant Interaction with Executives and the Board of Directors and was Thought to have Outstanding Potential**

197. The Board guidelines encourage the Chief Executive Officer to bring employees to various Board related meetings to provide "*exposure to individuals with outstanding management potential.*" (Schlicksup Dec., p.8, ¶16) It is a responsibility of Officers "*to develop their hi(gh) potential people including getting them exposure to people in the organization that select future leaders and officers of (the) company*". (Schlicksup Dec., p.8, ¶17)

198. Schlicksup was hired into Caterpillar Inc. in October 1992 during a 10 year hiring freeze imposed by Mr. Donald V. ("Don") Fites, Chief Executive Officer at the time. He had to personally approve Schlicksup's employment with Caterpillar. (Schlicksup Dec., p.8, ¶18)

199. In or about November 1992, within one month of being hired at Caterpillar, Schlicksup made a presentation to the Caterpillar Inc. Administrative Council which includes all Officers of the company.   Schlicksup took this to mean he was being provided exposure to all Officers of the company.  At that time no Tax Manager had

ever made a presentation to the Administrative Council, excluding Mr. Beran. (Schlicksup Dec., p.8, ¶19)

200. In or about April 1995, Mr. Beran and Schlicksup discussed that he informed Mr. Oberhelman, then Chief Financial Officer and Mr. Beran's supervisor, that within 2-3 years Schlicksup would be Mr. Beran's first choice as his successor. Schlicksup took this to mean that he was hired to succeed Mr. Beran. (Schlicksup Dec., p.9, ¶20)

201. In or about September 1995, Schlicksup was offered an overseas assignment in Belgium by Mr. Oberhelman, Mr. Burritt and Mr. Beran. These assignments are very expensive and reserved for high potential employees. Schlicksup took this to mean he was a high potential employee. (Schlicksup Dec., p.9, ¶21)

202. In December 1996, Schlicksup was promoted from a salary grade 26 to a 27. (Schlicksup Dec., p.9, ¶22)

203. In or about January 1996, prior to leaving to work in Belgium Schlicksup met with Mr. Oberhelman. Schlicksup took this to mean he was being provided exposure to Mr. Oberhelman who was the Chief Financial Officer at the time. (Schlicksup Dec., p.9, ¶23)

204. In or about January 1996, prior to leaving to work in Belgium Schlicksup met with Mr. Barton, who ultimately served as Chairman Chief Executive Officer from 1999 to 2004 and as Vice Chairman from 1998 to 1999. Schlicksup took this to mean he was being provided exposure to Mr. Barton who was a Group President at the time. (Schlicksup Dec., p.9, ¶24)

205. In or about June 1997, Schlicksup was offered a second overseas assignment in Geneva, Switzerland. (Schlicksup Dec., p.9, ¶25)

206. In or about December 1997, Schlicksup was promoted from a salary grade 27 to a 28. (Schlicksup Dec., p.9, ¶26)

207. In or about December 1998, Schlicksup was promoted from a salary grade 28 to a 29. (Schlicksup Dec., p.9, ¶27)

208. In or about the summer of 1999 while in Geneva Switzerland, Schlicksup presented to Mr. Owens and Mr. Flaherty.  Schlicksup took this to mean that he was being provided exposure to Mr. Owens and Mr. Flaherty who were Group Presidents at the time. (Schlicksup Dec., p.9, ¶28)

209. In or about the fall of 1999 while in Geneva Switzerland, Mr. Burritt and Schlicksup discussed his belief that Schlicksup would be a salary grade 31 back in the U.S. within the next 5 years.  Schlicksup took this to mean that high level people in the U.S. were aware of his work and capabilities.  This was in fact the case. (Schlicksup Dec., p.10, ¶29)

210. In or about October 2000, Schlicksup attended a meeting with the full Executive Office including Mr. Barton-then CEO, Mr. Owens, Mr. Flaherty, Mr. Shaheen, and Mr. Thompson.  The reason for Schlicksup's attendance was they were discussing an important company-wide project Schlicksup was leading.  Schlicksup took this to mean he was being provided exposure to the Executive Officers. (Schlicksup Dec., p.10, ¶30)

211. In or about August 2001, Schlicksup met with Mr. Baumgartner.  Mr. Baumgartner came with Schlicksup to another building to personally meet Schlicksup's Team. Schlicksup took this to mean he was being provided exposure to Mr. Baumgartner who was a Group President at the time. (Schlicksup Dec., p.10, ¶31)

212. In or about September 2001, Schlicksup met with Mr. Flaherty.  Mr. Flaherty came with Schlicksup to two other buildings to personally meet Schlicksup's Team. Schlicksup took this to mean he was being provided exposure to Mr. Flaherty who was a Group President at the time. (Schlicksup Dec., p.10, ¶32)

213. In or about December 2001, Schlicksup made another presentation to the Caterpillar Inc. Administrative Council that includes all Officers of the company, regarding the status of the company-wide project Schlicksup was leading.  Schlicksup took this to mean he was being provided exposure to all Officers of the company. (Schlicksup Dec., p.10, ¶33)

214. In or about March 2002, Schlicksup met with Mr. Owens and presented.  Schlicksup took this to mean he was being provided exposure to Mr. Owens who was a Group President at the time. (Schlicksup Dec., p.10, ¶34)

215. In or about January 2003, Schlicksup was promoted from a salary grade 29 to a 30. (Schlicksup Dec., p.10, ¶35)

216. In or about 2003, Schlicksup met with Mr. Barton and presented.  Schlicksup took this to mean he was being provided exposure to Mr. Barton who was Chief Executive Officer at the time. (Schlicksup Dec., p.11, ¶36)

217. In or about September 2005, Mr. Burritt had Schlicksup present to Mr. Fife. Schlicksup took this to mean he was being provided exposure to Mr. Fife who was Chairman of the Audit Committee of the Board of Directors at the time. (Schlicksup Dec., p.11, ¶37)

    a. Part of the presentation was about succession planning regarding Mr. Beran's successor.  Assuming people retired at 65, in 10 years Schlicksup would be the only current Tax Manager still with the company.  Mr. Fife seemed please with Schlicksup's presentation, as was Mr. Burritt, and asked him what he was going to be doing in 10 years.  Schlicksup took this to mean he was the likely successor to Mr. Beran.

    b. Prior to the threat-to-move-or-be fired and the move-to-IT on August 26, 2008, Schlicksup was the only one in the Tax Department who had made a presentation to a Board member, excluding Mr. Beran.

218. In or about April 2006, Schlicksup made a second presentation to Mr. Fife. Schlicksup took this to mean he was being provided additional exposure to Mr. Fife who was Chairman of the Audit Committee of the Board of Directors at the time. (Schlicksup Dec., p.11, ¶38)

**Schlicksup was Downgraded**

219. On September 7, 2007, Mr. Beran (Corporate Tax Director), who was the primary person responsible for using the Swiss and Bermuda Tax Structures, told Schlicksup that his job had been downgraded. (Schlicksup Dec., p.60-61, ¶161)

a. Mr. Beran told Schlicksup that this was simply the outcome of a study of all the senior managers in the Tax Department. Mr. Beran told Schlicksup he had to downgrade him to follow Company Policy.

b. However, Mr. Beran does not follow Company Policy in other situations. There is another person in the Tax Department, Mr. Wright, who prior to 2005 was in a salary grade 25 position in Europe. He had to return to the U.S. on short notice. At the time there were no salary grade 25 positions available. Corporate policy was ignored and Mr. Wright was put in a staff position for which the actual salary grade was 24, at that time, but Mr. Wright was given a salary grade 25. Mark Wright has been kept at a salary grade 25 for years.

c. Schlicksup reported Mr. Beran for fraud and other issues, then he strictly followed Company Policy in Schlicksup's case.

d. Occasionally within the Tax Department the Director would rate a job at the salary grade he wanted a person to be and used it to justify the salary grade even though the salary grade rating was for a completely different job than the actual job the person was doing.

e. Later, Mr. Beran stated in a meeting that the Tax Department has never reduced someone's job code.

f. In the History of the Tax Department since Schlicksup was hired, no one has ever had their job evaluated by HR and downgraded, but Schlicksup. And, in

the history of the Tax Department no one has ever reported Mr. Beran for fraud, but Schlicksup.

g.  Since Schlicksup was downgraded, all of the other senior managers in the Tax Department who have not retired, have been promoted.  All of these managers have either participated in, or gone along with, the Swiss and Bermuda Tax Structures

**Beran told Schlicksup that Burritt was going to Eliminate Schlicksup's Job**

220.  On October 12, 2007, Schlicksup met with Mr. Beran (Tax Director).  Mr. Beran told Schlicksup that his downgrade from a salary grade 30 to a salary grade 29 would mean that Schlicksup would get less equity compensation, less short-term bonus percentage, and since Schlicksup's base pay would be so high in the pay range for a salary grade 29, Schlicksup would get less raises in the future. (Schlicksup Dec., p.61-63, ¶162a-f)

a.  Mr. Beran told Schlicksup that the paperwork to grandfather him as a salary grade 30 for two years, to postpone the compensation decreases for two years, was working its way through the Executive Office.

b.  All personnel actions, positive or negative, for salary grade 29 and above must go through the full Executive Office.

c.  The paperwork was a "Special Agreement" prepared by Alice Barbour and signed by Schlicksup's superiors to indicate that he would be administered as though he was a salary grade 30 for only up to two years.

Doug Oberhelman emphasized on the Special Agreement that the two-year anniversary was a maximum date for protecting Schlicksup's pay.

d.  Mr. Beran then told Schlicksup that "by-the-way" Mr. Burritt (Chief Financial Officer) told Mr. Beran that they probably would not need Schlicksup's job at some point in the future.

e.  Schlicksup thought that this was very odd that now they may not need his job since he was managing the Tax Department's participation in the Global Finance Transformation which Mr. Beran had stated "*will be the most important thing we'll (the Tax Department) do in the next 25 years*". Mr. Beran even had this written on his white-board in his office where everyone could see it as they walked past his office.

f.  Schlicksup did not know at the time that previously on June 22, 2007, Mr. Beran had apparently made the entry in an employee data base that Schlicksup should be moved out of the Tax Department.

**Beran told Schlicksup the Tax Issue Had Not Been Resolved Despite Buda's investigation**

221.  On February 25, 2008, Schlicksup met with Mr. Beran (Tax Director).  This was supposed to be a routine meeting to discuss Schlicksup's performance review for the 12 month period ending February 29, 2008. (Schlicksup Dec., p.67-69, ¶170a-g)

a.  Mr. Beran started the meeting by telling Schlicksup he was making his and Mr. Burritt's (Chief Financial Officer) lives very difficult for reporting their behavior.

70

b.  Mr. Beran told me there were better alternatives than reporting "these things".

c.  Mr. Beran asked Schlicksup what he thought was wrong with the Swiss Tax Structure.

d.  Schlicksup told Mr. Beran that there is no one in Switzerland managing the business that generates the profit he shifted to Switzerland, but rather that business is, and always has been, managed from Peoria, Illinois.  Schlicksup previously worked in Switzerland and knew the content of the Swiss operations.  Mr. Beran did not dispute my assertion.

e.  Schlicksup told Mr. Beran that because the business had not changed in any meaningful way, you cannot continue to run the business as you always have, and arbitrarily shift the income to Switzerland to avoid United States income tax.

f.  Mr. Beran told Schlicksup that there were lots of agreements in place.

g.  Schlicksup told Mr. Beran that according to the 7th Circuit U.S. Court of Appeals case law Schlicksup sent him in January 2007, no amount of agreements by themselves can justify shifting profits to Switzerland to avoid United States income tax unless there is economic and business substance underlying the transaction.

h.  Schlicksup told Mr. Beran that all of the agreements he put in place are managed by the Tax Department, not by the business operations personnel.

i.   Schlicksup asked Mr. Beran to tell him the name of "1" business
     operations person who could explain the Swiss Structure from a business
     point of view.  He could not name a single person.

j.   The only significant impact of the Swiss Tax Structure was the avoidance
     of United State income taxes.

k.   While implementing the Swiss Tax Structure Mr. Beran even sought to
     avoid impacting the business in any way (i.e. no economic or business
     substance).

l.   Schlicksup asked Mr. Beran if he had read the 7th Circuit U.S. Court of
     Appeals case law.  He did not answer.

m.   Schlicksup asked Mr. Beran if he had read the PriceWaterhouseCoopers
     and outside counsel memos regarding the Swiss Tax Structure to see if
     they addressed the 7th Circuit U.S. Court of Appeals case law.  He did not
     answer.  All he said is that he was sure they (the memos) must have.

n.   Schlicksup asked him if the PriceWaterhouseCoopers consultants and the
     outside counsel attorneys had read the 7th Circuit U.S. Court of Appeals
     case law.  He did not answer.  All he said is that he was sure they must
     have.

o.   Mr. Beran said he needed Schlicksup's help "*to resolve this issue*".
     Schlicksup took this to mean that the economic substance issue was in
     fact not resolved.  This clearly meant to Schlicksup that Mr. Beran wanted
     his assistance in resolving this issue.

p.  Mr. Beran's statement above confirmed Schlicksup's belief that there was in fact an unresolved problem related the economic substance issue in the Swiss Structure.

q.  This confirmed Schlicksup's belief that a proper investigation was not conducted and the matter was not resolved when on October 1, 2007, Ms. Kuper (Securities Counsel) told Schlicksup the matter was resolved, and Ms. Snowden (Director of Ethics Office) and Mr. Buda (General Counsel) had told Schlicksup the issue had been resolved.

222.  In or about February 2008, Ms. Snowden (Director of Ethics Office) told Schlicksup that it would be best for him "personally" if he did not pursue these issues any further. (Schlicksup Dec., p.69, ¶171)

**Schlicksup Informed Beran of the Tax Fraud**

223.  There was a Board of Directors and Audit Committee meeting in April of 2008. Board meetings occur every other month starting in February of each year. Schlicksup was preparing a presentation regarding taxes for Mr. Beran (Tax Director) to give to the Audit Committee of the Board of Directors. (Schlicksup Dec., p.70, ¶172)

224.  Schlicksup believed several key things Mr. Beran wanted to represent to the Audit Committee of the Board of Directors were misleading or fraudulent. (Schlicksup Dec., p.70, ¶173)

225.    On March 19, at 3:08PM, Schlicksup pointed out my concerns to Mr. Beran in an

email. (Schlicksup Dec., p.70-71, ¶174a-i)

    a.  Mr. Beran wanted to tell the Audit Committee of the Board of Directors

that he manages tax risk in a systematic, methodical manner.  Schlicksup

told Beran he did not agree that this statement was true.

    b.  Caterpillar does not manage tax risk in a systematic, methodical manner.

    c.  Schlicksup specifically pointed out the Swiss Tax Structure to Mr. Beran as

an example of how he was misleading the Audit Committee of the Board

of Directors.

    d.  Schlicksup told Mr. Beran that the day before Mr. Giles Parsons (Senior

International Tax Manager located in Switzerland) told Schlicksup that

there is no economic or business substance supporting the legitimacy of

the Swiss Tax Structure.

    e.  Schlicksup told Mr. Beran that in a meeting the day before the Senior Tax

Managers and Mr. Caviness (Tax Counsel) rated the risk associated with

the Swiss Tax Structure related to economic and business substance to be

"HIGH" (i.e. because there is no economic or business substance).

    f.  Schlicksup told Mr. Beran that he did not understand the logic of

reporting more than $1,000,000,000 of profit on the public financial

statements due to the Swiss Tax Structure when no one can explain the

economic or business substance underlying the structure.

    g.   Schlicksup told Mr. Beran that a previous chart that he had presented to Mr. Rapp (Caterpillar Officer & Executive Office member) stating that, overall they  have a conservative approach to taxes and the Swiss Tax Structure is more conservative than most, is not true.

    h.   Schlicksup told Mr. Beran that a conservative approach would be to have economic and business substance in your tax structures.

    i.   Schlicksup told Mr. Beran that they should have an open discussion on this issue with the Board of Directors.

226.    On March 24, 2008, at 10:38AM, Schlicksup send an email to Mr. Beran (Tax Director).   Schlicksup told him that Mr. Scott (Director of Internal Audit) told him that Mr. Beran's presentation to the Audit Committee of the Board of Directors should cover the most important tax risks. (Schlicksup Dec., p.71-72, ¶175a-b)

    a.   Schlicksup asked Mr. Beran if Mr. Scott understands the risks associated with the Swiss Tax Structure related to economic and business substance.

    b.   Schlicksup asked Mr. Beran if PriceWaterhouseCoopers or outside counsel addressed the economic and business substance issue, and told him Schlicksup has to assume "no" since this would be very easy to check and no one has verified this since Schlicksup first raised the issue over a year ago.

227.    On March 24, 2008, at 10:57AM, Mr. Beran sent Schlicksup an email.  He told Schlicksup that he had checked into the issue, everything was "*ok*", and he "*didn't get a chance to mention it to you*". (Schlicksup Dec., p.72, ¶176)

   a.  Mr. Beran offered to let Schlicksup speak to outside counsel and discuss
       their "review process".

228.  On March 25, at 10:00AM, Schlicksup sent an email to Mr. Beran. (Schlicksup Dec.,
      p.72, ¶177a-b)

      a.  Schlicksup told Mr. Beran he would like to read the memos that address
          the economic and business substance issue regarding the Swiss Tax
          Structure prepared by PriceWaterhouseCooopers and outside counsel,
          and talk to them.

      b.  Mr. Beran told Schlicksup he would not let him do either even though
          Schlicksup knew these people and had worked with them on other issues
          in the past.

229.  On March 25, 2008, at 9:15AM, Schlicksup spoke on the phone to Mr. Scott (Director
      of Internal Audit).  Mr. Scott reiterated that Mr. Beran's presentation to the Audit
      Committee of the Board of Directors needed to address the most important tax
      risks.  Schlicksup told Mr. Scott that he had been involved in Board meetings for
      several years and that he has never known Mr. Beran to talk about risk openly with
      the Board, he just tells them everything is ok.  Mr. Scott did not respond nor do
      anything about this. (Schlicksup Dec., p.72-73, ¶178)

230.  On March 31, 2008, at 4:16PM, Schlicksup spoke on the phone to Mr. Scott (Director
      of Internal Audit).  Mr. Scott informed Schlicksup that Mr. Beran (Tax Director) had
      made some changes to his presentation for the April meeting of the Audit

Committee of the Board of Directors and Schlicksup had to get the changes made by

10:00AM the next day. (Schlicksup Dec., p.73, ¶179)

231.   On April 1, 2008, at 3:30PM, Mr. Beran (Tax Director) came into Schlicksup's office

and told Schlicksup he needed him to incorporate some changes he had made into

his presentation. (Schlicksup Dec., p.73, ¶180a-e)

   a.   Mr. Beran told Schlicksup he had taken "*some poetic license*" on some

slides.

   b.   Mr. Beran wanted Schlicksup to change the heading on a chart to imply

that the chart encompassed all risks related to the Swiss Tax Structure,

including the risk associated with economic and business substance.

   c.   Mr. Beran reiterated that he had checked and everything is ok with

regard to economic and business substance, but again, he would not let

Schlicksup speak to the people who said everything was ok nor see any

documentation that everything was ok.

   d.   As Schlicksup questioned Mr. Beran he asked me, "*Why are you bringing

this up*".  He seemed very concerned and agitated

   e.   Mr. Beran knew that his own Tax Managers, including the Swiss Tax

Manager, and Mr. Caviness (Tax Counsel) had formally rated the risk of

the economic and business substance issue regarding the Swiss Tax

Structure to be "HIGH", yet he was reluctant to discuss this with the

Audit Committee of the Board of Directors.

232.   On April 1, 2008, at 5:28PM, Schlicksup sent an email to Mr. Beran (Tax Director) telling him that Schlicksup did not include his "_poetic licensing_" in his presentation for the April Audit Committee meeting because it was misleading. (Schlicksup Dec., p.74, ¶181a-c)

   a.   Schlicksup told Mr. Beran that the Swiss Tax Structure was a $1,000,000,000 Pink Elephant on the Caterpillar balance sheet.

   b.   Schlicksup told Mr. Beran that he did not believe his presentation was a transparent discussion of the Swiss Tax Structure with the Board of Directors.

   c.   Schlicksup told Mr. Beran that discussing the Swiss Tax Structure in this manner was misleading.

233.   Schlicksup begged Mr. Beran for any explanation to show and tell Schlicksup why he was wrong about economic substance issue in Switzerland. (Schlicksup Dec., p.74, ¶182)

234.   To Schlicksup's knowledge, Mr. Beran has never discussed the economic and business substance issue regarding the Swiss Tax Structure with the Audit Committee of the Board of Directors during the April 2008 meeting or at any other time. (Schlicksup Dec., p.74, ¶183)

235.   Schlicksup has raised this issue to Mr. Burritt (Chief Financial Officer) and he has done nothing, contrary to Company Policy and the law that require him to take appropriate action. (Schlicksup Dec., p.74, ¶184)

**Direction From Executive Office to Report Misconduct**

236.    Each year Mr. Burritt (Chief Financial Officer) holds a meeting of all the Senior

Finance Managers from around the globe responsible for Accounting, Tax, Treasury

and other finance related functions. (Schlicksup Dec., p.75, ¶185)

237.    Schlicksup attended these meetings in 2005, 2006, 2007, and 2008. (Schlicksup

Dec., p.75, ¶186)

238.    At the 2005, 2006, and 2007 meetings, Mr. Oberhelman (Caterpillar Officer &

Executive Office member) spoke and told the attendees that he takes ethics very

seriously, and he holds the Senior Finance Managers to a higher standard than all

other employees at Caterpillar.  He told the attendees that if they had even a hint of

an ethics issue that they should raise it and get it addressed. (Schlicksup Dec., p.75

¶187)

239.    On April 28, 2008, Mr. Rapp (then Group President over Finance) spoke to the

finance managers at the civic center in Peoria.  Mr. Rapp talked about the finance

managers as being his "*trusted advisors*" and how integrity was a required part of

being a trusted advisor.  Mr. Rapp is known for telling people that you should avoid

even the "*appearance of impropriety*".  Schlicksup has heard Mr. Rapp say that

publicly more than once.  Schlicksup asked Mr. Rapp on April 28, 2008, if he could

comment about ethics.  In his comments he confirmed how important ethics are to

Caterpillar's reputation. (Schlicksup Dec., p.75, ¶188)

240.    On April 29, 2008, Mr. Fife (Caterpillar Board member and then Chairman of the

Audit Committee) spoke to the finance managers while they were eating desert

after lunch.  Mr. Fife attended the 4-day meeting.  Mr. Fife commented about

Caterpillar's sterling reputation and its importance to the company. He warned the group how it only takes one or two bad people to take down a company quickly, even as big as Caterpillar. He told the group that the Board trusts Caterpillar senior management. (Schlicksup Dec., p.75-76, ¶189)

241.    On the afternoon of May 1, 2008, sometime after 3:00PM Mr. Owens (then Caterpillar Chairman of the Board and Chief Executive Officer) closed the 2008 meeting. He told attendees that: (Schlicksup Dec., p.76, ¶190a-c)

   a.   "*He doesn't understand why other companies have integrity lapses that they should have known about earlier.*"

   b.   "*He couldn't imagine this happening at Caterpillar and he sleeps well.*"

   c.   "*We should have the highest integrity, always, and questions about integrity should be put on the table right away, and we should not be afraid to do that.*"

242.    Schlicksup recalls being at a similar meeting held in Peoria before Mr. Owens became CEO. This was sometime between September 1997 and August 2000, because Schlicksup remembers traveling from Geneva, Switzerland to attend the meeting and was one of the presenters. Mr. Owens was a Group President at the time. Mr. Owens stated very clearly that if anyone is getting pressure to inappropriately impact earnings he wanted to know about it right away. (Schlicksup Dec., p.76, ¶191)

243.    On the afternoon of May 1, 2008, after hearing Mr. Owens' comment about ethics and integrity, and after also hearing Mr. Rapp and Mr. Fife speak of the same

issue over the past two days, Schlicksup surmised that the Executive Office and the Board must not know about the issues associated with the Swiss Structure, and unless they knew about it, they could not do anything about it. (Schlicksup Dec., p.76, ¶192)

**Schlicksup Informed Rapp and Oberhelman of the Tax Fraud**

244.    In the past Mr. Rapp and Mr. Oberhelman had each received emails from Schlicksup and were both well acquainted with him, and his abilities. (Schlicksup Dec., p.80, ¶195)

245.    Schlicksup returned to his office after Mr. Owens closed the Global Finance Managers Meeting on May 1, 2008.  At 7:35PM Schlicksup sent an email to Mr. Rapp and Mr. Oberhelman (both Group Presidents & Executive Office members). (Schlicksup Dec., p.80, ¶196a-c)

    a.   The email raised serious issues about Caterpillar's ethics program.

    b.   Schlicksup told them that Mr. Burritt (Chief Financial Officer) told Schlicksup if he brought ethical issues to Mr. Oberhelman or the Board of Directors that he would be "toast".

    c.   Schlicksup told them that Ms. Snowden (Director of Ethics Office) and Mr. Buda (General Counsel) told him that there is no Caterpillar process for appealing issues you believe in good faith were not handled correctly.

246.    Attached to the email of May 1, 2008, at 7:35PM, was a 15 page memo. (Schlicksup Dec., p.81, ¶197a)

a. The memo sets out in great detail facts related to certain public auditor independence issues, misleading the Board of Directors, misleading public investors, and mail, wire and shareholder frauds, including the Swiss Tax Structure, all which Schlicksup believed they should know about as Executive Officers of Caterpillar.

   i. In this memo Schlicksup did not complain about his performance review. Schlicksup did comment about unsubstantiated negative statements in my performance review of February 2008 that echoed previous retaliatory statements made by Mr. Burritt (Chief Financial Officer) because Company Policy requires that statements made in performance reviews be substantiated with facts. Schlicksup included this comment to show the retaliation was ongoing.

   ii. Schlicksup specifically addressed the Swiss Tax Structure issue on page 11-12 of 15 of the May 1, 2008 memo which is the issue of greatest impact to shareholders.

   iii. Schlicksup requested a meeting with Mr. Rapp and Mr. Oberhelman on page 3 of 15 of the memo.

247. On May 2, 2008, Schlicksup sent Mr. Rapp and Mr. Oberhelman 137 pages of detailed supporting documentation substantiating the 15-page memo. (Schlicksup Dec., p.81, ¶198)

248. The totality of the email of May 1, 2008, at 7:35PM, the attached memo, and the 137 pages of supporting documentation is information presented to persons with

supervisory and investigation authority of a publicly-traded company. The 153

pages is not a complaint about a performance review rating. (Schlicksup Dec., p.81-

82, ¶199)

249.    Schlicksup was never contacted by Mr. Rapp or Mr. Oberhelman. (Schlicksup

Dec., p.82, ¶200)

250.    Neither Mr. Rapp nor Mr. Oberhelman ever met with Schlicksup. (Schlicksup

Dec., p.82, ¶201)

251.    Mr. Rapp and Mr. Oberhelman turned the 153 page complaint back over to the

Ms. Snowden (Director of Ethics Office) whose office was a subject of the complaint

and Ms. Barbour (Mr. Burritt's HR Manager) when Mr. Burritt was also a subject of

the complaint.  In Schlicksup's opinion, this was a conflict–of-interest according to

Corporate Policy. (Schlicksup Dec., p.82, ¶202)


**Rapp and Oberhelman *received* and *opened* the May 1 Memo**

252.    On May 1, 2008, Schlicksup sent a written memo to Mr. Oberhelman and Mr.

Rapp reporting a tax and financial statement fraud exceeding $1,000,000,000.

(Schlicksup Dec., p.83, ¶203)

253.    Schlicksup has sufficient knowledge of the relevant email system at Caterpillar

based on more than 15 years of using this system to be able to testify and explain

how it works in relation to sending and receiving email and use of the "Delivery

Confirmation Report" and "Return Receipt" functions. (Schlicksup Dec., p.83, ¶204)

254.    Schlicksup sent the memo as an attachment to an email he sent separately to

Mr. Oberhelman and Mr. Rapp at 7:35 PM on May 1, 2008. (Schlicksup Dec., p.83,

¶205)

255.    Within the relevant Caterpillar Inc. email system you can request a "Delivery

Confirmation Report" which means that your email was delivered and is now sitting

in the inbox of the recipient as new, unread mail as of the date and time stated in

the report. (Schlicksup Dec., p.83, ¶206)

256.    Schlicksup received a separate "Delivery Confirmation Report" from both  Mr.

Oberhelman and Mr. Rapp stating that his email with his attached memo was

delivered electronically to each of them separately in their individual email inboxes,

and was then sitting in their individual inboxes as new, unread mail as of the date

and time stated below: (Schlicksup Dec., p.83-84, ¶207a-c)

    a.  Mr. Oberhelman at 07:35:59 PM on May 1, 2008.

    b.  Mr. Rapp at 07:35:59 PM on May 1, 2008.

    c.  The delivery times are identical because it was a single email address to

       both Mr. Rapp and Oberhelman and, therefore, sent at the same time to

       their individual email inboxes.

257.    On the next page is a screen print, from Schlicksup's email file, of the email he

sent separately to Mr. Oberhelman and Mr. Rapp.  They would have seen this exact

same line (see within dark outlined box near middle of page) in their inbox, except it

would say "Daniel J. Schlicksup" because it was sent by Schlicksup - as opposed to

"Douglas R. Oberhelman" who was the first recipient Schlicksup addressed the email to. (Schlicksup Dec., p.84, ¶208)

258.    The line within dark outlined box on the screen print on the next page showed in "RED" in the inboxes of Mr. Oberhelman and Mr. Rapp to notify them that this was a new, unread email. (Schlicksup Dec., p.84, ¶209)

259.    The "subject" reads, "*Ethics Issues important to you, the Board and Cat Shareholders*". (Schlicksup Dec., p.84, ¶210)

260.    Merely by looking in their email inbox would put Mr. Oberhelman and Mr. Rapp on notice that there was an extraordinarily unusual email regarding, "*Ethics Issues important to you, the Board and Cat Shareholders*". (Schlicksup Dec., p.84, ¶211)

261.    Mr. Oberhelman and Mr. Rapp have a fiduciary duty to address serious "*Ethics Issues important to…the Board and Cat Shareholders*". (Schlicksup Dec., p.84, ¶212)



262.    Within the relevant Caterpillar Inc. email system you can request a "<u>Return</u>

<u>Receipt</u>" which means that your email was <u>in-fact-opened</u> by the recipient as of the

date and time stated in the report. (Schlicksup Dec., p.86, ¶213)

263.    Schlicksup received a separate "<u>Return Receipt</u>" for both  Mr. Oberhelman and

Mr. Rapp stating that his email with his memo attached was <u>in-fact-opened</u> by each

of them separately, from within their individual email inboxes as follows: (Schlicksup

Dec., p.86, ¶214a-b)

      a.  Mr. Oberhelman "<u>opened</u>" the email at 07:14:40 AM on May 2, 2008.

      b.  Mr. Rapp "<u>opened</u>" the email at 08:00:18 PM on May 1, 2008.

264.    In order to trigger the automatic "<u>Return Receipt</u>" that was sent to Schlicksup,

Mr. Oberhelman & Mr. Rapp had to "click-on" and "open" the email that Schlicksup

sent to them on May 1, 2008. (Schlicksup Dec., p.86, ¶215)

265.    On the <u>next page</u> is what Mr. Oberhelman & Mr. Rapp saw when they "<u>opened</u>"

the email Schlicksup sent them on May 1, 2008. (Schlicksup Dec., p.86, ¶216)



**Daniel
Schlicksup/0E/Caterpillar**
05/01/2008 07:35 PM

To  Douglas R. Oberhelman/0C/Caterpillar@Caterpillar, Edward
J Rapp/0E/Caterpillar@Caterpillar

cc

bcc

Subject  Ethics issues important to you, the Board and Cat
Shareholders

Caterpillar: Confidential Green          Retain Until: 05/01/2011

Dave Burritt told me that if I reported any ethical issues neither Doug nor the Board would do anything, and I would be "toast". I have observed conduct that appears contrary to Company Policy and in some cases applicable law. I reported several situations in accordance with Company Policy. All of these situations are known to one or more other high level Caterpillar employees who chose not to follow Company Policy, many for fear of certain retaliation. The fear of retaliation is real based on my experience.

As a result of reporting ethical issues, I have experienced threats, intimidation and retaliation, particularly from Dave Burritt. I am now an example to my colleagues, peers, and others that they made the correct choice when they chose to not report ethical issues and ignore Company Policy. I do not believe this is an isolated problem.

I have found no one within Caterpillar to-date who appears genuinely interested in encouraging employees to report ethical issues. The pressure to look the other way is overwhelming. The process for handling ethical complaints is incomplete, subjective, unclear and cumbersome, the practical effects of which are to discourage individuals from coming forward, to protect those who act improperly, and to disenfranchise those who follow Company Policy.

My experience with my chain-of-command is unbelievable. My experience with the OBP and Legal is extremely disappointing. The OBP and Legal told me there is no Caterpillar process for appealing issues you believe (in good faith) were not handled correctly.

I do not believe you or the Board can manage risks if you are not aware of them. Please take 20 minutes to read the attached memo before deciding your next steps. The memo speaks directly to Jim Owens' comments as he closed the 2008 Global Finance Managers' Meeting. I will forward a hardcopy of the memo and supporting documentation through company mail.

Sincerely,

Dan

050108 memo to DRO & EJR.pdf

266.    The "Subject" line of the email (as shown directly above) reads, "*Ethics Issues important to you, the Board and Cat Shareholders*".  (Schlicksup Dec., p.88, ¶217)

267.    In the last paragraph of my email Schlicksup points out to Mr. Oberhelman and Mr. Rapp: (Schlicksup Dec., p.88, ¶218a-c)

    a.    "*I do not believe you or the Board can manage risk if you are not aware (these issues)*";

    b.    "*Please take 20 minutes to read the attached memo….*"; and

    c.    "*The memo speaks directly to Jim Owen's comments as he closed the 2008 Global Finance Managers Meeting.*"

268.    Schlicksup believes Mr. Rapp was present at the Global Finance Managers Meeting when Mr. Owens closed the meeting by saying, "*We should have the highest integrity, always, and questions about integrity should be put on the table right away, and we should not be afraid to do that*". (Schlicksup Dec., p.88, ¶219)

269.    At Caterpillar, it is extraordinarily unusual for someone at Schlicksup's level with his experience and exposure to the Executive Office, to send an email to Executive Officers with the "Subject" line noted above and an attached memo outlining a more than $1,000,000,000 tax and financial statement fraud, and other frauds, especially within 2 hours of the Global Finance Managers Meeting where the Chairman had just spoke about ethics. (Schlicksup Dec., p.88, ¶220)

270.    Schlicksup does not know nor has he ever heard of anyone who has ever done this at Caterpillar in the 19 years he has been with the company. (Schlicksup Dec., p.88, ¶221)

271.    Schlicksup believes Mr. Oberhelman and Mr. Rapp have never received such an email before. (Schlicksup Dec., p.88, ¶222)

272.    Schlicksup believe by sending the email and memo he was doing what Mr. Oberhelman, Mr. Rapp and Mr. Owens told him to do as a senior finance/tax manager. (Schlicksup Dec., p.89, ¶223)

273.    On May 2, 2008, Schlicksup sent Mr. Oberhelman and Mr. Rapp each individually a "hard -copy" of the May 1st email, the 15 page memo that was attached to the email, and the 137 pages of documentation referenced in the memo supporting the tax and financial fraud, and other fraud against shareholders.  Schlicksup personally addressed these envelopes and walked them to the mail room in the basement of the Administration Building on the morning of May 2nd to assure their delivery to Mr. Oberhelman and Mr. Rapp on that day. (Schlicksup Dec., p.89, ¶224)

274.    On the next page is what Mr. Oberhelman and Mr. Rapp saw when they received the hard-copy. (Schlicksup Dec., p.89, ¶225)



Daniel
Schickkaup /CE/Caterpillar
05/01/2008 07:35 PM

To   Douglas R. Oberhelman /CC/Caterpillar@Caterpillar, Edward
cc   J Rapp/CE/Caterpillar@Caterpillar
bcc
Subject   Ethics issues important to you, the Board and Cat
Shareholders

Retain Until: 05/01/2011

Caterpillar Confidential Green

(A-4)

Dave Burritt told me that if I reported any ethical issues neither Doug nor the Board would do anything, and I would be "toast". I have observed conduct that appears contrary to Company Policy and in some cases applicable law. I reported several situations in accordance with Company Policy. All of these situations are known to one or more other high level Caterpillar employees who chose not to follow Company Policy, many for fear of certain retaliation. The fear of retaliation is real based on my experience.

As a result of reporting ethical issues, I have experienced threats, intimidation and retaliation, particularly from Dave Burritt. I am now an example to my colleagues, peers, and others that they made the correct choice when they chose to not report ethical issues and ignore Company Policy. I do not believe this is an isolated problem.

I have found no one within Caterpillar to-date who appears genuinely interested in encouraging employees to report ethical issues. The pressure to look the other way is overwhelming. The process for handling ethical complaints is incomplete, subjective, unclear and cumbersome, the practical effects of which are to discourage individuals from coming forward, to protect those who act improperly, and to disenfranchise those who follow Company Policy.

My experience with my chain-of-command is unbelievable. My experience with the OBP and Legal is extremely disappointing. The OBP and Legal told me there is no Caterpillar process for appealing issues you believe (in good faith) were not handled correctly.

I do not believe you or the Board can manage risks if you are not aware of them. Please take 20 minutes to read the attached memo before deciding your next steps. The memo speaks directly to Jim Owens' comments as he closed the 2008 Global Finance Managers' Meeting. I will forward a hardcopy of the memo and supporting documentation through company mail.

Sincerely,

Dan

050108 memo to DRO & EJR.pdf

275.    Schlicksup believe both Mr. Oberhelman and Mr. Rapp received the hard-copy of

my email, the attached memo and the 137 pages of documentation. (Schlicksup

Dec., p.91, ¶226a-b)

    a.    On May 14, 2008, at 9:24AM Schlicksup received an email from Ms.

Barbour stating, "*Doug Oberhelman and Ed Rapp have referred to me*

*your memo of May 1, 2008*".

    b.    On May 20, 2008, at 1:30PM Schlicksup received an email from Ms.

Snowden stating, "*Ed Rapp and Doug Oberhelman turned over your May*

*1, 2008, memo and its attachments to me*".

276.    The table of contents of Schlicksup's memo attached to the email he sent to Mr.

Oberhelman and Mr. Rapp on May 1, 2008, includes the following issues: (Schlicksup

Dec., p.91-92, ¶227a-m)

    a.    *"Appearance of improper reporting to the Executive Office"*

    b.    *"Appearance of improper reporting to the Board"*

    c.    *"Appearance of improper public statements"*

    d.    *"Appearance of Group President retaliation"*

    e.    *" Appearance of Sarbanes-Oxley violations"*

    f.    *"Appearance of improper reporting to the Audit Committee"*

    g.    *"Appearance of improper reporting in the public proxy"*

    h.    *"Appearance of threats and intimidation by the Chief Financial Officer"*

    i.    *"Appearance of intimidation by PwC"*

    j.    *"Appearance of improper reporting to the PwC National Office"*

     *k.*  *"Given advice from the legal department to engage in conduct that was dishonest &*
         *illegal"*

     *l.*  *"Appearance of improper income and expense reported on the financial statements"*

     m.  *"Appearance of possible fraud ".*

277.    The email to Mr. Oberhelman and Mr. Rapp on May 1, 2008, was to inform Mr.

Oberhelman and Mr. Rapp of serious shareholder fraud including serious short

comings of the Caterpillar Ethics Office and the General Counsel's Office in violation

of Sarbanes-Oxley – all things that needed to be reported to the Board.  These issues

were expounded upon in Schlicksup's written memo attached to his email and the

137 pages of supporting documentation. (Schlicksup Dec., p.92, ¶228)

278.    Schlicksup's written memo was to inform Mr. Oberhelman and Mr. Rapp of

serious shareholder fraud, and serious short comings of the Caterpillar Ethics Office

in violation of Sarbanes-Oxley. (Schlicksup Dec., p.92, ¶229)

279.    Mr. Oberhelman and Mr. Rapp are both Caterpillar Officers and members of the

Caterpillar Executive Office. (Schlicksup Dec., p.92, ¶230)

280.    As Officers and members of the Caterpillar Executive Office during the relevant

times, Mr. Oberhelman and Mr. Rapp each had and continue to have independent

authority to investigate, discover, or terminate misconduct of the kind raised in

Schlicksup's email and memo sent to them on May 1, 2008. (Schlicksup Dec., p.92,

¶231)

281.    The Executive Officers as a group review and approve all lateral moves,

promotions, etc. of employees at salary grade 30 and higher.  As such, Mr.

Oberhelman and Mr. Rapp, and all other executive officers, have specific supervisory

authority over all employees at salary grade 30 and higher, including Schlicksup.

(Schlicksup Dec., p.92, ¶232)

282.    Schlicksup's academic training, work experience, and positions held at Caterpillar

gave him the skills, knowledge and access to information to understand the tax and

financial statement activity in great detail, and to gather other, significant

documentation. (Schlicksup Dec., p.93, ¶233)

**Caterpillar Code of Conduct**

283.    The issues Schlicksup raised to Mr. Oberhelman and Mr. Rapp on May 1, 2008,

are very serious.  The Caterpillar Code of Conduct states that I if I become "*aware of*

*circumstances or action that violate, or appear to violate, the Code of Conduct,*

*enterprise policy or applicable law*" I should report it.  The Code states further that I

have a "*personal right and responsibility*" to report any such circumstance or action.

The Code also states that Schlicksup "*must use these reporting rights responsibly*

*and…only where we reasonably believe there has been a violation, and not where the*

*report is intended to be harassing, is based on personal opinion only, or is otherwise*

*trivial*".  (Schlicksup Dec., p.93, ¶234)

284.    Schlicksup believes his email dated May 1, 2008, with attached memo, and the

hard-copy of the same plus the 137 pages of supporting documentation provided to

Mr. Oberhelman and Mr. Rapp was a report commensurate with his right and

responsibility to report, commensurate with the magnitude of the issues Schlicksup

raised, and prepared to apprise them that the concerns raised were not "*…intended*

*to be harassing,…based on personal opinion only, or… otherwise trivial*". (Schlicksup Dec., p.93, ¶235)

285.    Mr. Owens said at approximately 3:30PM on May 1, 2008, in closing the Global Finance Managers Meeting that "*He couldn't imagine this* (ethics lapses) *happening at Caterpillar and he sleeps well.*"  Schlicksup took this to mean that Senior Management did not think it was possible for any ethical lapses to happen at Caterpillar and Schlicksup was aware of a more than $1,000,000,000 tax and financial fraud regarding the Swiss Structure.   Schlicksup believes the nature, presentation and content of his email, memo and supporting documentation were required and appropriate. (Schlicksup Dec., p.94, ¶236)

286.    Schlicksup has asked each and every time that he has reported an issue to anyone, that if they believe that the report is "…*intended to be harassing,…based on personal opinion only, or… otherwise trivial*" then for them to contact him right away.  At no time has anyone ever suggested or even remotely implied that any report Schlicksup made was unreasonable or improper in any way, shape, or form. Schlicksup included this same language on the third page, second to last paragraph of the memo attached to his May 1, 2008, email to Mr. Rapp and Mr. Oberhelman. (Schlicksup Dec., p.94, ¶237)

**Oberhelman, Rapp, Burritt & Beran's Performance Ratings Assigned to Schlicksup Indicate Functional, Productive Relationships**

95

287. Schlicksup believes Mr. Oberhelman, Mr. Rapp, Mr. Burritt and Mr. Beran's objective, written assessments of my performance documented before this lawsuit was filed and in the ordinary course of business support the fact that Mr. Burritt, Mr. Beran and Schlicksup had *functional*, *productive* relationships, despite their retaliation against him. (Schlicksup Dec., p.94-96, ¶238a-c)

    a. Schlicksup's performance ratings were as follows:

        i. March 1, 2005 - February 2006:     "2-Notable Performance", *signed by Oberhelman, Burritt and Beran*.

        ii. March 1, 2006 - February 2007:     "2-Notable Performance", *signed by Beran*.

        iii. March 1, 2007 - February 2008:     "2-Notable Performance", *signed by Rapp, Burritt, Beran, and Barbour*.

        iv. March 1, 2008 - September 30, 2008: "2-Notable Performance",

            1. This is documented only by an entry in the Humans Resources system.

            2. There is no written document as required by company policy.

            3. Schlicksup believes Defendants did not create a written document as required by company policy because they had <u>NO</u> other reasons for the threat-to-move-or-be-fired and move-to-IT, other than in retaliation for his reporting tax, financial and other shareholder fraud to Oberhelman and Rapp on May 1, 2008, and to Burritt and Beran from 2005 through April 2008.

    4. Schlicksup believes if Defendants had *any-other-legitimate-reasons* for the threat-to-move-or-be-fired and move-to-IT they would have documented them in his personnel file as required by company policy.

  b. "*2-Notable Performance*" is described by Defendants using the following phrases.

    i. "*This level of performance exceeds the accomplishments of most other employees*"; "*Surpasses <u>all</u> job expectations in accordance with the Values-based competencies*"; "*Significant contribution to the corporation*"; and "*Exceptional job performance*".

    ii. "*Exceeded job expectations on an ongoing basis*"; "*Deserving of notice and attention*"; and "*Highly competent*".

  c. Schlicksup was rated a "2-Notable Performance" for the period March 1, 2008 to September 30, 2008.  The threat-to-move-or-be-fired and move-to-IT occurred on August 26, 2008

**Beran and Schlicksup had a Functional, Productive Relationship**

288.    Mr. Beran and Schlicksup had a *functional*, *productive* relationship, despite Mr. Beran's retaliation against Schlicksup. (Schlicksup Dec., p.96, ¶239)

289.    Schlicksup has never received any indication, communication or implication from Mr. Beran that would contradict his belief that Mr. Beran and Schlicksup had a

*functional*, *productive* relationship, despite Mr. Beran's retaliation against

Schlicksup. (Schlicksup Dec., p.96, ¶240)

290.    Schlicksup has never received any indication, communication or implication from

anyone that would contradict his belief that Mr. Beran and Schlicksup had a

*functional*, *productive* relationship, despite Mr. Beran's retaliation against

Schlicksup. (Schlicksup Dec., p.97, ¶241)

291.    Mr. Beran and Schlicksup interacted by email, by phone and face-to-face in the

ongoing, normal course of business nearly every day from January 1, 2008, until the

threat-to-move-or-be-fired and move-to-IT on August 26, 2008.  This is true for

2005, 2006 and 2007 also. (Schlicksup Dec., p.97, ¶242)

292.    Schlicksup was respectful of and professional with Mr. Beran at all times since

before 1992, despite Mr. Beran's retaliation against Schlicksup. (Schlicksup Dec.,

p.97, ¶243)

293.    From January 1, 2008, until August 26, 2008, Mr. Beran and Schlicksup interacted

684 times by email alone.  This averages 4.5 times each day, excluding phone and

face-to-face interactions. (Schlicksup Dec., p.97-98, ¶244a-e)

    a.  January through April 2008: 360 emails

    b.  May through August 26, 2008: 324 emails

    c.  The volume of interaction between Mr. Beran and Schlicksup was

        essentially the same both before and after Schlicksup reported tax,

        financial and other shareholder fraud to Mr. Oberhelman and Mr. Rapp

        on May 1, 2008.

d.  Schlicksup believes the volume and level of interaction between Mr.
    Beran and Schlicksup did not change because Mr. Beran and Schlicksup
    had a *functional*, *productive* relationship, despite Mr. Beran's retaliation
    against Schlicksup.

e.  Schlicksup does not believe that Mr. Beran and Schlicksup would have
    maintained the same level of interaction, unless they had a *functional*,
    *productive* relationship.

294.  After Schlicksup reported tax, financial and other shareholder fraud to Mr.
Oberhelman and Mr. Rapp on May 1, 2008, he continued performing the same work
for Mr. Beran including: (Schlicksup Dec., p. 98-99, ¶245a-j)

a.  Chairing the Tax Council meetings on behalf of Mr. Beran;

b.  Working one-on-one with Mr. Beran bi-monthly to prepare his
    communications to the Board of Directors;

c.  Working one-on-one with Mr. Beran monthly on the Tax Department's
    budget and financial reporting;

d.  Managing and overseeing the Tax Department's role in the Global
    Finance Business Transformation sponsored personally by Mr. Burritt.
    Mr. Beran had written the following on the white board in his office in
    large RED letters for everyone to see.

    i.  "*Tax efforts in the Global Finance Transformation is the most
        important thing we'll do in next 25 years*."  This project is still
        ongoing;

e.  Working one-on-one with Mr. Beran bi-monthly to prepare the Board meeting Tax legislative updates for Mr. Burritt;

f.  Coordinating the Tax Department's input to the weekly Executive Office Round Table meetings; and

g.  Working one-on-one with Mr. Beran regarding presentations and material for him for events outside Caterpillar such as tax symposiums or panel discussions.

h.  The substance of Schlicksup's work with Mr. Beran was the same both before and after Schlicksup reported tax, financial and other shareholder fraud to Mr. Oberhelman and Mr. Rapp on May 1, 2008.

i.  Schlicksup believes Mr. Beran did not change nor have any reason to change the work that Schlicksup was doing because Mr. Beran and Schlicksup had a *functional*, *productive* relationship, despite Mr. Beran's retaliation against Schlicksup.

j.  Schlicksup does not believe that Mr. Beran would have let him continue to engage in work with his superiors and the Board Audit Committee unless they had a *functional*, *productive* relationship, and despite Mr. Beran's retaliation against Schlicksup.

295.  Mr. Beran continued to interact with Schlicksup by email, even after the threat-to-move-or-be-fired and move-to-IT on August 26, 2008.  (Schlicksup Dec., p. 99-100, ¶246a-c)

a. Mr. Beran and Schlicksup interacted by email approximately 108 times by email, after August 26, 2008.

b. Mr. Beran emailed Schlicksup all the way through April 2009.

c. Schlicksup believes Mr. Beran continued to interact with him because -- even after the threat-to-move-or-be-fired and move-to-IT -- Mr. Beran and Schlicksup had a *functional*, *productive* relationship, despite Mr. Beran's retaliation against Schlicksup.

296.    On September 12, 2008, at 1:58PM Mr. Beran emailed Schlicksup asking for his assistance. (Schlicksup Dec., p.100, ¶247a-e)

a. He also stated, "*Would like to thank you for all the work you did on getting some of our processes updated, and the good work on communications with Dave (i.e. Mr. Burritt) and upstairs (i.e. Mr. Oberhelman, Mr. Rapp and the Board Audit Committee).  Can I buy you lunch sometime?*"

b. Schlicksup took Mr. Beran's email to mean he believed he could still contact Schlicksup for assistance and Schlicksup would respond, which he did and to which Schlicksup responded.

c. Schlicksup took Mr. Beran's email to mean that Mr. Beran wanted to see Schlicksup before he moved-to-IT.

d. Schlicksup took Mr. Beran's email to be an admission by Mr. Beran that he knew "*a while ago*" that Schlicksup would be moved-to-IT, because he knows in a normal situation he was responsible to and would have talked

to Schlicksup if the move-to-IT was a real, genuine "opportunity", and not

retaliation.

e. Schlicksup took Mr. Beran's email to mean that Mr. Beran was

comfortable sending this email because Mr. Beran and Schlicksup had a

*functional*, *productive* relationship -- even after the-threat-to-move-or-

be-fired and move-to-IT, and despite Mr. Beran's retaliation against

Schlicksup.

297.    The Tax Department Personnel and Schlicksup had a *functional*, *productive*

relationship. (Schlicksup Dec., p.101-103, ¶248a-d)

a. Schlicksup believe Mr. Oberhelman, Mr. Rapp, Mr. Burritt and Mr. Beran's

objective, written assessments of my performance documented before

this lawsuit was filed and in the ordinary course of business (see above)

support the fact that the Tax Department Personnel and Schlicksup had a

*functional*, *productive* relationship.

b. In September 2008, the reactions of Tax Personnel after the-threat-to-move-or

be-fired and move-to-IT were the following.

i. "*Dear Dan.  You will be one of my best recollection(s) during my long*

*career with this company.  YES, my best recollection.*"

ii.  "*WOW!! Comes as a bit of a shock.  Thanks for all you did while in*

*tax.*"

iii. "*…it is a shock to hear that you are leaving us!  I am sorry you are*

*leaving tax - you will be missed.*"

102

iv.  *"Wow!  This was a surprise. It was great working with you and I appreciate all your advice/direction.  You have always been honest and reliable and that is refreshing."*

v.  *"I certainly enjoyed all my interactions with you over the past several years…the hosting, your general career counseling and advice, have all been great for me."*

vi.  *"I just want to thank you for you contribution to the group.  I am sorry to see that we are losing one of out last chances of a different management style.  Too bad for us, good news for S&PD (i.e. IT)."*

vii.  *"…your efforts are the main reason that I am still at Caterpillar today. Without your intervention…I would have quit Cat months ago."*

viii.  *"I think the tax group (especially the staff) will miss having an impartial non/boss in charge of bringing up personnel issues and concerns.  I know I certainly appreciated you in that regard, and always felt I was getting a straightforward answer- not a biased response…."*

ix.  *"…big loss for tax, gain for S&PD (i.e. IT)."*

x.  *"WHY ???"*

xi.  *"…it looks like they've already chopped up your tax role and spread it around (to your peers)."*

c.  Schlicksup believes he received these comments and others like them because the Tax Department Personnel and Schlicksup had a *functional, productive* relationship.

d.  Tax Department Personnel knew that Schlicksup was treated unfavorably regarding the threat-to-move-or be-fired and move-to-IT.  The Assistant Director of European Tax Services wrote,

   i.  "*Hope you are doing well and S&PD (i.e. IT) is treating you well ...& better than Corp Tax !*"

## Burritt and Schlicksup had a Functional, Productive Relationship

298.    Mr. Burritt and Schlicksup had a *functional, productive* relationship, despite Mr. Burritt's retaliation against Schlicksup. (Schlicksup Dec., p.103, ¶249)

299.    Schlicksup had never received any indication, communication or implication from Mr. Burritt that would contradict my belief that Mr. Burritt and Schlicksup had a *functional, productive* relationship, despite Mr. Burritt's retaliation against Schlicksup. (Schlicksup Dec., p.103, ¶250)

300.    Schlicksup has never received any indication, communication or implication from anyone that would contradict his belief that Mr. Burritt and Schlicksup had a *functional, productive* relationship, despite Mr. Burritt's retaliation against Schlicksup. (Schlicksup Dec., p.103, ¶251)

301.    Mr. Burritt and Schlicksup interacted little during 2008. (Schlicksup Dec., p.103, ¶252)

302.    Schlicksup believes Mr. Burritt and Schlicksup interacted little during 2008

because of his ongoing retaliation against Schlicksup for having raised financial, tax

and other shareholder fraud to him previously, and having reported him to Mr.

Oberhelman and Mr. Rapp on May 1, 2008. (Schlicksup Dec., p.104, ¶253)

303.    Mr. Burritt and Schlicksup interacted by email 7 times between January 1, 2008,

until the threat-to-move-or-be-fired and move-to-IT on August 26, 2008. (Schlicksup

Dec., p.104, ¶254a-d)

    a.   This averages to less than one email a month.

       i.   January through April 2008: 3 emails or less than one a month.

       ii.   May through August 26, 2008: 4 emails or one a month.

    b.   The volume of interaction between Mr. Burritt and Schlicksup was

essentially the same both before and after Schlicksup reported tax,

financial and other shareholder fraud to Mr. Oberhelman and Mr. Rapp

on May 1, 2008.

    c.   Schlicksup believes the volume and level of interaction between Mr.

Burritt and Schlicksup did not change because Mr. Burritt and Schlicksup

had a *functional*, *productive* relationship, despite Mr. Burritt's retaliation

against Schlicksup.

    d.   Schlicksup does not believe that Mr. Burritt and Schlicksup would have

maintained the same level of interaction unless they had a *functional*,

*productive* relationship, and despite Mr. Burritt's retaliation against

Schlicksup.

304.    After Schlicksup reported tax, financial and other shareholder fraud to Mr.

Oberhelman and Mr. Rapp on May 1, 2008, Schlicksup continued performing the

same work for Mr. Burritt including: (Schlicksup Dec., p.104-105, ¶255a-g)

    a.  Bi-monthly communications to the Board of Directors;

    b.  Managing and overseeing the Tax Department's role in the Global

Finance Business Transformation sponsored personally by Mr. Burritt;

    c.  Bi-monthly Board meeting Tax legislative updates for Mr. Burritt; and

    d.  Coordinating the Tax Department's input to the weekly Executive Office

Round Table meetings.

    e.  The substance of Schlicksup's work with Mr. Burritt was the same both

before and after he reported tax, financial and other shareholder fraud to

Mr. Oberhelman and Mr. Rapp on May 1, 2008.

    f.  Schlicksup believes Mr. Burritt did not change nor have any reason to

change the work that Schlicksup was doing because Mr. Burritt and

Schlicksup had a *functional*, *productive* relationship, despite Mr. Burritt's

retaliation against Schlicksup.

    g.  Schlicksup does not believe that Mr. Burritt would have let him continue

to engage in work with Burritt's superiors and the Board Audit

Committee unless we had a *functional*, *productive* relationship, and

despite Mr. Burritt's retaliation against Schlicksup.

305.    Schlicksup was respectful of and professional with Mr. Burritt at all times since before 1992, despite Mr. Burritt's retaliation against Schlicksup. (Schlicksup Dec., p.105, ¶256)

306.    Finance Personnel in Mr. Burritt's Division outside the Tax Department and Schlicksup had a *functional*, *productive* relationship. (Schlicksup Dec., p.105-106, ¶257a-b)

    a.  The accounting personnel for Mr. Burritt's Division wrote the following comments.

        i.  August 22, 2008:   "*Dan – thanks very much: wish all the groups (in Mr. Burritt's Division) would have sent back such a detailed analysis like yours!!*"  This was only 4 days before the threat-to-move-or-be-fired and move-to-IT.

        ii.  In or about 2008:   "*Dan, Thank you for all the time & energy that you have put into the Business Plan.*"

        iii.  In or about 2008:   "*Dan, Thank you for all your help with the Hackett Study.  I really appreciate the time and effort you put forth to contribute to GF&SSD's (i.e. Mr. Burritt's Division) input.*"

    b.  Schlicksup believes these comments were made by the Finance Personnel in Mr. Burritt's Division outside the Tax Department because they and Schlicksup had a *functional*, *productive* relationship.

307.    At Caterpillar, an employee is not required to sign their performance review.  It states on the performance review form that signing is merely an acknowledgement. (Schlicksup Dec., p.106-107, ¶258a-c)

a.  When Schlicksup did not sign his performance review for the period March 1, 2007 to February 28, 2008, Schlicksup politely told Mr. Beran and Mrs. Barbour that he would not sign it.

b.  There were no harsh words of any sorts.

c.  Neither Mr. Beran nor Ms. Barbour told Schlicksup he was required to sign the performance review, although they pressured him to do so.

**Management's Attitude Toward Schlicksup After Reporting Fraud to Oberhelman and Rapp**

308.    In or about July 2008, Schlicksup was walking down the hallway on the fourth floor of the Administration Building just outside the B-wing.  The hallway runs perpendicular to the escalators.  As Schlicksup walked down the hall from the C-wing toward the A-wing you pass the opening to the escalators on your left. The escalators come up from the third floor and go up to the fifth floor in this opening. As Schlicksup walked by the opening to the escalators Mr. Owens was coming up the escalator with a couple other people.  They were all about to step onto the 4th floor landing and turn to go up the escalator to the 5th floor.  Mr. Owens was carrying-on a conversation with the other gentlemen.  When Schlicksup made eye contact with Mr. Owens, he held his hand out in the *shape-of-a-pistol* and pushed his thumb forward and down *as-if-to-shoot-me*.  Schlicksup has passed Mr. Owens in the

building and outside the building many times before and he had said, "*Hi Dan.*"  He has never made this gesture to me before.  Schlicksup knew of no reason that Mr. Owens would have made this gesture other than his recent reporting of shareholder fraud to Mr. Oberhelman and Mr. Rapp.  Mr. Owens was not smiling when he made this gesture toward me and he looked dead serious.  Since the hallway runs perpendicular to the escalators and the opening from the escalator landing to the hallway is only 8-10 feet wide, Schlicksup was the only person in Mr. Owens' view toward whom his hand was pointing.  Schlicksup took this to mean that Mr. Owens knew that Schlicksup had reported tax, financial and other shareholder fraud to Mr. Oberhelman and Mr. Rapp, and Schlicksup was a *walking-dead-man* as far as Caterpillar management was concerned. (Schlicksup Dec., p.107-108, ¶259)

309.     In or about August 2009, Schlicksup was in the Administration Building. Schlicksup was leaving the fourth floor, by entering the stairwell at the intersection of the A and B wings.  As Schlicksup descended the stairs Mr. (Steve) Williams was ascending the stairs.  Mr. Williams is an economist for PriceWaterhouseCoopers whom Schlicksup knows well and who performed much of the economic analysis related to the GloVE program (i.e. Swiss and Bermuda structures).  Mr. Williams is a friend of Mr. Beran.  Mr. Williams looked up and saw Schlicksup.  Schlicksup said, "*Hey Steve*".  Mr. Williams said, "*I thought they'd have run you out of town by now*". Schlicksup took this to mean that Mr. Williams was aware of his reporting tax, financial and other shareholder fraud, and that Schlicksup had filed this lawsuit. Also, that Mr. Williams had an understanding of management's feelings and attitude

toward Schlicksup, which was *run-him-out-of-town.* (Schlicksup Dec., p.144-145, ¶334)

**Move-To-IT from Tax Reduced Schlicksup's Economic Contribution to the Company**

310.    *Before* the threat-to-move-or-be-fired and the move-to-IT, while in the Tax Department, Schlicksup was responsible for generating more than $428,000,000 of net tax savings for shareholders or *value to the company* from 1992 through 2000, which was documented in the normal course of business in his personnel file by Mr. Oberhelman, Mr. Burritt, and Mr. Beran as follows: (Schlicksup Dec., p.145-146, ¶335a-j)

   a.   1992: $40,000,000

   b.   1993: $10,000,000 + $1,124,123 = $11,124,123

   c.   1994: $10,000,000

   d.   1995: (review for 1995 missing from personnel file provided by Defendants)

   e.   1996: $1,000,000 + $1,000,000 + $1,000,000 + $4,800,000 + $99,500,000 + $21,000,000 = $128,300,000

   f.   1997: $4,500,000

   g.   1998: $50,000,000

   h.   1999: $150,000,000

   i.   2000: $35,000,000

This averages approximately $47,000,000 each year for 9 years.

311.    *After* the threat-to-move-or-be-fired and the move-to-IT I have only been able to generate cost savings or *value to the company* of approximately $7,575,373 over 3 years for an average of approximately $2.5 million each year. (Schlicksup Dec., p.146, ¶336)

    a.  This is *only 5%* of the *value to the company* Schlicksup added each year in the Tax Department

### Schlicksup's Responsibilities *Before* and *After* the threat-to-move-or-be-fired & move-to-IT

312.    *Before* the threat-to-move-or-be-fired and the move-to-IT Schlicksup was responsible for large budgets and significant numbers of people.  Schlicksup had significant responsibility based on the following information as documented by the Defendant's in the ordinary course of business. (Schlicksup Dec., p.146-147, ¶337a-c)

    a.  <u>2001</u>:  Delivered $25,000,000 program on-budget, on-time & on-spec, leading 195 people and 3 consulting firms in 200 locations on two continents.

    b.  <u>2002</u>:  Delivered $27,000,000 program on-budget, on-time & on-spec, leading 194 people and 3 consulting firms in 200 locations on two continents.

    c.  <u>2003</u>:  Delivered three programs totaling $23,000,000 on-budget, on-time & on-spec, leading over 200 people and 3 consulting firms over 200 locations on three continents.

313.   *After* the threat-to-move-or-be-fired and the move-to-IT, Schlicksup has: (Schlicksup Dec., p.147, ¶338a-d)

    a.  No budget,

    b.  No personnel,

    c.  No authority, and

    d.  No substantive, real responsibility.

314.   Schlicksup asked for greater responsibility from Mr. Jensen several times to no avail.  (Schlicksup Dec., p.147-148, ¶339a-d)

    a.  On or about March 18, 2009, Schlicksup proposed ways to have a much greater impact on the IT organization.  Schlicksup told Mr. Jensen that he could do much more with a few more resources while promising to save money in return.  He never responded.

    b.  On October 18, 2009, Schlicksup emailed Jensen asking for responsibility. The Caterpillar IT organization had no "innovation" group.  Schlicksup offered to lead such a group and produce results if he would give me a small amount of resource.  For example, there are many problems with Caterpillar engineering systems which I indicated could benefit from such an effort.  He never responded.

    c.  On November 20, 2009, Schlicksup emailed Jensen explaining how organizational barriers are preventing progress within IT, and offering to discuss this more.   He never responded.

d. On December 1, 2009, Schlicksup emailed Jensen about more quickly implementing a new technology, how to do it, and that Schlicksup thought there could be a $100,000,000 positive impact. He never responded

**Threat-to-move-or-be-fired and Move-to-IT caused a Decrease-in-Pay and Loss-of-Promotions**

315. Earlier Schlicksup discussed the Board's and senior management's responsibility to create exposure for employees with outstanding management potential, and the continuous exposure to senior management created for Schlicksup up until approximately May 2006. (Schlicksup Dec., p.148, ¶340)

316. Mrs. Pierpont indicated in her deposition that Schlicksup was the "*Number 2*" person in the Tax Department. Schlicksup took this to mean that when Mr. Burritt brought him into the Tax Department in 2005 he had told others about the importance of his role and that Schlicksup would likely succeed Mr. Beran. (Schlicksup Dec., p.149, ¶341)

317. The table below shows Schlicksup, and his peers as of August 26, 2008, the time of the threat-to-move-or-be-fired and the move-to-IT. It shows their salary grades over time. (Schlicksup Dec., p.149, ¶342)

318. As of 2006, Perkins and Schlicksup were each one salary grade higher than their peers. (Schlicksup Dec., p.149, ¶343)

319. Schlicksup is the only one of his peers who reported tax, financial and other shareholder fraud in 2006 and 2007, even though they were all aware of most, or even more, of the facts that Schlicksup was aware of. (Schlicksup Dec., p.149, ¶344)

320.    In or about October 2007, Perkins, Parsons, Stiles and Vest were promoted.

Hagen and Crook remained at the same salary grade.  Schlicksup was demoted

(grandfathered at salary grade 30 for 2 years on a "special agreement").  At this

time, it was known that Crook would retire soon. (Schlicksup Dec., p.149, ¶345)

| Name | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|------|------|------|------|------|------|------|
| Hagen | 29 | 29 | 29 | 30 | died | *JOB OPEN* |
| Crook | 29 | 29 | retired | | | |
| Vest | 29 | 30 | 30 | 30 | 30 | 30 |
| Stiles | 29 | 30 | 30 | 31 | 31 | 31 |
| Perkins | 30 | 31 | 31 | retired | | |
| Parsons | 29 | 30 | 30 | 30 | 30 | 31 |
| Schlicksup | 30 | 29/30 | 30 | | | |

321.    On July 31, 2008, at 3:17PM Schlicksup sent an email to Mr. Beran explaining to

him a salary grade 30 or higher position in the Tax Department that would be

suitable for him, and specifically pointed out 13 reasons as to why Schlicksup was

more qualified for open positions and promotions than any of him peers.  All of

these reasons were relevant to and considered when promoting people at

Caterpillar. (Schlicksup Dec., p.150, ¶346a-d)

a.  Knowing that Crook (U.S. State Tax Manager) and Hagen (U.S. Federal Tax

Manager) would retire soon, Schlicksup suggested combining the State

and Federal Tax Manager jobs into a U.S. Domestic Tax Manager position.

    b.  Schlicksup know Mr. Beran received the email because he got a return receipt which means he clicked-on the email and opened it.

    c.  Mr. Beran never responded in any way.

    d.  Schlicksup believe Mr. Beran never responded because he was already aware, or shortly thereafter became aware, of the imminent threat-to-move-or-be-fired and move-to-IT.

322.  In or about October 2008, Crook retired as planned and his job was combined with Hagen's in order to promote Hagen as the U.S. Domestic Tax Manager.  This is exactly the job Schlicksup had brought to Mr. Beran's attention on July 31, 2008. (Schlicksup Dec., p.150, ¶347)

323.  In 2009, Perkins retired and Stiles was promoted into Perkins' job. (Schlicksup Dec., p.150, ¶348)

324.  Previously, in or about January 2006, Mr. Beran and Schlicksup discussed his intent to have Schlicksup replace Perkins upon Perkins' retirement. (Schlicksup Dec., p.150, ¶349)

325.  Stiles was aware of nearly all, or more than, the facts that Schlicksup was aware of, including discussing and agreeing with Schlicksup that there was no economic or business substance to the Swiss Structure.  Stiles, however, never reported the issues as problems. (Schlicksup Dec., p.151, ¶350)

326.  In November 2010, Hagen died and his job became open.  It is still open. Schlicksup is qualified to fill it. (Schlicksup Dec., p.151, ¶351)

327.    On December 6, 2010, at 11:20AM, even though being previously told Schlicksup could not work in the Tax Department or Finance, Schlicksup sent an email to Mr. Jensen, his current supervisor in IT, telling him there was a position open in the Tax Department that Schlicksup had previously raised to Mr. Beran and was qualified for, pursuant to company policy. (Schlicksup Dec., p.151-152, ¶352a-e)

    a.  Schlicksup pointed out to Mr. Jensen that he could add far more *value to the company* working in the Tax Department than in the IT Department.

    b.  Schlicksup asked Mr. Jensen if he would inquire into job and he said yes. Schlicksup never heard back from him.

    c.  Schlicksup asked Mr. Jensen for the status of this job several months later in late spring of 2011.   Mr. Jensen told Schlicksup these things take time and they are just following the process.   Schlicksup never heard back from him.

    d.  Schlicksup asked Mr. Jensen for the status on this job in August 2011 and still did not get an affirmative answer one way or the other.  Jensen stated it's possible they could look outside the company to fill this position if they are "*looking for fresh ideas*".

      i.  Schlicksup pointed out again to Mr. Jensen that he could add far more *value to the company* working in the Tax Department than in the IT Department.

      ii.  Mr. Jensen told Schlicksup he didn't want to speculate about this.

      iii.  Schlicksup told Mr. Jensen this was documented in his personnel file.

      iv.   Mr. Jensen told Schlicksup he would not answer any more questions.

    e.   Mr. Rapp stated in his deposition in or about June 2011 that they intend to fill Mr. Hagen's job in the Tax Department from outside the company. Schlicksup took this to mean when he was previously told that he cannot work in the Tax Department or Finance, they meant what they said and this was proof it, particularly since Hagen died and is job is *STILL OPEN*.

328.    In 2011, Parsons was promoted again, this time from a salary grade 30 to a 31. (Schlicksup Dec., p.152, ¶353)

329.    Below is a table with *succession planning* ratings provided by the Defendants. A "K" means that someone is thought to be well placed where they are and should not be moved, not even laterally. An "L" means that you are thought to be able to move laterally only, no promotions. A "P" means that you are thought to be promotable at least one salary grade. (Schlicksup Dec., p.152, ¶354)

| Name | 2006 | 2007 | 2009 |
|---|---|---|---|
| Hagen | K | K | K |
| Crook | retired in 2008, not on list run in early 2010 | | |
| Vest | K | K | K |
| Stiles | K | P | P |
| Perkins | K | K | K |
| Parsons | P | P | P |
| Schlicksup | missing | L | L |

330.    Mr. Burritt assessed Schlicksup on March 17, 2006, but there is no rating.  The

rating is missing from the documents produced by Defendants. (Schlicksup Dec.,

p.153, ¶355)

331.    When, on June 22, 2007, Mr. Beran apparently made the entry in an employee

data base that Schlicksup should be moved out of the Tax Department, he had never

discussed this with Schlicksup. (Schlicksup Dec., p.153, ¶356)

332.    On August 20, 2007, Schlicksup was rated down to an "L", but there is no

indication who was responsible for rating me an "L" which Schlicksup knows to be a

downgrade in his status. (Schlicksup Dec., p.153, ¶357)

333.    Schlicksup have been told nearly his entire career that he was *High Potential* (see

earlier regarding comments in performance reviews), until Schlicksup reported tax,

financial and other shareholder fraud. (Schlicksup Dec., p.153, ¶358)

334.    *High Potential* or "H" means more than "P" or promotable.  For someone at a

salary grade 29 or 30 it means that you are capable of being a salary grade 31 or

higher. (Schlicksup Dec., p.153, ¶359)

335.    When Schlicksup was rated down to an "L" on August 20, 2007, Stiles was rated

up from a "K" (no moves at all) to a "P", available for promotions. (Schlicksup Dec.,

p.153-154, ¶360a-c)

    a.    When Stiles was rated up from a "K" or *no moves at all* to being

        *promotable*, a significant jump up, there was no change or addition to the

        notes accompanying the assessment.  The comments were the same they

        had been when she was a "K".

b. It is standard practice at Caterpillar based on my experience that you document and explain significant changes in personnel assessments.

c. On October 12, 2007, Mr. Beran discussed with Schlicksup that "*by-the-way*" Mr. Burritt told Mr. Beran that they probably would not need his job at some point in the future.

336. Schlicksup believes the practical effect of all this is that he reported tax, financial and other shareholder fraud and was demoted, then threatened-to-move-or-be-fired, and then moved-to-IT.  Schlicksup's peers who did not report tax, financial and other shareholder fraud despite being aware of nearly all, or more than, the facts that I was aware of, were all promoted over the same period of time. (Schlicksup Dec., p.154, ¶361)

337. Schlicksup believes, based on his personnel record described earlier in documents written by the Defendants and due to all the exposure to senior management he was given throughout his career until mid 2006, Schlicksup would have been promoted to a salary grade 31 in the Tax Department, just like all his peers in the Tax Department were, if he had not reported tax, financial and other shareholder fraud to Mr. Burritt, Mr. Beran, Mr. Buda, Mr. Oberhelman and Mr. Rapp. (Schlicksup Dec., p.154, ¶362)

338. The change resulting from becoming a salary grade 31 is so significant that you get a letter from the Chairman stating it is a "*significant milestone in your career*" and puts you in "*a select group of Caterpillar employees in terms of position and compensation*". (Schlicksup Dec., p.154, ¶363)

339.    Schlicksup has performed a detailed calculation of his salary through age 62 and

his pension through age 85.  Schlicksup used a 4% annual salary increase.  This is the

average annual raise for an average "3B" performer for the last 15 years.  This is

conservative since Schlicksup have always been rated above a "3B" prior to the

move-to-IT.  Schlicksup used a conservative amount for the value of the equity that

is significantly below recent increases in the value of Caterpillar stock.  Schlicksup

used a 4% discount factor which represents his personal cost of capital or funds.

Schlicksup made the calculation for both a salary grade 30 and a 31.  The <u>difference</u>

in the *<u>present value</u>* of Schlicksup's cumulative compensation for the balance of his

career and retirement as a salary grade 30 versus a 31 is:  *$5,766,000 less*

*compensation at a salary grade 30 versus a salary grade 31*. (Schlicksup Dec., p.154-

155, ¶364)

340.    Schlicksup was denied a salary increase in April 2011 for the 2010 performance

period.  If Schlicksup was rated a "3B" or higher, he would have received a raise

because a person rated "3B" was only limited by the maximum of their salary range.

Since Schlicksup was rated a "3C", he was limited to the mid-point of his salary

range.  Since Schlicksup has been such a high performer in the past, his salary

already exceeds the mid-point of his salary range. (Schlicksup Dec., p.155, ¶365)

341.    There are many *intangible benefits* to being in the Tax Department that are very

important to Schlicksup with 2 children in middle school and significant immediate

family residing in Peoria.  First, Schlicksup's peers in the Tax Department as of

August 26, 2008, have never had to relocate in order to be promoted.  Hagen, Crook,

Vest, Stiles, Perkins and Parsons have never relocated outside their home country.

This is a significant advantage when you have 2 children ages 11 and 13 as Schlicksup

does.  In IT, and if it's even possible, Schlicksup will have to prove himself all over

again which would mean moving my family.   Second, the Tax Department is the

only Department Schlicksup knows where people can get significant promotions in

the same job.  For example, Perkins was promoted to a salary grade 28 in or about

1991.  He was since promoted to a 29, 30, and then 31 without ever changing jobs or

even leaving the same wing of the same building in the same city. (Schlicksup Dec.,

p.155-156, ¶366)


**Graphic Depiction of Schlicksup's Career *Before* and *After* Reporting Shareholder Fraud**

342.    Schlicksup was promoted on average every 3.5 years before reporting tax,

financial and other shareholder fraud.  Schlicksup's job has (i.e. Schlicksup has) been

re-evaluated.  Schlicksup is awaiting a downgrade, perhaps to a level lower than

what he hired in at 20 years ago. (Schlicksup Dec., p.164, ¶378)



343.    Schlicksup's performance review ratings dropped significantly after the threat-to-move-or-be-fired and the move-to-IT.  He received no rating from 2008 through June 2010.  Schlicksup was denied a salary increase in 2011 due to these ratings.  (Schlicksup Dec., p.165, ¶379)



344.    Schlicksup's Career Potential:  (Schlicksup Dec., p.165, ¶380)



345.    Schlicksup's career potential ratings dropped significantly after the threat-to-move-or-be-fired and the move-to-IT.   To Schlicksup's knowledge prior to the move-to-IT, he was rated "high potential" which meant he was capable of significant future promotions, "A Leader of Leaders" as Caterpillar defines it.   Then in 2007, after reporting shareholder fraud to Mr. Burritt and Mr. Beran, Schlicksup was suddenly considered "not promotable" and only capable of a "lateral" move.  The Company guidelines for assessing potential state that "lateral" means "lateral only".  If you believe someone is capable of being promoted in the "longer term", but you want them to have a developmental lateral move in the near term, then you still must rate them as capable of being high potential or promoted, but not lateral.

(Schlicksup Dec., p.166, ¶381)

346.    It is Company Policy that all moves related to employees at Schlicksup's level (salary grade 30 and above) must be approved by each member of the Executive Office. (Schlicksup Dec., p.166, ¶382)

347.    Schlicksup was a high potential employee. (Schlicksup Dec., p.166, ¶383a-b)

   a.   From 1996 to 2000 Schlicksup worked for Mr. Burritt (Chief Financial Officer).  Schlicksup reported directly to Mr. Burritt.  Mr. Burritt told Schlicksup several times that he was a "High Potential" employee for career advancement purposes.

   b.   Mr. Lavin (Officer & Executive Office member) described my career advancement potential by stating, "*Dan is a high potential, high performing employee who should be brought along more aggressively.*"

348.    Impact on Advancement. (Schlicksup Dec., p.166-167, ¶384a-d)

    a.  For the remainder of Schlicksup's career, a "one" salary grade promotion from a salary grade 30 to a salary grade 31 would more than $5M to my compensation and benefits including retirement (see above).  A salary grade 31 is a significant milestone in a Caterpillar career entitling an employee to significant additional compensation only available at a salary grade 31 or higher (see above).

    b.  Information Technology (IT) has only four positions that are a salary grade 31 or above.  Also, IT has no potential lateral moves at a salary grade 30 (see below).

    c.  Finance has twenty-nine positions that are salary grade 31 or above.  Also, Finance has three to ten potential lateral moves at a salary grade 30 (see below).

    d.  Schlicksup had more opportunity to advance to a salary grade 31 in Finance, than in Information Technology.

**IT Department has Less Opportunity than the Tax Department**

349.    The data below is taken from the Career Progression Planning Tools for each functional area within Caterpillar.  This information is available to Caterpillar employees on the company's intranet.  The table below shows the salary grades offered, by Function. (Schlicksup Dec., p.167, ¶385)

| Salary Grade | 29 | 30 | 31 | 32 | 33 | 34 |
|---|---|---|---|---|---|---|
| Finance (incl'g Acctg, Tax, Treas) | x | x | x | x | x | x |
| Engineering | x | x | x | x | | |
| Marketing | x | x | x | x | | |
| Purchasing | x | x | x | x | | |
| Human Resources | x | x | x | | | |
| Logistics | x | x | x | | | |
| Operations | x | x | x | | | |
| Supply Chain | x | x | x | | | |
| Health & Safety | x | x | x | | | |
| Manufacturing | x | x | | | | |
| Revenue Management | x | x | | | | |
| IT | | | | | | |

350.    The IT function does not show any positions for salary grades 29 and above for

an employee to consider for progression into.  The IT function displays fewer

opportunities for employees to consider for promotions than any other function

within Caterpillar. (Schlicksup Dec., p.168, ¶386)

351.    The data in the table below comes from information provided by the

Defendants.  The table below shows the number of positions in the Finance and IT

Departments for the following salary grades.  There are a few salary grades that

show up in this table that do not show up in the table above.  IT has chosen not to

include this information for employees to see in the Career Progression Planning

Tools used for the chart above. (Schlicksup Dec., p.168-169, ¶387)

| Salary Grade | 29 | 30 | 31 | 32 | 33 | 34 | Sum |
|---|---|---|---|---|---|---|---|
| Finance (incl'g Acctg, Tax, Treas) | 37 | 10 | 16 | 9 | 1 | 3 | 76 |
| IT Dept | 1 | 1 | 3 | 1 | 0 | 0 | 6 |

352.   The Finance positions are taken directly from the Exhibit.  The IT positions

require some explanation because the Exhibit includes several instances of a retired

person and their successor giving an incorrect impression of a larger pool as of

August 26, 2008.  Schlicksup knows this because he knows the people involved and

when they retired and who replaced them. (Schlicksup Dec., p.169, ¶388a-c)

a.   As of August 26, 2008, Mr. Heller had the following employees at the

following salary grades: Gorman –29; Jackson – 32; Buzzell – 31; Barclay –

31; Samp – 31; Desai – 28, Daisomont – 30; and Lucas – 28.

b.   Riley, McCoy and Williams were not part of IT at this time.

c.   Later Jensen succeeded Jackson, McCoy succeeded Barclay, Desai

succeeded Samp, Riley and Williams moved into IT, I moved to IT, and

Gorman moved out of IT succeeded by Lucas.

353.   The Finance positions are based on a total employee population of 1770

employees.  The IT positions are based on a total employee population of more than

127

2000 employees.  Thus, the opportunity in Finance is even better than shown by the raw numbers in the table above. (Schlicksup Dec., p.169, ¶389)

354.    Mr. Heller and the Defendants told Schlicksup they were offering him an "*opportunity*" by moving him to the IT Department.  Schlicksup believe Finance offers him more opportunity given his education, background and experience in taxation, and the number of positions. (Schlicksup Dec., p.170, ¶390)

355.    The Tax Department was a particularly good opportunity because all of the direct reports to Mr. Beran were promoted at least once, and in one case twice, since the time Schlicksup was downgraded, threatened-to-move-or-be-fired, and moved-to-IT. Schlicksup knows of no other function, area, or department where all the managers were collectively promoted.  Schlicksup was denied this opportunity. (Schlicksup Dec., p.170, ¶391)

**Schlicksup is subject on Ongoing Retaliatory Actions After Move-To-IT**

356.    Since the threat-to-move-or-be-fired and the move-to-IT, Schlicksup has been subjected to ongoing and repeated retaliatory acts including, but not limited to the following actions.

357.    <u>Impossible Assignment</u>:  October 2008 (Schlicksup Dec., p.170-171,  ¶392a-g)

   a.   Schlicksup is a trained lawyer and accountant.

   b.   He was asked to consolidate Caterpillar's 200+ data centers around the world.

   c.   Numerous career IT professionals have worked on this before with no significant progress.

d.  Schlicksup was set up to fail.

358.  <u>Exclusion from Critical Meetings</u>:  (Schlicksup Dec., p.172-174,  ¶393a-m)

a.  December 2009: Schlicksup was excluded by his peers from meetings in which his peers rank all the supervisors in Mr. Jensen's department and decided who would get promoted.

b.  June 2010:  Schlicksup was excluded by his peers from the meeting assessing the performance of all the supervisors in Mr. Jensen's department.

c.  September 2010:  Schlicksup was excluded by his peers from an IT infrastructure strategy white-boarding session to prepare information for Mr. Jensen (Schlicksup's boss) regarding "*data centers and computer networks*", which is Schlicksup's responsibility.

d.  January 2011:  In 2011, Mr. Jensen (Schlicksup's boss) has routinely dismissed Schlicksup early from his staff meetings while others, all at lower salary grades, remain behind.  At first Mr. Jensen would ask Schlicksup to leave saying, "*We have personnel issues to discuss*".  Schlicksup took this to mean that he is not allowed in any discussions regarding personnel even though Schlicksup is a higher salary grade then his peers.  Schlicksup am a salary grade 30.  Schlicksup's peers are a salary grade 28.  Then in August Mr. Jensen has now also asked Schlicksup to leave by saying, "*We have operational issues to discuss.*"  Schlicksup took this to mean, now he is not even allowed in any discussions regarding IT operations.   IT operations

would include "*data centers, computer networks and associated software suites"*.

e.  April 2011: IT Executive session re Manufacturing, Assembly & Quality software applications:   This involves the future strategy for software.   Mr. Jensen passes this information to all of Schlicksup's peers, but not Schlicksup when this information is important to him also.

f.  April 2011:  Technology Management Committee Meeting:  This involves a steering committee regarding future technologies for "*data centers, computer networks and associated software suites"*.   All Schlicksup's peers are invited, but he is not.

g.  May 2011:   Monthly meetings regarding changes to the global "*data center"* operations.  Some of Schlicksup's peers are invited, but he is not.

h.  June 2011: Schlicksup's peers have a meeting regarding mission-critical "*data centers, computer networks and associated software suites"*.  Schlicksup is not invited.

i.  July 2011:  Enterprise Architecture Steering Committee for mobility computing meeting:  This is a meeting regarding mobile computing which is critical to "*data centers, computer networks and associated software suites"*. Some of Schlicksup's peers are invited, but he is not.

j.  September 2011:  Mr. Jensen arranges a daily meeting with all of his peers regarding business-critical IT outages.  Schlicksup is not invited.

k.  There are many, many more examples in which Schlicksup is excluded from meetings and information that are important to Mr. Heller's definition of his job, yet Schlicksup is still being held responsible for satisfactorily completing his description of my responsibilities.  People assigned these responsibilities in the past are invited to these meetings.

359.  <u>Intimidation</u>:  August 2009 (Schlicksup Dec., p.174-176,  ¶394a-n)  Schlicksup was in the administration building on Adams Street.  Schlicksup walked into the Tax Department work area to say hi to some friends.  Schlicksup was talking to Claire Estebanez.  While we were talking, Mr. Vest came up and stood less than a foot from me within what Schlicksup considered to be his personal space.  He stared at Schlicksup.   Mr. Vest said in a low serious authority-like tone, "*Do you have a business reason for being here?*"  Schlicksup asked Mr. Vest, "*Do I need to have a business reason for being here?*"  Mr. Vest said, "*You know exactly what I'm talking about.*"  Schlicksup told Mr. Vest, "*I am talking to a friend.  If you think I am doing something wrong then please call security*."  Mr. Vest grumbled something as he walked away.  Schlicksup took this to mean that Mr. Vest knew he was not doing anything wrong and he was trying to intimidate Schlicksup and get Schlicksup to leave when he had no innocent reason for doing so.

360.  <u>Intimidation & Meaningless Assignments</u>:  April 2009 (Schlicksup Dec., p.176-178, ¶395a-o)  On April 3, 2009, at 07:30AM Mr. Jensen (Schlicksup's boss) told

Schlicksup that Mr. Heller (Vice President & CIO) was upset with Schlicksup.   Mr.

Jensen told Schlicksup that Mr. Heller wanted to meet with him, and that Mr. Jensen

sensed from Mr. Heller that this meeting would be *confrontational*. Schlicksup took

this to mean he should be concerned about meeting with Mr. Heller.  On April 6,

2009, Schlicksup went to Mr. Heller's private conference room in Building AB to

meet with Mr. Heller and Mr. Jensen.  Mr. Heller and Mr. Jensen were pre-meeting

in Mr. Heller's office and were both late in arriving.  Mr. Jensen arrived first without

Mr. Heller.  Mr. Jensen told Schlicksup that he just informed Mr. Heller that he

(Jensen) had previously conveyed to Schlicksup the meeting could be

*confrontational*.  Mr. Jensen told Schlicksup Mr. Heller responded, "*Good, I am glad*

*you did.*"   Schlicksup took this to mean that Mr. Heller wanted him to be concerned

in advance about him, a Vice-President, coming into a meeting in a *confrontational*

frame of mind in which Schlicksup would be on-the-spot, and he was pleased by

that.  Within a couple minutes Mr. Heller came in and the meeting started.  Mr.

Heller was quite short with Schlicksup.  Schlicksup have never in his career at

Caterpillar had anyone tell him that an Officer was anticipating a meeting to be

*confrontational* and the Officer was glad that Schlicksup was forewarned he would

be confrontational.  Schlicksup took this to be an intentional application of pressure

on him and in direct retaliation for having reported fraud to Oberhelman and Rapp

on May 1, 2008, which lead to his being moved-to-IT; his  refusal to go along with

the frauds Schlicksup had reported and keep quiet; and his filing a complaint with

OSHA pursuant to Sarbanes-Oxley and this lawsuit.

361.  <u>Meaningless & Impossible Assignments, Intimidation</u>:  July 2009  (Schlicksup Dec., p.178-187,  ¶396a-cc)

    a.  Schlicksup worked on a project at the request of Mr. Jensen (Schlicksup's boss) and Mr. Heller (Vice President & CIO).   Mr. Heller asked Schlicksup to develop a global high-level strategy for IT infrastructure.

    b.  Schlicksup thought this was odd since he knew that the IT Managers that report to Mr. Jensen and his peers, who in-turn report to Mr. Heller, had already developed and presented high-level strategies.

    c.  Schlicksup thought it was *meaningless* for him to be re-doing work that had already been done by seasoned IT professionals.

    d.  On May 27, 2009, Mr. Jensen told Schlicksup Mr. Heller changed his mind. The new scope for the strategy and Blue-Dot presentation was not just infrastructure as Mr. Heller had said on April 6, 2009, but rather was *everything- in- IT* including the following:  rationalizing more than 13,500 applications software applications; creating a back-up & recovery plan for the global data center located in East Peoria which has a complete back-up & recovery plan that has been tested; and Vendor models for purchasing IT software, hardware, and networks.

    e.   Schlicksup was to present this strategy in a little over 30 days on July 7, 2009. This was *impossible* for one person to do in just over 30 days and Schlicksup had no authority or resources to do this.

f.   After the presentation one of Mr. Jensen's peers wrote an email to Schlicksup saying "*great job*".

g.   On July 14, 2009, Mr. Jensen sent an email to Mr. Burritt (peer to Mr. Jensen & brother of Defendant Dave Burritt) stating, *"The CIO Council gave us a thumbs-up ...".*

h.    On August 13, 2010, 13 months later, Schlicksup received a performance review regarding this work from Mr. Jensen.  Mr. Jensen told Schlicksup that he "*missed the mark*", only got a  "*lukewarm reaction*" and was  a "*sales-job*" and not what he was requested.  Mr. Jensen told Schlicksup that he was trying to "*avoid accountability*".

i.   Schlicksup thought to himself that Mr. Jensen's comments are quite contrary from what was written in emails and notes more than a year earlier about this same activity (discussed above), including Mr. Jensen writing to Mr. Burritt saying they got a "*thumbs-up*".

j.   During the whole meeting Mr. Jensen was lecturing in a nasty tone at Schlicksup and not allowing him to talk.  This is the nature of Schlicksup's meetings with Mr. Jensen now.

k.   Schlicksup presented the same work to 616 IT professionals in the America's, Europe, and Asia.

l.   October 23, 2009, after one of the presentations to the 616 IT professionals Schlicksup received an email stating, "*I have three words for you:  Excellent, EXCELLENT, EXCELLENT!  Many on-line participants… instant messaged me*

*saying this was the best, most clear presentation they've seen to date.  You*

*did a great job…. I am sitting here thinking…I am proud to be part of the team*

*and proud to be working with you.  Great job."*

362.   <u>False Accusations</u>:  September 2009  (Schlicksup Dec., p.187-188,  ¶397a-f)

    a.   In or about September 2009, Mr. Jensen accused Schlicksup of having a poor

        relationship with Pat Robinson, the Decatur Plant IT Manager, and implying

        this was his fault.

    b.   When Schlicksup asked Pat about the proposed meeting he said, "*I didn't*

        *realize that the Decatur transformation (our work together) was not going*

        *well…My general opinion is that things are fine.*"  Schlicksup told Pat, "*I think*

        *you and I are on the same page*".

363.   <u>Sales to Sanctioned Countries</u>:  January 2010 (Schlicksup Dec., p.188-191,  ¶398a-m)

    a.   In or about December 2009, Schlicksup was beginning to think about how to

        consolidate data centers outside the U.S. which would include possibly

        moving some of the software applications from servers located outside the

        U.S. to servers located within the U.S.  Moving servers to the U.S. raised the

        issue regarding the prohibition of sales to or the mere facilitation of sales to

        sanctioned countries such as IRAN, SUDAN, and NORTH KOREA.

b.  Schlicksup told his boss, Mr. Jensen, that he would look into this issue.
Jensen agreed that Schlicksup should do so because there had never been a
clear resolution of this issue.

c.  Staff in East Peoria supporting software applications in Asia told Schlicksup
that they were concerned whether management was asking them to do
things that may not be legitimate in regard to the fact that sales and
production running through these software applications were destined-for-
sanctioned-countries.

d.  Schlicksup was given a memo written by the Caterpillar Legal Department
which made it clear that computer servers upon which software applications
were installed (a.k.a. as hosted) which processed sales to sanctioned
countries could not be located in the U.S., nor could people in the U.S.
facilitate such sales.

e.  Caterpillar has two primary global ordering systems:  the Caterpillar Machine
Order Processing system or CMOPS; and the Engine Order Management
Processing system or EOMP.

f.  These systems are known to be running on computer servers located in the
U.S. in East Peoria and Morton, Illinois and are supported from Peoria,
Illinois.

g.  Schlicksup was told by a peer to be careful about talking about this issue.
Schlicksup took this to mean that he knew what was happening was not
legitimate.  This peer is responsible for computer operations in the data

136

centers in East Peoria and Morton, Illinois where the computer servers are located that host CMOPS and EOMP.

h. Schlicksup talked to one of the support groups for these systems located in Peoria to get more information. This person told Schlicksup that just that morning they were working on resolving issues regarding sales to Sudan.

i. On or about February, 17, 2010, Mr. Jensen told Schlicksup to remove himself from this work and this issue. This issue was still important to Schlicksup's work.

j. On or about May 27, 2010, Schlicksup specifically asked Mr. Jensen if the Legal Department was aware that the servers hosting CMOPS and EOMP are located in the U.S. and process sales to sanctioned countries. Mr. Jensen told Schlicksup, "*As a U.S. citizen, I don't want to or need to know any more*".

364. <u>False Accusations</u>:  January 2010  (Schlicksup Dec., p.191-192,  ¶399a-c)

a. In or about January 2010, Mr. Jensen accused me of having a poor relationship with Jess Richmond, the Aurora Plant IT Manager, and implying this was Schlicksup's fault.

b. Schlicksup called Jess and he told Schlicksup, "*(H)e is getting feedback that he and I have a conflict, but doesn't understand where this notion is coming from…*"  Schlicksup told Mr. Jensen, "*Jess and I do not have a conflict, so if you know the source of the rumor, please correct them.  There does not appear to be a factual source for the notion of a conflict*".

    c.   Mr. Jensen never followed up on this issue in the manner he said he would.

365.   <u>Hyper-supervision</u>:  January 2010  (Schlicksup Dec., p.193,  ¶401a)

    a.   On January 27, 2010, Mr. Jensen asked to have a weekly update regarding Schlicksup's project.  To Schlicksup's knowledge none of his peers had such frequent updates with Mr. Jensen about their projects.  Previously, Schlicksup has never been asked to provide such frequent updates, particularly at his level in the company.

366.   <u>Working Conditions</u>:  January 2010  (Schlicksup Dec., p.193-194, ¶402a-e)

    a.   In the fall of 2009 Mr. Jensen wanted Schlicksup to move his office from the first floor to the third floor where he and his peers sat.

    b.   When they set up Schlicksup's office on the third floor it was right next to his peers, but was different from his peers in that there was no door, the wall was crooked and look like it had been cobbled together, and it had the furniture normally put in the office of a supervisor at half my salary grade.

    c.   The facilities engineer told Schlicksup that Mr. Jensen told him that Schlicksup did not need a door.

    d.   Schlicksup was told by a supervisor that two of Schlicksup's peers told him to "*not talk to Dan*" and "*to be careful what you say to Dan*".

    e.   Another supervisor told Schlicksup that one of his peers was asking the supervisor, "*Why is Dan doing all this* (i.e. suing Caterpillar)?"

    f.   Schlicksup is also aware that a supervisor is telling their staff to "*just-shun-Dan*".

367.  <u>False Accusations</u>:  January 2010  (Schlicksup Dec., p.194-195, ¶403a-b)

    a.   On January 25, 2010, Mr. Jensen told Schlicksup, out of the blue, that there was a growing trend of me not getting along with his peers and that he just brings problems to him and expect him to solve them.  He had never mentioned these problems to Schlicksup before.  He told Schlicksup he would set up a meeting to discuss this in more detail with Schlicksup.

    b.   Mr. Jensen did not follow-up.

368.  <u>False Accusations</u>:  February 2010  (Schlicksup Dec., p.195, ¶404a-c)

    a.   In or about February 2010, Mr. Jensen accused Schlicksup of causing 2 different IT outages at the Decatur plant and wanted to know what he learned from these mistakes.

    b.    Schlicksup thought this was odd since he knew Mr. Jensen gets regular updates on IT outages from Jerry Brandes who reports to Mr. Jensen and is his peer.

    c.   Schlicksup inquired with Jerry Brandes whose team is responsible for determining the root cause of outages.  Jerry told Schlicksup the outages had nothing to do with his work.  Jerry sent Schlicksup the Root Cause Analyses or RCAs for both outages proving they were unrelated to his work.

369.   <u>False Accusations and Hyper-Supervision</u>:  February 2010  (Schlicksup Dec., p.196, ¶405a-c)

    a.   Around February 25, 2010, Mr. Jensen accused Schlicksup of spending money to refurbish the Decatur plant's data center when he had not approved it.

    b.   Schlicksup told Mr. Jensen this is not the case.  After they move equipment from the plant data centers they have a plan prepared so that they can downsize the data center if and when they determine it is wise to do so.

    c.   Schlicksup also reminded Mr. Jensen that he was making Schlicksup get all spend pre-approved, even gas mileage to Lafayette, Indiana, just $50. Previously Schlicksup has been responsible for annual budgets and spend exceeding $20,000,000.

370.   <u>False Accusations</u>:  March 2010  (Schlicksup Dec., p.196-199, ¶406a-f)

    a.   On March 23, 2010, Mr. Jensen sent Schlicksup an email asking me to see him about the above.

    b.   On March 24, 2010, Schlicksup went to see Mr. Jensen and when Schlicksup sat down Jensen said out-of-the-blue *"I have been patient with you for the last 12 months"; "You have been creating all kinds of uncertainty and problems for some time."; "You ask me to do things without doing your homework."; and "What you do is incomplete staff work*."

    c.   Schlicksup was very surprised and asked Mr. Jensen why he was so upset.

   d.  Mr. Jensen said, *"I cannot have a conversation with you without worrying about it showing up in black and white in print somewhere."*

   e.  Schlicksup took this to mean Mr. Jensen had read his affidavit for this lawsuit filed in December 2009, and was very upset about it and taking it out on Schlicksup.

   f.  On March 26, 2008, Mr. Jensen told Schlicksup, "*I cannot manage you like the others (i.e. my peers)*".

   g.  Schlicksup took this to mean that he is treated differently by Mr. Jensen than he treats Schlicksup's peers.

371.  <u>False Accusations</u>:  March 2010  (Schlicksup Dec., p.199, ¶407a-c)

   a.  The work Schlicksup was doing for the East Peoria plant where they produce tract-type tractors or TTT was completed in 2009.

   b.  On March 24, 2010, Mr. Jensen told Schlicksup there were 61 software applications found by another team that were not being used by anyone indicating that somehow Schlicksup missed these applications in his work.

   c.  Schlicksup emailed the IT manager for the plant, one of his supervisors and a staff and was told, "*I have no idea what (this is) about…*" and *"…no one on the…team seems to know about…61 applications (not being used)*".

372.  <u>Profanity in Open Areas & Impossible Tasks</u>:  May 2010  (Schlicksup Dec., p.200-207, ¶408a-z)

a.  From November 4, 2009, through May 2010 Schlicksup provided Mr. Jensen with multiple updates about Schlicksup's work including the *project plan*.

b.  Despite this, Mr. Jensen kept pestering Schlicksup to show him Schlicksup's *project plans*.

c.  Schlicksup has never heard Mr. Jensen ask his peers for their project plans.

d.  On May 19, 2010, Mr. Jensen came into Schlicksup's office area.  The office area is made of partitions that are only about 7 feet tall stopping well short of the ceiling.  Therefore, there is a lack of privacy and voices carry easily. Mr. Jensen was upset and agitated.  He wanted to talk about *project plans*. Schlicksup tried to explain to him that he had been showing him *project plans*.

e.  Mr. Jensen said, "*Dan, just show me your  f-u-c-k-i-n-g   project plan!!!*"

f.  Schlicksup asked Mr. Jensen to please not use foul language in his area and he said, "*Fine! ...then you can fill out my next performance review.*"

g.  Mr. Jensen was talking so loud that many other people heard him. Schlicksup knows this because he overheard people talking about the incident later.  The tone of Mr. Jensen's voice was such that people who heard him told Schlicksup's project manager they were sure glad they were not in his shoes.

h.  Schlicksup told Mr. Jensen, "*I don't believe that I did anything to warrant the manner in which this discussion occurred.  Exactly what is it you are disappointed about?  This is not the first such conversation conducted in this*

142

*manner.   All I can say is what happened, and why is this reoccurring?  With all due respect, you treat me differently than your other direct reports.  You've told me you do so.  Why?  Please let me know if we can discuss this further*."  Mr. Jensen never responded.

i.  Mr. Jensen then forced Schlicksup to manage his project differently using project management software that is very cumbersome and requires additional resources just to make it work.

j.  Mr. Jensen also set in motion or allowed personnel turnover on Schlicksup's project that included 34% of the people.  Of the new people replacing the 34% leaving the project, 75% were new to Caterpillar from outside agencies.  This also included a 60% turnover in the key leadership positions on my project.  This included moving Schlicksup's project manager, who Schlicksup had personally selected, to a different job without any warning to Schlicksup and for reasons that didn't make any sense.  Never before had Schlicksup had someone take people off his projects without even talking to him.  Mr. Jensen then selected a new project manager without any input from Schlicksup.  Never before had Schlicksup had someone put people on his projects without even talking to him.

k.  *Prior* to June 2010 when Mr. Jensen forced these changes upon Schlicksup, his project generated a $179,836 net profit per month and a total Net Present Value of $8,684,896 from savings to be realized in future years based on 15 months of work.

l.  *After* Mr. Jensen made the changes taking resources away from Schlicksup's

   project, against Schlicksup's objections, Schlicksup's project has now

   generated a net loss of $79,163 per month and a Net Present Value of only

   $1,876,408 from savings to be realized in future years based on 12 months of

   work.

m.  Schlicksup believes Mr. Jensen has intentionally sabotaged his work.

n.  For Schlicksup's performance review for the period ended December 31,

   2010, Mr. Jensen wanted to know what the incremental benefit of his project

   was from August through December.  Schlicksup has a voicemail of Mr.

   Jensen in or about January 2011 asking him for the incremental benefit of his

   project.  Schlicksup has a recording of this voice mail.

o.  Due to Mr. Jensen's actions the value of Schlicksup's project is decreasing

   over time.

373.  <u>Differing Treatment</u>:  June 2010  (Schlicksup Dec., p.207, ¶409a)

   a.  On June 7, 2010, Mr. Jensen told Schlicksup that "*he is not allowed or able to

      manage me because of litigation and liability.*"

374.  <u>Differing Treatment – Cannot Work in Tax</u>:  July 2010  (Schlicksup Dec., p.207-208,

   ¶410a-c)  On July 2, 2010, Mr. Jensen told Schlicksup that he cannot work in Tax.

   This puts Schlicksup at a significant disadvantage because Mr. Oberhelman is

requiring *deep expertise* and *longevity in your field* to advance.  Schlicksup is a 50-year-old lawyer and accountant in the IT Department.

375. <u>Employee Action Plan and Downgrade</u>:  September 2010  (Schlicksup Dec., p.208-216, ¶411a-u)

    a.  On July 23, 2010, Schlicksup asked Mr. Jensen for guidance on a human resources issue regarding a performance review.  Schlicksup asked him what the IT standards were.

    b.  Mr. Jensen never told Schlicksup what the standards were.

    c.  Schlicksup told Mr. Jensen he was going to get Human Resources involved because he did not understand the process.

    d.  Schlicksup contacted Mrs. Billimack in Human Resources and asked her what the process was.

    e.  On September 10, 2010, at 2:00PM Schlicksup walked into Mr. Jensen's office.  Mrs. Billimack was with him, which was a surprise to Schlicksup as Billimack was not on the meeting invitation.  It was clear to Schlicksup that the topic of this meeting was not going to be what was on the invitation.

    f.  Schlicksup asked Mrs. Billimack if she talked did what he requested her to do.  She said, "*I talked to some people, but it wasn't who you wanted me to talk to*".  Schlicksup took this to mean that when he got her involved to help him that she went directly to talk with Mr. Jensen which resulted in this meeting.

g.   Mr. Jensen told Schlicksup he was immediately being rated a "4" and put on an Employee Action Plan (improvement plan) because of this situation.

h.   Mr. Jensen told Schlicksup it was unacceptable that Schlicksup requested facts related to his employee's performance review from his peers and expected them to support their desire to rate the employee differently than Schlicksup did.

i.   Mr. Jensen told Schlicksup it was unacceptable for Schlicksup to explain to the employee's new supervisor that Schlicksup was waiting on facts to support his peers desire to rate the employee lower than Schlicksup, his supervisor, had rated him.

j.   Mr. Jensen told Schlicksup he was going to be put on an Employee Action Plan immediately, all of his direct reports would be taken away from Schlicksup and that his job would be reevaluated as one without any direct reports (i.e. downgrade).

k.   Mr. Jensen impressed upon Schlicksup that this did not relieve him of any of his job responsibilities to complete his work.  Schlicksup thought this was odd that he said we are going to re-evaluate your job, but you will still be held accountable for everything you are working on now.  Schlicksup took this to mean that he was being demoted and downgraded, but in salary grade only.

l.   Mr. Jensen told Schlicksup that he was *no longer allowed to use email* as my primary form of communication and instead had to use the telephone or

146

meet with people face to face.  Schlicksup had been using email as a primary form of communication since 1992, and so do most other employees.

m.  Mr. Jensen told Schlicksup that he could *no longer take my laptop computer to meetings*.  Schlicksup is rarely in a meeting in which more than 50% of the people do not have laptops or some other mobile communication device, including Mr. Jensen.

n.  Schlicksup was required to read a book about teamwork and provide an *oral-book-report* to Mr. Jensen and Mrs. Billimack.

o.  Schlicksup was required to report to Mr. Jensen every other week to review his progress.  They met less than twice a month from September 2010 into January 2011.

p.  During these meetings, Mr. Jensen never once had any complaints to convey to Schlicksup.  Schlicksup took this to mean there never were any complaints.

q.  In a January 2011 meeting Schlicksup asked Mr. Jensen where they were regarding the Employee Action Plan and he said, "*No Worries*".   The whole thing seemed to be a charade, but had caused Schlicksup and his wife significant stress and difficulty.

r.  Schlicksup and his Wife have been under the threat of downgrade and salary reduction since September 10, 2010, and still are.

s.  What Mr. Jensen and Mrs. Billimack did was not consistent with company policy.  The Employee Action Plan process instructions state the following.

t.  In the meeting Mr. Jensen told Schlicksup that he had to sign the Employee

Action Plan then and there, even though a signature is not required, or Mr.

Jensen said, "*If you don't we'll hold that against you in determining whether

you are complying with the action plan*".

u.  Per company policy, Mr. Jensen and Mrs. Billimack were not supposed to

take disciplinary action unless Schlicksup did not comply with the Employee

Action Plan.   Instead, their message was immediate that Schlicksup would

be demoted and downgraded, but in salary grade only, not responsibility.

376.  <u>Differing Treatment & Excluded from Leadership Activities</u>:  March 2011  (Schlicksup

Dec., p. 216-220, ¶413a-r)

a.  On March 25, 2011, Mr. Jensen sent an email to his other direct reports and

Schlicksup asking for initiatives that could be recognized at the next Business

Excellence Meeting on April 6th.

b.  Schlicksup had never heard of these meetings before.

c.  Schlicksup asked Mr. Jensen about these meetings and he told him that the

Business Excellence meetings replaced the former Communicator Meetings

for leaders.

d.   Schlicksup asked Mr. Jensen if he was supposed to attend the Business

Excellence Meetings because these meetings were not on his calendar.  Mr.

Jensen told Schlicksup, "*No these meetings are only for leaders, people who

lead other people.*"

148

e.  The Humans Resources sent Schlicksup an email stating the same thing.

f.  On April 1, 2010, Schlicksup looked up all the people who were invited to the Business Excellence Meetings in the employee data base to see if they have direct reports.  Thirty of the people invited to the Business Excellence Meetings do not have direct reports.

g.  Of the more than 240 people invited to the Business Excellence meetings, all of them are at lower salary grades than Schlicksup, except for John Heller and about 4 of his direct reports.  Many of these people are less than one-half Schlicksup's salary grade.

377.  <u>Differing Treatment & Excluded from Leadership Activities</u>:  March 2011 (Schlicksup Dec., p.220, ¶414a)   Schlicksup previously had access the to an internal IT Department website called the Leaders Tool-Kit or Leaders Desk-Top.  When Schlicksup tried to access the site in or about March 2011, he received an error notice and have not had access since.

378.  <u>Reducing My Responsibilities</u>:  May 2011  (Schlicksup Dec., p.220-221, ¶415a-c)

a.  During 2010 we met with employees of Caterpillar Japan to talk about data centers. Caterpillar Japan had a large data center in Japan.  There was also a large data center in Singapore.  Schlicksup's involvement was, if we decided

to consolidate the Japanese data center, then he would be responsible for doing so.

b. Schlicksup found out accidentally from a staff in or about May 2011, that Mr. Jensen had reassigned his responsibilities for this work to one of his peers and given the peer one of the most important, technically competent staff that Schlicksup had working on his other project. Neither Mr. Jensen nor his peer told Schlicksup anything about this change.

c. Schlicksup is excluded from update meetings related to this work while his peers are all invited.

379. <u>Destruction of Schlicksup's Data</u>: June 2011 (Schlicksup Dec., p.221-222, ¶416a-i)

a. At Caterpillar each employee has a "P-Drive", which is individual, private space on the central storage servers for you to store and backup data.

b. In or about late May or early June 2011, Schlicksup was looking for some older files related to his work with certain data on them to avoid having to recreate information.

c. Schlicksup called his former project manager to see if he had the files. He looked and told Schlicksup his "P-Drive" had been wiped clean.

d. Schlicksup decided to see if maybe he had kept a copy of these files. When Schlicksup went to look on his "P-Drive" all the material he had backed-up was no longer there. My "P-Drive" had been wiped clean also.

e. Schlicksup called the help-desk who told Schlicksup there was no way to recover the data.

f.  Schlicksup knew the technical support team for the Help Desk who said the Help Desk should have been able to recover the data but couldn't.

g. Schlicksup then stopped by to talk to the Chief Storage Architect and told him what had happened.  The Chief Storage Architect told Schlicksup it was impossible that my P-Drive could not be recovered.  He said, "*You would be the only one that has ever happened to at Caterpillar*".

h. Schlicksup's "P-Drive" had documents and data stored on it relevant to this case and reports Schlicksup have made to law enforcement agencies.


380.  <u>Hyper-supervision</u>:  July 2011  (Schlicksup Dec., p. 222-225, ¶417a-o)

a. The practice in Mr. Jensen's group is to inform him or his assistant for personal time out of the office of one-half day or greater.  Anything shorter than a half-day did not require notice such as a doctor's appointment.  Also you did not have to inform him if you were going to work flex hours coming in early and leaving early or vice-versa.

b. This is consistent with Schlicksup's 19 years of experience at Caterpillar in the three countries he has worked in and for all levels of management employees.

c. In July 2011, Mr. Jensen told Schlicksup, "*Because of the recent publicity* (on July 8, 2011) *about this lawsuit everybody will be looking a reason to fire*

*you*". Schlicksup took this to mean that management and certain employees alike are looking for any reason to fire him, and in particularly Mr. Jensen and his peers.

d. Mr. Jensen said, "*It is your responsibility to manage everyone's expectations*". Schlicksup took this to mean that they are all watching, if I they find anything they can fabricate into a reason to fire him they will, and this was Schlicksup's problem to deal with – don't expect any help from management.

e. Schlicksup thought this was incredibly unfair, and unusual.  It was tantamount to telling someone likely to be the subject of discrimination or retaliation that it's their problem to keep bad things from happening to them.  In Schlicksup's 19 years at Caterpillar he has never heard anyone tell a women that it's her responsibility to keep everyone from sexually harassing her, or tell a minority that it's his/her responsibility to prevent others from engaging in racism or bigotry.  Instead, the rule is it is everyone's responsibility to prevent sexual harassment and racism.  The Code of Conduct states that the company will not tolerate retaliation.  If this were true, then it would be everyone's responsibility to prevent retaliation against me, not feel free to find reasons to fire me.

f. As a result, Mr. Jensen told Schlicksup, "*I want you in the building eight and one-half hours each day*". Schlicksup told Mr. Jensen that he does not take the standard 30 minute lunch break so why 8-1/2 hours.  He said, "*I don't care it's eight and one-half hours each day*".

g.  Eight hours is the standard workday at Caterpillar and can be worked within reasonable flex hours.  Schlicksup knows of no one at any level that is required to work more than the standard work hours every day and "be in the building" 8-1/2 hours each day.

h.  Schlicksup now has to keep a time log for Mr. Jensen every day, essentially punching-the-clock, and turn it into him each month.  Schlicksup cannot leave the building for personal reasons including lunch without prior permission from Jensen.  Schlicksup cannot work flex-hours without prior permission from Jensen.  Schlicksup must schedule all doctors appointments in off-shift hours.

i.  Schlicksup has never heard of anyone having to do this, particularly at a salary grade 30 which is in the top 3-400 people in the whole company.  Schlicksup knows of no one at any level that has to do this.  Hundreds of people come and go from building to building each day.

381.  <u>Continual False Accusations & Pressure</u>:  August 2011  (Schlicksup Dec., p. 225-227, ¶418a-h)  Schlicksup has taken approved unpaid leave to prepare for and attend depositions this since February 2011.  Suddenly,  Mr. Jensen said that he didn't know Schlicksup took unpaid leave to prepare for depositions.  He said, "*That Is not allowed*!"  Mr. Jensen said, "*There has been a big misunderstanding*".  Then he said, "*No Dan you told me in a one-on-one meeting that you were only to use unpaid leave to attend depositions*".  Schlicksup never told Mr. Jensen that.  Mr. Jensen said,

"*Dan, I cannot believe you would abuse my trust like this and take advantage of Caterpillar*".  The whole time he was saying this he was grinning.  He seemed to be enjoying making these accusations and implying that Schlicksup is now in big trouble.  Schlicksup told Mr. Jensen that this is not something he wanted to do. Schlicksup has taken nearly 30 days of unpaid leave and it's cost me $30-40,000 in pay this year.  Mr. Jensen looked at me grinning again and said, "*What, am I supposed to have an emotion?*"

382.  <u>Continual False Accusations & Pressure</u>:  August 2011  (Schlicksup Dec., p. 227-229, ¶419a-j)

a.  Schlicksup met with Mr. Jensen on August 4, 2011.  Schlicksup had never received his performance review rating for January to June 2011 even though he had met with Schlicksup in June and discussed it.  Schlicksup asked Mr. Jensen what his rating was.  He said, "*I will not be able to tell you in until the morning*".  Schlicksup told him they had time right now.  Mr. Jensen said, "*I will not be prepared until the morning*".  Schlicksup told him someone else would be with him in the meeting in the morning.  Mr. Jensen said, "*Then move it*".  Schlicksup took this to mean he should reschedule whatever he had planned to talk about.  Schlicksup told him he would reschedule the other issue.

b.  The next morning Schlicksup showed up at Mr. Jensen's office expecting for him to tell Schlicksup his rating.  Mr. Jensen said, "*Where is the other person?*"  Schlicksup told him he rescheduled the other issue because they were going to talk about his rating for January to June.  Mr. Jensen said, "*See Dan, this is just another big misunderstanding.*"  The tone of his voice made it clear he thinks there are lots of misunderstandings and they are Schlicksup's fault.  Schlicksup called the other person and they met with Mr. Jensen regarding the other issue.

c.  Mr. Jensen then rescheduled a meeting to discuss my rating for Friday, August 19, 2011.  On August 17, 2011, Mr. Jensen cancelled the 19th at 10:00AM and rescheduled for Friday, August 26, 2011, even though he still had this time available on his calendar on the 19th.  On August 25, 2011, Mr. Jensen cancelled the 26th at 1:00PM and rescheduled for Thursday, September 1, 2011, even though he still had this time available on his calendar on the 26th.  On August 25, 2011, Mr. Jensen cancelled the September 1st meeting and rescheduled for Wednesday, August 31, 2011.  On August 29, 2011, Mr. Jensen cancelled the August 31st meeting and did not reschedule.

d.  Schlicksup still does not know what his rating is for January to June 2011 and there is no meeting schedule to even discuss it.

383.  <u>Differing Treatment</u>:  September 2011  (Schlicksup Dec., p. 229, ¶420a-d)

a. When Schlicksup's peers request approval from Mr. Jensen to spend money they merely provide a one page explanation and their requests are routinely approved.

b. When Schlicksup requests approval from Mr. Jensen to spend money on similar or exactly the same things, Schlicksup has to present Mr. Jensen with a discounted cash flow analysis which is very difficult to construct in the IT Department because they do not have detailed cost data.

c. Schlicksup has asked Mr. Jensen about why his peers and others in the IT Department do not have to use discounted cash flows to prove the value of their projects and proposals.

d. Mr. Jensen told Schlicksup that everyone in the IT Department uses discounted cash flows.

e. Schlicksup knows this to be untrue and verified this with the Accounting Department who told Schlicksup he is the only one using discounted cash flow.

f. In addition, while the corporate default is 10 years for the cash flow and discount period, which should apply to Schlicksup's projects, he has been told to use a 7 year or lesser period which causes his projects to appear less favorably than they would using a 10 year period.

384. <u>Differing Treatment</u>: September 2011 (Schlicksup Dec., p. 230, ¶421a)  Mr. Oberhelman has personally sponsored a leadership program within Caterpillar

beginning in the calendar year 2011.  Schlicksup has heard him state that all salary grades 28 and above will be trained this year.  To date Schlicksup is not invited to any of this training.

385.  <u>Differing Treatment</u>:  September 2011  (Schlicksup Dec., p. 230, ¶422a)  Mr. Heller had a global IT leaders meeting in China later this year which included attendance by Mr. Rapp.  Schlicksup is not invited to any of this even though Schlicksup is the highest-ranking employee in Mr. Heller's Division, except for approximately four of Mr. Heller's direct reports.  Nearly everyone attending the meeting was at a lower salary grade than Schlicksup.

**Schlicksup has been under threat-of-Demotion-and-Downgrade since for 14 months**

386.  Schlicksup hired into Caterpillar in October 1992 at a salary grade 26. (Schlicksup Dec., p.230, ¶423)

387.  In Mr. Jensen's deposition he indicated that they have already reevaluated Schlicksup's job and that he has seen the job description and rating. (Schlicksup Dec., p.230, ¶424)

388.  He said the rating is a range from a salary grade 25 to a salary grade 28.  This means somewhere between a 30 to 50% cut in compensation. (Schlicksup Dec., p.230, ¶425)

389.  Schlicksup has never heard of the job evaluation department providing such a wide range for a job.  Schlicksup has worked with them many times and they

determine a single rating, not a range of possible ratings. (Schlicksup Dec., p.230, ¶426)

390. Schlicksup took this to mean that the Defendant's and Mr. Jensen will be able to and plan to down grade him as much as they like and when they like. (Schlicksup Dec., p.231, ¶427)

**Miscellaneous**

391. Schlicksup was asked in his deposition as a general statement about whether Ms. Barbour had the authority to fire him. Schlicksup answered that generally she would not. Human Resources people generally work with line managers in such situations. However, Schlicksup does believe Ms. Barbour had the authority to make the threat-to-move-or-be-fired on August 26, 2008. Schlicksup believes this for the following reasons. First, she was not Mr. Heller's Human Resources Manager. He had his own. Therefore, Ms. Barbour was sent to the meeting by someone to do something. Second, during the meeting Ms. Barbour interrupted Mr. Heller, a Vice President, in mid-sentence in order to deliver the threat. Mr. Heller did not appear to be at liberty to stop her because he let her complete the threat. Schlicksup has never seen anyone below the Vice President level cut off a Vice President like this. Schlicksup knows Ms. Barbour and has worked with her many times since 2000. Ms. Barbour is not the type of person to interrupt anyone like that, much less a Vice President. It appeared to Schlicksup that someone put her up to it. Third, after Schlicksup asked Ms. Barbour if Mr. Heller and Schlicksup could talk alone she left.

Schlicksup asked Mr. Heller about the threat and he told Schlicksup that she got her marching orders from HR and Legal.  Then Mr. Heller tried to back pedal a bit. Schlicksup told him that he doesn't have the authority to take back what Ms. Barbour said.  He agreed.  Schlicksup told him he would have to go talk to Buda, Rapp and Owens.  He agreed. (Schlicksup Dec., p.231, ¶428)

392.    In Schlicksup's deposition he was asked if he trusted Mr. Burritt and Mr. Beran. In or around April 2008, Schlicksup did not trust them with regard to the frauds he had reported or that they would deal with them appropriately, or that they would deal with him fairly for having reported  them (Burritt and Beran).  Schlicksup was still performing all the work he had previously performed for them in a professional manner and continued to do so without any complaints from them up until the threat-to-move-or-be-fired and the move-to-IT. (Schlicksup Dec., p.332, ¶429)

393.    Mr. Heller (Chief Information Officer) is often asked to take whom "they" consider to be "troubled" employees. (Schlicksup Dec., p.108, ¶260)

394.    On August 26, 2008, Schlicksup was called to a meeting on short notice with Mr. Heller (Chief Information Officer) and Ms. Barbour (Human Resources Manager). (Schlicksup Dec., p.108, ¶261a-f)

    a.  Ms. Barbour told Schlicksup that he had to move out of the "Tax" department into the "Information Technology" department, to a newly created position at a salary grade "29", effective September 1, 2008, or Schlicksup would be "fired".

    b.  Ms. Barbour gave Schlicksup a "threat-to-move-or-be-fired".

159

c.  Ms. Barbour told Schlicksup not to worry about the "stigma" of moving so quickly with no notice or announcement.

d.  Mr. Heller did not interrupt Ms. Barbour or in any way disagree with what she had told Schlicksup even though he out ranked her.

e.  Schlicksup asked Ms. Barbour if her reason for being in the meeting was to deliver the threat-to-move-or-be-fired to Schlicksup and, if so, could she please leave.  Ms. Barbour then left the meeting.

f.  Mr. Heller told Schlicksup that he had to move out of finance and could no longer work in finance.

395.   Schlicksup considered the meeting on August 26, 2008, to be a direct threat-to-move-or-be-fired, and a demotion as explained below. (Schlicksup Dec., p.109, ¶262)

396.   On August 26, 2008, after Ms. Barbour (Human Resources Manager) left the meeting, Mr. Heller (Chief Information Officer) told Schlicksup it is too bad that Ms. Barbour didn't realize that they might not have had to threaten Schlicksup if he could have gotten Schlicksup to go along with the move. (Schlicksup Dec., p.109-110, ¶264a-b)

a.  Mr. Heller also told me "they" (i.e. Corporate Legal, Corporate Human Resources, and the Executive Office) would be very nervous that he was now talking to me alone.  Mr. Heller told Schlicksup that "they" were very concerned about the information that Schlicksup had regarding shareholder fraud and no one wanted Schlicksup to "take-the-nuclear-option" (which Schlicksup took to mean going to law enforcement authorities or the media).

b. Schlicksup asked Mr. Heller who gave Ms. Barbour her marching-orders.  Mr. Heller told Schlicksup that Corporate Legal and Corporate Human Resources gave Ms. Barbour her marching-orders.  Schlicksup asked Mr. Heller if he had the authority to take back Ms. Barbour's "threat-to-move-or-be-fired".  Mr. Heller told Schlicksup he would have to get permission from "them" (i.e. Corporate Legal, Corporate Human Resources, and the Executive Office) to withdraw the threat-to-move-or-be-fired.

397. Mr. Heller left Schlicksup a voicemail at 4:13PM on August 26, 2008, stating that he got validation that they were not at any ultimatum position, and that Schlicksup had time to think about the opportunity.  To Schlicksup this did not mean that there was no threat-to-move-or-be-fired.  It merely meant that Schlicksup had a couple days beyond September 1, 2008, to consider the threat-to-move-or-be-fired. (Schlicksup Dec., p.110, ¶265)

398. Between August 27 and November 12, 2008, Schlicksup communicated with Mr. Heller (Chief Information Officer) regarding the August 26, 2008 meeting. (Schlicksup Dec., p.111, ¶268)

399. On or about August 27 or 28, 2008, Schlicksup told Mr. Heller that Ms. Barbour had violated Sarbanes-Oxley by threatening to fire Schlicksup. (Schlicksup Dec., p.111, ¶269)

400. Qualifications (Schlicksup Dec., p.157, ¶368a-e)

a. Schlicksup invested 8 years of college and earned 2 post graduate degrees to prepare for a career in finance and taxation.

161

b. Schlicksup obtained 2 professional licenses to prepare for a career in finance and taxation.

c. Schlicksup has spent the majority of his career pursuing professional education in finance and taxation.

d. Schlicksup has no background or training whatsoever related to computing infrastructure (i.e. data center design, computer networking, computer servers, computer storage, etc.).

e. Many people in Mr. Heller's organization wondered why he put a "tax attorney/CPA" into a technical computer infrastructure job.

401. Experience (Schlicksup Dec., p.157, ¶369)

a. Schlicksup has 20 years work experience in finance and taxation.

b. Schlicksup had no work experience related to computing infrastructure (i.e. data center design, computer networking, computer servers, computer storage, etc.) prior to September 2008.

---

ARGUMENT

---

In accordance with 29 CFR § 1980.104(b), Plaintiff has the burden to show the following elements by a preponderance of the evidence, in order to establish a prima facie case:

"(i) The employee engaged in a protected activity or conduct;
 (ii) The named person knew or suspected, actually or constructively, that the employee engaged in the protected activity;
 (iii) The employee suffered an unfavorable personnel action; and
 (iv) The circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action."

Even if Plaintiff establishes a prima facie case, a finding of liability can be avoided if the named person demonstrates by clear and convincing evidence that said named person would have taken the same unfavorable personnel action in the absence of the complainant's protected behavior or conduct. 29 C.F.R. §1980.104(c).

With emphasis on the first element, under 29 C.F.R. §1980.104(b)(i), the first four pages of the May 1 memo establish that Plaintiff engaged in protected activity.  Activity is protected by SOX if an employee provides information or causes information to be provided to a person with supervisory authority over the employee or to a person who has the authority to investigate, discover, or terminate misconduct.  18 U.S.C. §1514A(1)(C).  The statute does not require that fraudulent conduct (reported by the employee) be committed directly by the employer.  *Feldman v. Law Enforcement Associates Corp.*, 2011 WL 891447 (E.D.N.C. 2011). The disclosure to a relevant person in authority need not be stated precisely.  A complaint that is described by an employee as a violation of a corporate code of ethics may suffice as a report of a violation of federal law, if the conduct which was reported was in violation of federal law. *Harp v. Charter Communications, Inc.*, 558 F.3d 722, 725 (7th Cir. 2009).  The complaint need not

cite a specific section of the United States Code.  *VanAsdale v. International Game Technology*, 577 F.3d 989, 996, 1002 (9th Cir. 2009).  Fraud that is described in the complaint need not be material within the meaning of federal securities laws.  *Sylvester v. Parexel*, No. 07-123 (ARB May 25, 2011),[1] *overruling Platone FLYi, Inc.*, No. 04-154 (ARB Sept. 29, 2006).  An employee's belief that misconduct has occurred can be "reasonable" even if it clashes with views of others, as reasonable minds can differ.  *Menendez v. Halliburton*, Nos. 09-002 and 09-003, 2007-SOX-005 (ARB Sept. 13, 2011),[2] at p.12.  Here, the first four pages of the May 1 memo, including the first footnote and the other footnotes in the Executive Summary, contained enough information so as to constitute protected activity.  On top of that, the remaining pages of the May 1 memo amounted to a detailed presentation of protected activity, along with all of Plaintiff's prior protected activities established thereby. Clearly Plaintiff engaged in protected activity, so the first element has been met.

With emphasis on the second element, under 29 C.F.R. §1980.104(b)(ii), Plaintiff is able to show that Rapp had knowledge of Plaintiff's protected activities.  Here, Rapp acknowledges reading the first four pages of the May 1 memo.  Rapp apparently understood that legal contentions were being asserted in the first four pages because he acknowledged he viewed the memo as "legalistic."  Even though Rapp does not admit to reading more than the first four pages, Rapp also can be charged with knowledge of the content of the remaining pages.  A superior's knowledge of the content of an underling's complaint or disclosure can be inferred if such an inference is supported by evidence, even if such knowledge is denied by the superior. *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994).  It is sufficient to

---

[1] http://www.oalj.dol.gov/PUBLIC/ARB/DECISIONS/ARB_DECISIONS/SOX/07_123.SOXP.PDF
[2] http://www.oalj.dol.gov/PUBLIC/ARB/DECISIONS/ARB_DECISIONS/SOX/09_002.SOXP.PDF

show that the named person knew or suspected, actually or constructively, that the employee engaged in the protected activity.  *VanAsdale v. International Game Technology*, 577 F.3d 989, 996, 1002 (9th Cir. 2009); 29 C.F.R. §1980.104(b)(ii).   Moreover, Rapp's ostrich-like omission to read the remainder of the disclosures and details in the May 1 memorandum cannot be viewed as providing a defense to Rapp or to Caterpillar.  Indeed, such intentional blindness is a basis for denial of summary judgment on the element of knowledge.  See *United States v. Frykholm*, 362 F.3d 413, 416 (7th Cir. 2004) ("A form of knowledge sufficient to support a conviction… is more than sufficient to stave off summary judgment in civil litigation.") Rapp's ostrich-like neglect to read the remainder of the May 1 memo is actually indicative that he knew that even more detailed revelations likely followed in the memo where his reading supposedly left off.  As explained in *United States v. Frykholm, id.*, a person who intentionally averts his eyes, lest he learn more, has actual knowledge. See also *Ho v. Donovan*, 569 F.3d 677 (7th Cir. 2009) (conscious avoidance of information is a form of knowledge which is the basis of the "ostrich instruction"); *Jonasson v. Lutheran Child and Family Services*, 115 F.3d 436, 438 (7th Cir. 1997) (punitive damages in civil case warranted where employer engaged in ostrich-like failure to address illegal discrimination).

        In any event, because the first four pages (consisting of one page of email and three pages of executive summary) of Plaintiff's May 1 memo, sufficiently conveyed knowledge to Rapp that what would follow would be even more specific descriptions of fraud and other lapses cognizable under the Sarbanes-Oxley Act (SOX), there is ample reason to conclude that Rapp knew about Plaintiff's protected activity, thereby satisfying the second element of a prima facie case.

With emphasis on the third element under 29 C.F.R. §1980.104(b)(iii),  Plaintiff is able to show that he suffered an unfavorable personnel action when Rapp decided to move him.[3]  As established in the thorough discussion by the Administrative Review Board (ARB) of the U.S. Department of Labor in *Menendez v. Halliburton, supra*, at pp. 14-29, and as discussed in Plaintiff's response to Defendant Barbour's motion for summary judgment, the third element of an unfavorable personnel action does not require a tangible loss.  All that is required is that a personnel action be "more than trivial, either as a single event or in combination with other deliberate employer actions alleged."  *Menendez, supra*, at p. 17.  Here, the evidence shows, the transfer of a career tax lawyer and accountant into the computer area is not merely trivial. Opportunities for high-ranking positions are more numerous in the Finance area than in the IT area. Thus, for summary judgment purposes, the third element has been shown.

Plaintiff can also meet the fourth element of causation using the "contributing factor" test of causation as set forth in 29 C.F.R. §1980.104(b)(iv) and as described in *Menendez, supra*, at pp. 29-32, when the evidence is judged in the light most favorable to the Plaintiff.

SOX adopts the burdens of proof established by the Wendell H. Ford Investment and Reform Act for the 21st Century, colloquially known as "AIR 21." 18 U.S.C. §1514A(b)(2)(C).  The AIR 21 approach is codified at 49 U.S.C. §42121(b)(2)(B), which states in pertinent part:

> (B) Requirements.--
>
> (i) Required showing by complainant.--The Secretary of Labor shall dismiss a complaint filed under this subsection and shall not conduct an investigation otherwise required under subparagraph (A) unless the complainant makes a prima facie showing that any behavior described

---

[3] As to Defendant Caterpillar, it was also an unfavorable personnel action when Defendant Alice Barbour threatened Plaintiff, for the reasons set forth in Plaintiff's response to her motion for summary judgment, which is hereby adopted as part of this response.

in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint.

(ii) Showing by employer.--Notwithstanding a finding by the Secretary that the complainant has made the showing required under clause (i), no investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.

(iii) Criteria for determination by Secretary.--The Secretary may determine that a violation of subsection (a) has occurred only if the complainant demonstrates that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint.

(iv) Prohibition.--Relief may not be ordered under subparagraph (A) if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior. [Underscoring added.]

The "contributing factor" test of causation can be demonstrated by temporal proximity between protected conduct and a personnel action. *Ameristar Airways, Inc. v. Administrative Board of Review, U.S. Dept. of Labor*, 2011 WL 3505466 at nn. 19 & 21 (5th Cir. 2011); *Vieques Air Link, Inc. v. U.S. Dept. of Labor*, 437 F.3d 102, 109 (1st Cir. 2006); *Kewley v. Department of Health and Human Services*, 153 F.3d 1357, 1362-63 (Fed.Cir. 1998); *Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1378-79 (N.D. Ga. 2004) (temporal proximity found sufficient to deny motion for summary judgment). Notably, in the instant case, the protected activity (communication in May 1 memo to Rapp and Oberhelman) was conterminous with the adverse action (Rapp's decision to transfer Plaintiff). Based on that fact alone, causation can be shown.

Here, causation should also be regarded as established in light of the leading decision of *Marano v. Department of Justice*, 2 F.3d 1137, 1138 (Fed. Cir. 1993). The *Marano* case under

the WPA has been found to be applicable in cases under SOX. See, e.g., *Allen v. Administrative Review Bd.*, 514 F.3d 468, 476 n.3 (5th Cir. 2008);  *Pardy v. Gray*, 2008 WL 2756331 (S.D.N.Y. 2008); *Mahony v. KeySpan Corp.*, 2007 WL 805813 (E.D.N.Y. 2007) (*Marano* case used to find causation where after protected activity employee observed that he was being isolated within the company, his performance evaluations changed dramatically, and he fell out of favor with CEO); *Livingston v. Wyeth Inc.*, 2006 WL 2129794 (M.D.N.C. 2006, *aff'd on other grounds*, 530 F.3d 344 (4th Cir. 2008).  Recently, in *Menendez, supra*, (at pp. 31-32 n. 173) the ARB of the Department of Labor specifically found that it endorsed using *Marano* to decide causation issues under SOX.

The facts in *Marano* are strikingly similar to those in the instant case, in that a memo was sent by the employee complaining of misconduct and then the complaining employee was transferred based on alleged dysfunction reflected by his contentions in the memo.  In the *Marano* case, Frederick R. Marano achieved the position of a Criminal Investigator in the Albany office of the Drug Enforcement Administration. There was poor leadership, due to poor management by supervisory agents, in the Albany Office.  The appointed supervisors were John McCarthy and William Logay. The management shortcomings of McCarthy and Logay led to Marano becoming the *de facto* manager and "boss" of the Albany Office, even though any such gravitas on the part of Marano well exceeded the actual station of Marano's rank.

On January 29, 1990, Marano signed a memorandum addressed to the incoming Special Agent-in-Charge of the DEA's New York Field Division. This writing alleged specific misconduct and mismanagement by the Albany Office's supervisory agents, McCarthy and Logay. The memorandum provoked an investigation of the situation in the Albany Office by Special Agent

Inspector McVane of the DEA. McVane's investigation report confirmed the contents of

Marano's memorandum. The report also noted that, in the absence of leadership from the two

faulty supervisors, Marano had been considered the "boss" of the Albany Office, and had

assumed the role of *de facto* manager. As a result of the investigation, McVane recommended a

major overhaul of the Albany Office, to correct the extremely poor management situation,

including transferring the two faulty supervisors, plus transferring the *de facto* boss, Marano.

The Acting Deputy Administrator (ADA) proposed that both supervisors, Logay and McCarthy,

be transferred to DEA's New York City Office; that Marano also be transferred to the New York

City Office; and that a new supervisor be installed from outside the Albany Office.

Marano filed a complaint with the Office of Special Counsel (OSC) regarding his

reassignment, alleging that it amounted to a prohibited personnel action taken in response to

his shielded disclosures under the WPA. The Administrative Judge (AJ) ruled that Marano's

memorandum, revealing mismanagement in the Albany Office, was a protected disclosure

under 5 U.S.C. § 2302(b)(8). The AJ concluded, however, that the ADA's decision to transfer

Marano was not due to the fact that Marano made the protected disclosure, but instead

stemmed from the investigation into the Albany Office management situation: "[Marano's]

transfer was the result of the situation that existed in the Albany Office, not the disclosures of

information that he made." 2 F.3d at 1139. The AJ credited the ADA's testimony that correction

of the situation in Albany would require reassigning Marano in order to affect a "clean sweep"

of office leadership and avoid any potential obstacles for the incoming supervisor. The AJ

therefore determined that Marano had not established as a legal matter that his disclosure

constituted a contributing factor to the subsequent personnel action under 5 U.S.C. §

1221(e)(1).

The court of appeals reversed, finding that Marano's whistleblowing activity had been

"a contributing factor" in the Acting Deputy Administrator's decision to transfer Marano to the

New York Office.  The court of appeals found that, under the language of the WPA, a transfer

would be reviewable as a prohibited personnel action if it is alleged to have resulted from

retaliation for protected activity. 2 F.3d at 1139. *Accord*, *Mahony v. KeySpan Corp.*, 2007 WL

805813 (E.D.N.Y. 2007) (under SOX, complainant need not prove termination or suspension

from the job, or a reduction in salary or responsibilities).

The court of appeals also overruled the decision of the AJ that causation had not been

shown between Marano's protected activity and Marano's ensuing transfer. The court began its

analysis by pointing to the legislative history of the "contributing factor" standard in the WPA.

The court of appeals explained that, after passage of the WPA, an aggrieved employee need not

prove that an unfavorable action was "in reprisal for" protected activity; nor need the

aggrieved employee prove that a protected activity was "a substantial factor," or "a motivating

factor," or "a significant factor," or the "real reason." 2 F.3d at 1140 n.3. Citing the

Congressional Record, 2 F.3d at 1140, the court assigned a meaning to the "contributing factor"

test set forth in the WPA, as follows:

> "The words 'a contributing factor' ... mean any factor which, alone or in connection with
> other factors, tends to affect in any way the outcome of the decision. This test is specifically
> intended to overrule existing case law, which requires a whistleblower to prove that his
> protected conduct was a "significant", "motivating", "substantial", or "predominant" factor
> in a personnel action in order to overturn that action."

The court further explained that, under this standard, a whistleblower's burden is substantially

decreased because an employer might take an adverse action "because of" or "as a result of"

many different factors, only one of which must be a protected disclosure and a contributing

factor to the personnel action in order for the WPA's protection to take effect. The court noted

that, if any weight was assigned to the protected activity, either alone or in combination with

other factors, this will satisfy the "contributing factor" standard of causation.

The court in *Marano* also held that, under the "contributing factor" standard, the

manager who makes a decision to impose a personnel action need not have himself or herself

had a retaliatory motive. The court quoted the congressional record, thusly: "Regardless of the

official's motives, personnel actions against employees should quite [simply] not be based on

protected activities such as whistleblowing." 2 F.3d at 1141.[4]  The court of appeals further held

that the "contributing factor" test is satisfied if either the fact of, or the content of, the

disclosure was one of the factors that tended to affect in any way the personnel action. 2 F.3d

at 1143. The court found there had been substantial evidence that the "management situation"

in the Albany Office, as exposed by Marano's disclosure in the memo he signed, resulted in his

reassignment. 2 F.3d at 1142. Since the transfer was ordered due to information revealed

within the four corners of the employee's disclosure, the court in *Marano* held that the

disclosure would be viewed as a "contributing factor" even though the employer engaged in an

independent investigation to determine whether or not the facts alleged in the employee's

memo were correct. *Id.* at 1143.  The court of appeals held that the facts set forth in the

---

[4] This conclusion in *Marano* was not the same as a so-called "cat's-paw" analysis. Recently, Justice Scalia suggested the same conclusion in a portion of his discussion of the "motivating factor" test in *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011), when he stated that the intentions and actions of agents might be aggregated with the actions of other agents to assess liability against a principal, under general principles of agency law and tort law. Such a result, Justice Scalia said, would be more likely where the test of causation requires only that the protected activity be a "factor" or a "causal factor" than where, as in *Staub*, the relevant test is that of a "motivating factor." Id. at 1191-1192.

employee's memo were so intertwined with the investigation that it was not possible to say the memo was not a contributing factor. The court, 2 F.3d at 1143, concluded:

> "In this case, though the ADA testified that the decision to reassign Marano was based solely on the results of the investigation and not on the bare fact that Marano *made* a disclosure, all the testimony before the AJ proves that the initial memorandum was inextricably intertwined with the investigation. The investigation was prompted as the direct result of the protected disclosure, and served, *inter alia,* to verify the content of the protected disclosure. Consequently, there is more than sufficient evidence in the record to support the AJ's finding that Marano was reassigned because of the management situation in the Albany Office. In this case, then, the uncontested sequence of events demonstrates that the initial, protected disclosure, ("in connection with") the investigative report, satisfies the ("contributing factor") requirement of the statute. The content of Marano's disclosure gave the agency the reason for its personnel action. Consequently, the contributing factor in this case appears to be the same as the agency's reason for taking the personnel action. The facts uniformly prove that the content of Marano's disclosure was a contributing factor to his reassignment."

See also *Formella v. United States Dept. of Labor*, 628 F.3d 381, 392 (7th Cir. 2010) (stating that an employer must afford an employee leeway in engaging in conduct that otherwise might be viewed as insubordinate, when employees are engaging in whistleblowing). Accordingly, the decision to transfer Marano could not be justified as an exercise of business judgment relative to managing the Albany Office, the court of appeals held. Stated another way, a decision to take a personnel action based on unlawful considerations does not become legitimate just because it can be also characterized as a business decision. *E.E.O.C. v. Yenkin-majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir. 1997); *Brooks v. Dent*, 2011 WL 2412592 (S.D. Ohio 2011).

Defendants Caterpillar and Rapp have cited *Casanova v. American Airlines, Inc.* 616 F.3d 695 (7th Cir. 2010), for the proposition that, when he read the May 1 memo, Rapp could lawfully separate, on the one hand, the "legalistic" nature of the May 1 memo and some difficulties or "dysfunction" in the relationship between Plaintiff and Defendants Burritt and Beran from, on the other hand, the parts of the May 1 memo showing that Plaintiff was complaining about illegal activities and suffering retaliation for same.

Defendants' reliance on *Casanova v. American Airlines* is wholly misplaced.  First of all,

in *Casanova* the affected employee lied during a meeting and otherwise prevaricated.  The

employee in *Casanova* was not disciplined for the usual tension that might accompany the filing

of a workers compensation claim.  An employee cannot lie in pursuing such a claim.  However,

this does not mean that the employee must avoid creating any tension with his supervisors.

Some tension is expected when an employee engages in protected activity, including the filing

of a work comp claim.  Likewise, under SOX, some tension must be expected and tolerated.  In

the instant case, under SOX, it was expected that there would be some tension created

between Plaintiff and his supervisors, but this was the sort of tension an employer is expected

to tolerate.  *Formella, supra*, 628 F.3d at 392 (some degree of upset must be tolerated).

Second, *Casanova* cannot be used as authority in a SOX case.  The decision in *Casanova*

relied heavily on state law, including issues of burden shifting and issues of pretext.  While

these matters generally seemed to follow the same sorts of analyses as Title VII cases

employing the methodology of the *McDonnell-Douglas* test, the Seventh Circuit has expressly

repudiated using any such methodology in federal whistleblower cases.  In the Seventh Circuit,

the "contributing factor" approach is recognized as more favorable to an employee than a "but-

for" standard of causation. *Formella, supra*, 628 F.3d at 389; *Addis v. Dep't of Labor*, 575 F.3d

688, 690-91 (7th Cir. 2009) (contributing factor standard replaces McDonnell Douglas

formulation, causing defendants to have a "tough time" defending themselves); *see also*

*Jennings v. Tinley Park Community Consol.  School Dist. No. 146*, 864 F.2d 1368, 1373 (7th Cir.

1988), *citing Equal Employment Opportunity Comm'n v. Crown Zellerbach Corp.,* 720 F.2d 1008,

1012 (9th Cir.1983) (disloyalty to superiors typically exists in most instances where complaints

of discrimination are made by employees and therefore alleged disloyalty cannot be articulated

by an employer as a legitimate, non-discriminatory reason for discrimination where alleged

disloyalty is associated with the employee's belief that discrimination has occurred).

On public policy grounds, the state-law decision in *Casanova v. American Airlines, supra*,

cannot be regarded as a federal precedent in SOX cases.  The intentions of the Illinois General

Assembly in state workers' compensation laws (see 820 ILCS 304/4(h)) in legislating Illinois

public policy which will then be recognized by courts in wrongful termination cases is entirely

different from the intentions of the United States Congress in SOX.  In SOX, Congress

determined that it wanted employees of publicly-traded corporations to report wrongdoing.  If

an employee who reports wrongdoing can be made to suffer for not trusting persons to whom

he reports, reports of wrongdoing will be deterred.  In short, here, causation should be found

by disregarding *Casanova* and by following the leading federal case of *Marano*.

Finally, the moving parties have not shown by clear and convincing evidence that they

would have transferred Plaintiff anyway, even if he had not engaged in protected conduct.

With emphasis on the "clear and convincing" standard of proof, Seventh Circuit Pattern Jury

Instruction 1.28 states:

> "1.28 CLEAR AND CONVINCING EVIDENCE
>
> When I say that a particular party must prove something by "clear and convincing evidence," this is what I mean: When you have considered all of the evidence, you [are convinced that it is highly probable that it is true] [have no reasonable doubt that it is true].
>
> [This is a higher burden of proof than "more probably true than not true." Clear and convincing evidence must persuade you that it is "highly probably true."]

Rapp claims he decided to move Plaintiff because the May 1 memo was "legalistic." However, this was entirely related to protected conduct, in that SOX (18 U.S.C. §1514A(a)(1)) obviously anticipates that a whistleblower's provision of information could, in form and in substance, be legalistic.  The fact that Rapp viewed the memo as legalistic is not a defense. Rather, it is an indication that Rapp took action because Plaintiff was making a legal disclosure.

Nor is it a defense to say that Plaintiff's relationship with his supervisors was "dysfunctional."  All that Rapp was relying on was the May 1 memo and the problems which Plaintiff described therein concerning erroneous information being set forth in his performance evaluation.  Plaintiff was not disputing his rating of a "2."None of this stemmed from anything other than Plaintiff's protected activities.  All of this was intertwined and set forth in the May memo, like the memo in *Marano, supra.*  Thus, no legitimate basis for the transfer has been shown that could be considered as separate from Plaintiff's protected actions, nor has any proof been submitted that, had Plaintiff not sent the May 1 memo, he would have been moved out of the Tax Department anyway.  Indeed, even defendant Rapp testified he didn't know what if anything would have been done, had Plaintiff not sent the May 1 memo.

## ILLINOIS WHISTLEBLOWER ACT

As the Court previously found in its earlier ruling herein, the Illinois Act depends on whether the federal claims succeed.  The Court should once again so rule.

## DAMAGES

Schlicksup is not looking for back pay or any retrospective damage awards. Instead, Caterpillar has an available position within the Tax Department. They have been looking externally to fill the position of Domestic Tax Manager, a position that came available when Al Hagen, the former Domestic Tax Manager, passed away. Schlicksup, who currently works in the Global Information Services Division, is trained as a tax accountant and a tax lawyer, and as such, his training and skill set is not suited for a position in Global Information Services. Moreover, there has been animosity directed at him in the Global Information Services Division, if not to the point of a constructive discharge, then very close to it. In contrast, Schlicksup would be well suited for the position within the Tax Department. His experience in the department coupled with his skills and training demonstrate that he is an ideal candidate. The only tension between him and the Tax Department is what stems from this litigation which would be concluded. As such, Schlicksup would request that the court order that he be reinstated to the Tax Department.

If such relief is refused, Schlicksup would request that this Court grant front pay. In *Pierce v. Atchison, Topeka and Santa Fe Railway Co.*, 65 F.3d 562, 574-75 (7th Cir. 1995), the Seventh Circuit affirmed the granting of 10 years of front pay to a 51 year old railroad employee on his ADEA claim. In so holding, the Court stated that Defendant's "normal retirement age was 65 and an employee would receive reduced retirement benefits if he resigned before that time" (*Id*. at 574). The Court also stated that the award fell within Plaintiff's 72.8 year life expectancy. The Court remanded the case to be decided on unrelated grounds with directions to reinstate the front pay pending the District Court's decision on those unrelated grounds (*Id*.

176

at 575).  Accord, *Hagman v. Washington Mutual Bank, Inc.*, 2005-SOX-00073 (ALJ Dec. 19,

2006)[5] (10 years of front pay reduced to present value).  Accordingly, if he is not reinstated to

the Tax Department, Schlicksup would request front pay and the vesting of all benefits he

would otherwise be entitled until he reaches the typical retirement age of 65 years old, an age

well within his life expectancy.

<u>CONCLUSION</u>

Accordingly, Plaintiff respectfully requests that this Court deny Defendant Rapp's and

Defendant Caterpillar's Motions for Summary Judgment, grant oral argument, and grant such

other, further relief as this Court deems just and appropriate.

Respectfully submitted,

DANIEL J. SCHLICKSUP

By His Attorneys:

<u>s/Daniel G. O'Day</u>
Daniel G. O'Day
415 Hamilton Blvd.
Peoria, Illinois 61602
Phone: (309) 637-5282
Fax: (309) 637-5788
Email:  doday@cfgolaw.com
6181202

---

[5]http://www.oalj.dol.gov/Decisions/ALJ/SOX/2005/HAGMAN_THERESA_v_WASHINGTON_MUTUAL_BA
_2005SOX00073_(DEC_19_2006)_174914_CADEC_SD.PDF

/s/David Dorris
207 West Jefferson
Suite 601
Bloomington, Illinois 61701
Phone: (309) 820-9174
Fax: (309) 821-9174
Email: dvdorrislaw2000@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2011, I electronically filed the **PLAINTIFF'S AMENDED RESPONSE OPPOSING CATERPILLAR/RAPP'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

- **Kathryn S Clark**
  kclark@seyfarth.com,mgruzlewski@seyfarth.com,chidocket@seyfarth.com
- **David V Dorris**
  dvdorrislaw2000@aol.com,dvdstoy@aol.com
- **Daniel G O'Day**
  doday@cfgolaw.com,bboland@cfgolaw.com,jhougland@cfgolaw.com,eschatsiek@cfgolaw.com
- **Steven J Pearlman**
  spearlman@seyfarth.com,yvasquez@seyfarth.com,chidocket@seyfarth.com
- **Joseph S Turner**
  jturner@seyfarth.com,chidocket@seyfarth.com,ncostello@seyfarth.com